UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP, INC.
and ENERGY INTELLIGENCE GROUP
(UK) LIMITED,

        Plaintiffs,

v.

CHS McPHERSON REFINERY, INC.
(F/K/A NATIONAL COOPERATIVE
REFINERYASSOCIATION),

        Defendant.

Civil Action 6:16-cv-1015-EFM-GLR

## CHS MCPHERSON REFINERY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

COMES NOW, Defendant CHS McPherson Refinery, Inc. and submits the following Memorandum of Law in Support of its Motion for Partial Summary Judgment limiting Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited's claim for damages to the three-year period allowed by the statute of limitation and further limiting EIG's statutory damages claim to the number of registered works during that period.

## NATURE OF THE CASE

For nearly twenty years, CHS McPherson Refinery, Inc. (the "Refinery") received *Oil Daily*, a daily publication, and *Petroleum Intelligence Weekly*, a weekly publication, from Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Ltd.'s

1

(collectively "EIG") in print form. The Refinery routinely routed these publications to a select group of executives, a practice that was permitted by EIG. In the early 2000s, EIG ceased all print delivery of *Oil Daily* and *Petroleum Intelligence Weekly*, and delivered its subscriptions to the Refinery electronically. The Refinery then began routing the publications electronically amongst, generally, the same group of executives.  The last fees for an annual single subscription to *Oil Daily* and *Petroleum Intelligence Weekly* were $3,895 and $4,195, respectively. Now, however, EIG seeks a multi-million dollar windfall for the same practice that it permitted the Refinery to engage in for nearly two decades.

EIG seeks a massive amount of statutory damages from the Refinery for its alleged infringement of copyrights in *Oil Daily* and *Petroleum Intelligence Weekly*, where the actual damages for any infringement would be minimal.  EIG alleges that it is entitled to recover statutory damages for the Refinery's alleged infringement dating back to 2004 and encompassing more than 2,500 publications. But EIG knew or should have known of the Refinery's alleged infringement in at least 2012, more than three years before it filed this lawsuit. Thus, the statute of limitations applies. Moreover, EIG misconstrues the meaning of "work" within the Copyright Act's statutory damages provision. When construed properly, the statutory damages provision limits EIG's statutory damages claim to its registered works.

First, the statute of limitations bars EIG from recovering damages for acts of infringement occurring before January 18, 2013 because EIG knew or should have known about the Refinery's forwarding practice in at least 2012. Before having actual

knowledge of the Refinery's forwarding practice in 2012, EIG was well-versed in

monitoring and enforcing its alleged copyrights. It had trained its employees to spot

potential copyright infringement and had put in place strict procedures to follow when

an employee suspected such infringement. As a result of EIG's efforts, it developed a

specialized knowledge for spotting potential infringers. Thus, by the time the Refinery

alerted EIG of its forwarding practices in 2008—and specifically told EIG in 2012—EIG

already should have known of the Refinery's forwarding practices. Indeed, EIG had

actual knowledge of the Refinery's forwarding practices in 2012. Because EIG did not

institute an action for copyright infringement until January 2016, the three-year statute

of limitations bars recovery for damages related to acts before January 18, 2013.

Second, the statutory damages provision of the Copyright Act allows damages

per "work" infringed.  EIG seeks to massively increase any damages award it might

receive by claiming that it is entitled to damages for each individual publication that the

Refinery forwarded from 2004 to 2016. However, EIG cannot claim statutory damages

for every publication between 2004 and 2016, or even every publication between

January 18, 2013 and January 18, 2016. The term "work" within the statute means

registered work. EIG's own copyright applications and registrations show that these

publications were registered monthly. As a matter of law, each copyright registration

constitutes "one work" for the purpose of calculating statutory damages.

The Refinery submits this memorandum of law in support of its motion for

partial summary judgment pursuant to Federal Rule of Civil Procedure 56 requesting

summary judgment that: (1) EIG's request for damages for acts occurring outside of the

three-year statute of limitations is barred by law; and, (2) EIG's request for statutory damages based on each individual publication, rather than each registered work, is incorrect as a matter of law. This motion is necessary to limit the incredible overreaching by EIG in its claim for statutory damages. EIG knew or should have known of the Refinery's actions by 2012 and could have promptly filed suit under the Copyright Act. However, EIG seeks to circumvent the three-year statute of limitations and "one work" provision in the Copyright Act, and receive damages for alleged acts of infringement of every individual publication spanning more than a decade. Such a request is in direct contradiction to recent Supreme Court precedent, *Petrella v. MGM*, 134 S. Ct. 1962 (2014) and the Copyright Act, 17 U.S.C. § 504(c). Accordingly, the Refinery requests that this Court limit EIG's colossal claim for statutory damages on summary judgment. As discussed herein, there are no disputes as to any material facts, and the Refinery is entitled to judgment as a matter of law.

<u>**STATEMENT OF UNCONTROVERTED FACTS**</u>

<u>**The Claims**</u>

1.      EIG commenced this action on January 18, 2016, and filed an Amended Complaint on August 16, 2016, alleging that the Refinery infringed the copyrights of both its *Oil Daily* and *Petroleum Intelligence Weekly* publications (the "Publications") by "regularly and systematically copying and forwarding the [Publications] and the articles contained therein . . . ." (*See* Compl. [Dkt. 2]; Am. Compl. ¶¶ 51-52 [Dkt. 28.])

2.     EIG seeks compensatory damages, enhanced damages (for willful infringement), prejudgment interest, and attorney's fees for acts occurring back to 2004. (Am. Compl. pp. 18-19 [Dkt. 28].)

3.     In its complaint, EIG alleges that each registration of either *Oil Daily* or *Petroleum Intelligence Weekly* covers a particular number of "works." (Am. Compl. ¶¶ 32-33 [Dkt. 28].)

**The Publications**

4.     EIG sells subscriptions to a number of publications, two of which include *Oil Daily* and *Petroleum Intelligence Weekly.* (Am. Compl. ¶¶ 8-9 [Dkt. 28].)

5.     The audience for these publications include: "individuals with an interest in the oil and gas industries, including consultants, bankers, investors, stock market analysts, traders, commodity analysts, and others who follow these industries and or sell goods and services to those in or following these industries." (Am. Compl.¶ 10 [Dkt. 28].)

6.     Within EIG, account managers are tasked with making periodic calls on the account to which they are assigned in order to, among other things, "look for opportunities to increase the account's value by increasing the number of subscriptions that any one individual might have to other [EIG publications],"and also inquire about whether a company might need to increase the number of licenses that it holds.  (Ex. 1, John Hitchcock Dep. 16:1-21.)

7.     Even "small accounts," those that bring in less revenue, are attended to by an account manager. (Ex. 1, John Hitchcock Dep. 14:7-15:17.)

8.    Derrick Dent is an account manager at EIG with a "specialty" in working with smaller accounts. (Ex. 3, Derrick Dent Dep. 9:5-6.)

9.    He has remained the Refinery's account manager since at least 2009. (Ex. 4 June 2, 2009 Email From Brown to Dent, p. 1.)

**EIG's Subscription Options**

10.    EIG sells three types of subscriptions to companies: (1) a single subscription; (2) multiple subscriptions; and (3) a "Global Enterprise License." (Ex. 5, Deborah Brown Dep. 30:3-31:11.)

11.    Under the single subscription, EIG's position is that only one person is authorized to read the subscription. (Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p.1.)

12.    EIG's position is that the authorized user "can only be a living individual and never a company, organization or any other entity." (Ex. 6, 2015 *Oil Daily* Renewal, p. 4.)

13.    In addition to its subscriptions, EIG permits readers to access individual articles or issues on a pay-per-view basis. (Am. Compl. ¶ 20.)

14.    For *Oil Daily*, an individual article costs $9.00, while an individual issue costs $95.00. (Am. Compl. ¶¶ 20-21.)

15.    For *Petroleum Intelligence Weekly*, an individual article costs $24.00, while an individual issue costs $395.00. (Am. Compl. ¶¶ 20-21.)

16.    While EIG allows users to pay per view, these sales are *de minimus*. (Ex. 1, John Hitchcock Dep. 224:14-23.)

6

17.   EIG's policy is to promote sales of annual subscriptions and packages, not individual publications. (Ex. 1, John Hitchcock Dep. 224:4-7.)

**EIG's Copyright Registration of Its Publications**

18.   Since 2006, Deborah Brown—account services manager at EIG— has filed EIG's copyright applications for both *Oil Daily* and *Petroleum Intelligence Weekly*. (Ex. 7, Deborah Brown Dep. 7:25-8:5.)

19.   Both Publications are applied for and registered in monthly increments. (Ex. 7, Deborah Brown Dep. 12:10-13:8.)

20.   From 2006 to about 2008, Deborah Brown registered *Oil Daily* as a compilation or "set." (Ex. 1, John Hitchcock Dep. 216:1-3; Ex. 2, Hitchcock Dep. Ex. at Ex. 21, p. 2.)

21.   Beginning around 2008, Deborah Brown stopped checking the "compilation" box on the application for reasons unknown to EIG. (Ex. 1, John Hitchcock Dep. 216:20-25; 217:12-16.).

22.   *Petroleum Intelligence Weekly* is registered as a "collective work." (Ex. 2, Hitchcock Dep. Ex. at Ex. 26.)

**The Refinery Subscribes to EIG's Publications**

23.   In 1992, the Refinery began its single subscription to EIG's *Oil Daily* publication. (Am. Compl. ¶ 34 [Dkt 28]; Ans. Am. Compl. ¶ 34 [Dkt. 31].)

24.   The Refinery initially received *Oil Daily* by print delivery and routed it to a handful of executives. (Ans. Am. Compl. ¶ 35 [Dkt. 31].) In 1999, the Refinery elected

to receive *Oil Daily* as a PDF attachment to an email. (Am. Compl. ¶ 36 [Dkt. 28]; Ans.

Am. Compl. ¶ 36 [Dkt. 31].)

25.    From 2004 to 2015, Galen Menard was the Refinery's named employee on

the *Oil Daily* publication. (Ans. Am. Compl. ¶ 35 [Dkt. 31].)

26.    In 1982, the Refinery began its single subscription to EIG's *Petroleum*

*Intelligence Weekly* publication and routed that publication. (Am. Compl. ¶ 41 [Dkt. 28];

Ans. Am. Compl. ¶ 41 [Dkt. 31].)

27.    The Refinery initially received *Petroleum Intelligence Weekly* by print

delivery, but later elected to receive *Petroleum Intelligence Weekly* via web access. (Ans.

Am. Compl. ¶ 42 [Dkt. 31].)

28.    Since 1982, Jim Loving has been named as the authorized user. However,

in 2002, the address was changed from "Mr. James S. Loving" to "K. Swanson." (Ex. 2,

Hitchcock Dep. Ex. at Ex. 20.) K. Swanson was Loving's Assistant.

**The Refinery Seeks to Add More Users**

29.    In February 2008, Galen Menard emailed EIG requesting a breakdown of

costs associated with adding up to ten users "within our company" to its single

subscription for *Oil Daily*. (Ex. 2, Hitchcock Dep. Ex. at Ex. 3.)

30.    EIG's Peter Buttrick responded with the following pricing schedule:

        1 User-- $1,910.00 annually
        5 Users- $7,863.00 annually
        10 User--$ 14,708.00 annually

(Ex. 2, Hitchcock Dep. Ex. at Ex. 5.)

31.    Menard followed-up with Buttrick on April 2, 2008 and again on April 3, 2008 requesting pricing for two or three additional users. (Ex. 8, Follow-up Email Galen to Buttrick.)

32.    No one at EIG responded to Menard's additional requests.

33.    Nonetheless, on April 17, 2008 the Refinery received a renewal notice from EIG for its single subscription to *Oil Daily*. (Ex. 9, April 2008 Renewal.)

34.    The Refinery continued to receive its single subscription to *Oil Daily* from EIG through 2015. (Am. Compl. ¶ 34 [Dkt. 28]; Ans. Am. Compl. ¶ 34 [Dkt. 31].)

**EIG Issues Copyright Infringement Warning to the Refinery in 2012**

35.    On or about March 27, 2012, LeAnn Flickinger, employee of the Refinery and assistant to Galen Menard, spoke with Derrick Dent about the Refinery's subscription to *Oil Daily*. (Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p. 2.)

36.    During those communications, Flickinger communicated to Dent that she forwarded *Oil Daily* to other employees at the Refinery. (Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p. 2.)

37.    Pursuant to EIG's policy that upon encountering potential infringement an account representative is to wait for instruction from management to "contact the customer and ask them to confirm the scope of their usage of EIG's publication(s)," (Ex. 10, Decl. of Thomas Wallin, ¶ 10), Dent sent the following email:

> Thank you for providing information on how you distribute the publication. It would be very helpful if you could take just a moment to provide the names of the persons on your distribution list. Any details you can provide would be appreciated. We want to update our records as well.

9

(Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p. 2.)

38.    That same day, Flickinger provided Dent with a summary of the Refinery's forwarding practices:

> As per our phone conversation, the Energy Oil Daily is forwarded to Galen Menard by me and if he is out it is forwarded to one of the other executives. I get the e-mail since Galen is out of the office on occasions and then someone else in the Executive office can see the information.

(Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p. 2.)

39.    EIG did not initially respond to Flickinger's email.

40.    EIG's 30(b)(6) witness, John Hitchcock, testified that after receiving this information Dent reported it to EIG's in-house counsel pursuant to EIG's copyright infringement policy. (Ex. 1, John Hitchcock Dep. 105:2-6.)

41.    Two days later, on March 29, 2012, EIG processed the Refinery's single subscription renewal to *Oil Daily*. (Ex. 11, Confirming Renewal; Ex. 12, *Oil Daily Renewal*.) Only *after* allowing the Refinery to renew its single subscription, did Dent issue the following warning:

> Thank you for your recent renewal to Oil Daily. You are one of our valued subscribers and we appreciate your business. This is just a gentle reminder to inform you that our publications are licensed for use by named authorized user as provided in the license (subscription) agreement for their sole use and are priced accordingly. All single user subscriptions such as yours are intended soly for the designated named recipient and not anyone else or any entire organization or a group within it. A single user subscription cannot be shared by electronic means among multiple readers by forwarding or posting on an intranet, or by sharing of a log-in name and password. If access if required by others beyond the current subscription agreement, a multiple named user suscription could be purchased.

(Ex. 2, Hitchcock Dep. Ex. at Ex. 4, p. 1.)

42.    No further action was taken by Dent or EIG. (Ex. 1, John Hitchcock Dep., 68:5-12.)

43.    The Refinery continued to receive its single subscription to *Oil Daily* from EIG through 2015. (Ex. 13, Def.'s Suppl. Ans. to Pl.'s First Set of Interrogatories No. 1.)

**EIG Sues Four Years Later**

44.    On or about March 30, 2015, the Refinery reached out to EIG regarding its *Oil Daily* subscription. On March 30th, Dent again issued a warning to the Refinery that "the terms of [EIG's] subscription agreement with [the Refinery] for the Oil Daily publication does not permit the kind of usage you described during our phone call." (Ex. 2, Hitchcock Dep. Ex. at Ex. 13, p. 1.)

45.    Similar to the warning issued three years earlier, Dent stated, "[e]lectronic forwarding of the publication creates copies that violate the terms of the subscription agreement and our copyrights in the publication."  (Ex. 2, Hitchcock Dep. Ex. at Ex. 13, p. 1-2.)

46.    Nonetheless, Dent offered to discuss a license that would "be in keeping with the usage [the Refinery] is making of Oil Daily." (Ex. 2, Hitchcock Dep. Ex. at Ex. 13, p. 2.)

47.    Menard immediately apologized for the misunderstanding and requested a quote for additional users. (Ex. 2, Hitchcock Dep. Ex. at Ex. 13, p. 1.)

48.    Like in 2008, his request went unanswered.

49.     Pursuant to EIG's copyright enforcement policies, on or about November 10, 2015, EIG pitched its "Global Enterprise License" to the Refinery. (Ex. 14, EIG Settlement Proposal.)

50.     The Refinery declined EIG's offer to purchase the Global Enterprise License. EIG filed this lawsuit on January 18, 2016. (Compl. [Dkt. 2].)

**In Addition to EIG's Actual Knowledge of the Refinery's Actions, EIG Also Began "Ratcheting Up" Its Copyright Enforcement Tactics In and After 2005.**

51.     Realizing that its subscription model had become an "anachronism in the electronic age," EIG began the aggressive enforcement of its copyrights and pursuit of potential copyright infringers in 2005. (Ex. 2, Hitchcock Dep. Ex. at Ex. 7, p. 1.)

52.     EIG testified that the alleged copyright infringement of its subscriptions had become "a threat to [EIG's] existence" and that "some among the board and senior management felt that we needed to take strong steps to counter that." (Ex. 1, John Hitchcock Dep. 75:23-76:3.)

53.     In a May 31, 2005 memorandum titled "Energy Intelligence Profitability Improvement Plan," Tom Wallin—then president of EIG—proposed copyright enforcement as a potential revenue stream. (Ex. 2, Hitchcock Dep. Ex. at Ex. 6, p. 2.)

54.     Calling it an "aggressive area of [EIG's] business," Wallin indicated that EIG could gain potential revenue from both legal settlements and improved subscription revenues "due to better compliance by subscribers." Ex. 2, Hitchcock Dep. Ex. at Ex. 6, p. 3.)

55.   EIG filed its first copyright infringement lawsuit in 2005. (Ex. 15, George King Dep. 55:7-56:10.)

56.   In 2007, EIG amped up its copyright enforcement tactics. It issued new copyright notices in its publications, (Ex. 16, New Copyright Notice Email), new procedures for monitoring and enforcing its copyrights, (Ex. 17, New Procedures for Copyright Infringement Email, p. 1), and began running "password abuse" reports designed to "pick out users with the most suspicious behavior." (Ex. 18, 2007 Web Log Analysis Email, p. 1.)

57.   EIG also sought to streamline its executives' "random entrapment efforts," by hiring someone for a "copyright job." (Ex. 2, Hitchcock Dep. Ex. at Ex. 7, p. 1.)

58.   EIG's goal was clear: "aggressively pursue the rest of [its] large clients with lawsuits." (Ex. 21, VISAs and Other Email, p.1.) This appeared to have support of EIG's board of directors and ownership. (Ex. 2, Hitchcock Dep. Ex. at Ex. 7, p. 1.)

59.   In 2010, John Hitchcock joined EIG as managing director. (Ex. 1, Hitchcock Dep. 9:23-10:5.) On February 23, 2010 he emailed his team a memorandum "which represent[ed] a ratcheting-up of [EIG's] efforts to thwart copyright abuse." (Ex. 19 Monitoring Copyright Infringement Email.)

60.   In the memorandum, EIG rolled out its bonus plan, calling upon the "sales force and customer service representatives to act as another line of defense in identifying incidents of unauthorized usage among [its] customers." (Ex. 2, Hitchcock Dep. Ex. at Ex. 10, p. 2.)

61.    Under the plan, all "credible, well-documented information regarding suspicious activity by a customer or, of course, direct evidence of authorized usage" is to be "reported immediately" to Hitchcock. (Ex. 2, Hitchcock Dep. Ex. at Ex. 10, p. 2.)

62.    Under these policies, if management "determines that the circumstances reported by sales and customer service staff are ambiguous as to whether unauthorized copyright actually occurred, the applicable Account Representative would be instructed to contact the customer and ask them to confirm the scope of their usage of EIG's publication(s)." (Ex. 10, Decl. of Thomas Wallin ¶ 10.)

63.    This is precisely what Dent did in 2012. (Ex. 1, John Hitchcock Dep. 61:21-63:12.)

64.    If a salesperson reports suspicious behavior to management and EIG commences a copyright infringement lawsuit on the basis of such reporting, "a payment of $5,000" is provided to the reporting employee. Should the lawsuit lead to a settlement or court-ordered award to EIG, an additional $5,000 payment is made to the reporting employee. (Ex. 2, Hitchcock Dep. Ex. at Ex. 10, p. 2.)

65.    EIG's copyright enforcement "business" has been identified as "a key part of the new EIG." (Ex. 20, Email to Raja Sidawi and Marcel van Poecke, p. 1.)

66.    Since 2005, "EIG has remained vigilant in protecting its copyrights and has aggressively enforced them when confronted with explicit evidence of infringement." (Ex. 10, Decl. Thomas Wallin ¶ 15.)

14

## ARGUMENTS AND AUTHORITIES

I.   **STANDARD OF REVIEW**

Partial summary judgment is appropriate here because there is no genuine issue as to any material fact and the Refinery is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Under Fed. R. Civ. P. 56(c), the court is compelled to render summary judgment on behalf of a moving party if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Thompson v. La Petite Academy, Inc.*, 838 F. Supp. 1474, 1475 (D. Kan. 1993). In copyright infringement cases,

> where a defending party pleads a statute of limitations defense and moves for summary judgment, and it appears that the action is barred by the appropriate statute of limitations and there is no genuine issue as to any material fact in connection with such statute, then the motion for summary judgment should be granted.

*Home Design Servs., Inc. v. B&B Custom Homes, LLC*, 509 F. Supp. 2d 968, 970 (10th Cir. 2007). "The proper application of the statute of limitations and the date the statute of limitations accrues under undisputed facts are questions of law." *14200 Properties, L.L.C. v. Department of Transportation, Colo.*, No. 13-cv-00057-KMT, 2013 WL 4776070, at *2 (D. Colo. Sept. 5, 2013) (citing *Parkhurst v. Lampert*, 264 Fed. Appx. 748, 749 (10th Cir. 2008)). The Refinery is entitled to summary judgment because, as this memorandum demonstrates, the undisputed facts in this record establish the absence of a triable issue. Accordingly, the Refinery is entitled to summary judgment as a matter of law.

II.   **EIG'S CLAIM FOR DAMAGES FOR ACTS OCCURING PRIOR TO JANUARY 18, 2013 FAILS AS A MATTER OF LAW BECAUSE EIG KNEW OR SHOULD HAVE KNOWN THAT THE REFINERY WAS FORWARDING ITS SUBSCRIPTIONS SINCE AT LEAST 2012.**

The Refinery seeks summary judgment on EIG's copyright infringement claims for acts occurring prior to January 18, 2013. As a matter of law, EIG's alleged damages for acts of infringement occurring prior to January 18, 2013 are barred because the evidence shows that EIG knew or should have known of the Refinery's actions in 2012 or before. Because EIG filed its complaint on January 18, 2016—more than three years from the date it learned of the infringement—it cannot recover damages from acts that occurred before January 18, 2013.

A claim for copyright infringement must be brought "within three years after the claim accrued." 17 U.S.C. § 507(b). In this Circuit, a claim for copyright infringement accrues when the copyright owner has "knowledge of a violation or is chargeable with such knowledge.'" *Diversey v. Schmidley*, 738 F.3d 1196, 1200 (10th Cir. 2013) (quoting *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)); *see also Petrella v. MGM*, 134 S. Ct. 1962, 1969 (2014) (holding that the limitations period accrues when "the plaintiff discovers, <u>or with due diligence should have discovered</u>, the injury that forms the basis for the claim."); *Home Design Servs., Inc. v. B&B Custom Homes, LLC*, 509 F. Supp. 2d 968, 973 (10th Cir. 2007).  If a copyright owner does not file suit within three years of the date of accrual, the claim is untimely. *Diversey*, 738 F.3d at 1200 ("[Diversey's] claim for unauthorized copying under § 106(1) accrued no later than February 20, 2008. His June 15, 2012, complaint was not timely."). When an untimely

claim for copyright infringement is filed the copyright owner is barred from receiving relief "of any kind for conduct occurring prior to the three-year limitations period." *Petrella*, 134 S. Ct. at 1967.

A copyright infringement claim accrues either when the copyright owner has actual knowledge or constructive knowledge of the infringement. A copyright owner is said to have actual knowledge of an infringement when it becomes "aware" of the infringement. For instance, in *Diversey v. Schmidley* the 10th Circuit upheld the district court's determination that the plaintiff had actual knowledge of the unauthorized copying of his dissertation when he received a letter from the university stating that a copy of his dissertation had been submitted in the university's library. 738 F.3d 1196 (10th Cir. 2013). *See also Iconics, Inc. v. Massaro*, No. 11-11526-DPW, 2016 WL 199407 (D. Mass. Jan. 15, 2016) (finding the plaintiff to have had actual knowledge of infringement on the date that plaintiff's counsel sent a letter to the defendant indicating that it was aware of the infringement); *Wu v. John Wiley & Sons, Inc.*, No. 14 Civ. 6746 (AKH) (AJP), 2015 WL 5254885, at *6-7 (S.D.N.Y. Sept. 10, 2015) (defendant had actual notice at least on receipt of email from present counsel advising plaintiff to "send [counsel] any licenses you've granted to [defendants]. We've got some dirt on them.").

Alternatively, a copyright owner is said to have constructive knowledge of an infringement once he "possesses information fairly suggesting some reason to investigate whether he may have suffered an injury at the hands of a putative infringer." *Sieger Suarez Architectural P'ship, Inc. v. Arquitectonica Int'l Corp.*, 998 F. Supp. 2d 1340, 1354–55 (S.D. Fla. 2014). The question of constructive notice focuses on

17

"whether a reasonably prudent person in [the p]laintiff's position would have become aware of the alleged infringement." *Warren Freedenfield Assocs, Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008). For instance, in *Design Basics, LLC v. Carhart Lumber Co.*, the court found constructive knowledge and limited plaintiff's claim for damages to a three-year period where the plaintiff had found potentially infringing works on the defendant's website, which the court held had "alert[ed] him that there might be some infringing plans." 8:13CV125, 2016 WL 424974, at *3 (D. Neb. Feb. 3, 2016). Even though the plaintiff did not confirm his suspicions until later, the court held that he "clearly had notice of [the defendant's] possible infringement . . . and he could have confirmed the existence of such infringement if he had continued to look further on [defendant's] website that day . . . ." *Id.* at *4. Similarly, in *Scott Breuer Const., Inc. v. Koch* the court found constructive knowledge and limited the plaintiff's damages when the plaintiff "drove past a home that looked suspiciously like [the plaintiff's] copyrighted design." NO. 12-CV-3182 (PJS/JSM), 2014 WL 2893200, at *1 (D. Minn. June 26, 2014). The plaintiff investigated, but did not file suit for four years, which the court held had rendered his claim untimely. The court granted judgment on the pleadings in favor of the defendants. *Id.* at *2-3.

In sum, when a copyright owner "discovers, or with due diligence should have discovered, the injury that forms the basis for the claim," it has three years to file its copyright infringement suit. *Petrella*, 134 S.Ct. at 1969 n. 4. If the copyright owner fails to do so, it will "miss out on damages for periods prior to the three-year look back." *Id.* at 1976. EIG had actual knowledge, or at least constructive knowledge, of the Refinery's

forwarding of EIG's Publications more than three years before filing this lawsuit. The statute of limitations applies. As a result, EIG should be barred from recovering damages associated with acts of infringement occurring before January 18, 2013.

A.     **EIG had constructive knowledge of the Refinery's forwarding of *Oil Daily* at least as early as 2008.**

When EIG received Galen Menard's email in February 2008 seeking to increase his single subscription by ten, EIG, acting as a reasonably diligent plaintiff under the circumstances, should have investigated the Refinery's use of the *Oil Daily* publication. Had EIG acted reasonably and investigated, it would have discovered the Refinery's unauthorized forwarding and could have immediately remedied the problem. However, because EIG failed to act reasonably, it cannot recover damages for acts of infringement that it should have discovered. As a matter of law, EIG should be barred from recovering damages for acts of infringement occurring prior to January 18, 2013.

A copyright claim accrues, and a plaintiff's claim for damages is limited to a three-year period, when a plaintiff acting with due diligence should have discovered the infringement. *Petrella*, 134 S.Ct. at 1969 n.4. The standard for determining whether a plaintiff should have discovered the infringement is whether the plaintiff was acting reasonably or diligently under the circumstances. *Id.* In tort law, a person who has "special knowledge" is held to a higher standard of care than the typical reasonable person. That is, the reasonable person with "special knowledge" must exercise "a quantum of care which is commensurate with the circumstances, one of which is his or her special skill and training." *LaVine v. Clear Creek Skiing Corp.*, 557 F.2d 730, 734 (10th

19

Cir. 1977); *Johnston v. U.S.*, 568 F. Supp. 351, 354 (D. Kan. 1983) (holding that a

manufacturer with special knowledge was to be held to a higher standard of care).

EIG is not a typical company when it comes to copyright infringement. Rather,

EIG has specialized knowledge about what behavior is suspicious and what constitutes

copyright infringement. Since 2005, EIG has aggressively expanded its copyright

enforcement "business." It has kept offices in New York so as to take advantage of U.S.

copyright laws, made numerous changes to its copyright policy, hired new employees

for a "copyright job," awarded bonuses on the basis of reporting copyright

infringement, monitored subscribers password use, trained sales associates and editors

on the basis of copyright law, pursued "entrapment" efforts, and filed upwards of fifty

lawsuits against its subscribers. EIG's knowledge about what might indicate

infringement exceeds that of a typical business. Thus, for the purpose of finding

constructive knowledge, the question should be whether EIG, <u>as a company with</u>

<u>special knowledge in detecting copyright infringement</u>, acted reasonably and diligently

when it failed to investigate Menard's request to increase the Refinery's single

subscription by ten. It did not.

On February 27, 2008, Menard reached out to EIG requesting to discuss "the

costs associated with adding additional subscriptions within [the Refinery]. Possibly up

to ten users." (Ex. 2, Hitchcock Dep. Ex. at Ex. 3.) Deborah Brown forwarded this on to

then-EIG employee Peter Buttrick who responded to Menard's request by phone, and

followed-up via email with a breakdown of prices. (Ex. 2, Hitchcock Dep. Ex. at Ex. 5.)

About a month later, Menard reached out to Buttrick again on April 2, 2008 to discuss

adding two new subscribers. He received no response. He reached out on April 3, 2008, requesting information for a three-user subscription. Again, he received no response. (Ex. 8, Follow up Email to Galen to Buttrick.) Nevertheless, two weeks later, on April 17, 2008, EIG sent the Refinery a subscription renewal form for its current single subscription. (Ex. 9, April 2008 Renewal.) The Refinery's single subscription to *Oil Daily* continued uninterrupted. (Ex. 13, Def.'s Supp. Ans. Pl.'s First Set Interrogatories No. 1.)

Per EIG's own sales directives, its account managers are to be "aggressive at promoting additional purchases of subscriptions," including products that "people could be convinced to take." (Ex. 1, John Hitchcock Dep. 81:11-15.) Additionally, if suspicious activity has been communicated by a client, "the applicable Account Representative would be instructed to contact the customer and ask them to confirm the scope of their usage of EIG's publication(s)." (Ex. 10, Decl. of Thomas Wallin ¶ 10.) In light of EIG's policies to aggressively sell additional subscriptions and to question a client about suspicious behavior, EIG, acting as a "reasonably diligent plaintiff," should have at least investigated whether the Refinery was engaging in any unauthorized forwarding. If it had done so, it likely would have discovered the Refinery's forwarding of the *Oil Daily* subscription. This is particularly true in light of the fact that the Refinery has freely disclosed its forwarding practices to EIG on multiple occasions. (Ex. 2, Hitchcock Dep. Ex. at Exs. 4, 13.) Despite having specific facts to warrant further investigation, EIG did nothing. It took no steps to investigate why the Refinery sought to add ten additional subscribers after holding its single subscription for more than

fifteen years. EIG did not act as a reasonably diligent plaintiff under the circumstances. As a result, EIG cannot recover damages for an unlimited period of time.

      **B.**    **EIG had actual notice of the Refinery's unauthorized forwarding of *Oil Daily* since at least as early as 2012.**

      EIG should also be barred from receiving damages for acts occurring prior to January 18, 2013 because it had actual knowledge of the Refinery's forwarding in at least as early as March 2012. EIG's corporate deponent admitted that after receiving information of the Refinery's alleged infringement, Dent reported this information to management and in-house counsel pursuant to EIG's copyright infringement policy. As such, EIG was aware of the Refinery's actions in March 2012.

      In the 10th Circuit, a party has actual notice of infringement when the copyright owner becomes "aware" of the infringement. *See Diversey*, 738 F.3d at 1198. A copyright owner is "aware" of infringement when it is explicitly notified of the infringement or receives information leading the copyright owner to discover the infringement. For instance, in *Diversey*, the 10th Circuit found the plaintiff to have actual knowledge of the infringement when he had received a letter from the defendant stating that a copy of his work had been submitted in the defendant's library. *Id.* at 1201. Similarly, in *Wu v. John Wiley & Sons, Inc.*, the copyright owner had actual knowledge of the infringement when the plaintiff's counsel instructed it to "send any license you've granted to [defendants]. We've got some dirt on them." No. 14 Civ. 6746 (AKH) (AJP), 2015 WL 5254885, at *6-7 (S.D.N.Y. Sept. 10, 2015).

EIG became aware of the Refinery's forwarding of *Oil Daily* on March 27, 2012 when the Refinery communicated to EIG that it had been forwarding the *Oil Daily* to non-authorized users. (Ex. 2, Hitchcock Dep. Ex. at Ex. 4.) EIG, concerned by the Refinery's admission, issued a warning to the Refinery that EIG's publications are:

> licensed for use by named authorized user as provided in the license (subscription) agreement for their sole use and are priced accordingly. All single user subscriptions such as yours are intended soly for the designated named recipient and not anyone else or any entire organization or a group within it. A single user subscription cannot be shared by electronic means among multiple readers by forwarding or posting on an intranet, or by sharing of a log-in name and password. If access if required by others beyond the current subscription agreement, a multiple named user suscription could be purchased.

(Ex. 2, Hitchcock Dep. Ex. at Ex. 4.) Nonetheless, EIG granted the Refinery renewed the Refinery's single subscription to *Oil Daily*. (Ex. 11, Confirming Renewal; Ex. 12, *Oil Daily* Renewal.)

While a plaintiff is not <u>required</u> to initiate litigation in light of copyright infringement, that does not stop the statute of limitations from triggering the moment the plaintiff becomes aware of the infringement. *Petrella*, 134 S. Ct., at 1976. As the Supreme Court stated in *Petrella*, 17 U.S.C. § 507(b) "allows a copyright owner to defer suit until she can estimate whether litigation is worth the candle." *Id.* However, because the suit is untimely, the plaintiff "will miss out on damages for periods prior to the three-year look-back . . . ." *Id.* Therefore, regardless of whether EIG chose to bring a claim or wanted to wait to determine the breadth of the infringement, it does not change the fact that EIG had <u>knowledge</u> of the infringement more than three years prior to filing this suit.

The fact that EIG was "aware" of the Refinery's unauthorized forwarding following this email exchange is illuminated by the fact that Dent strictly followed EIG's copyright infringement policy upon speaking with Flickinger. In fact, as Hitchcock notes in his deposition, Dent reported the information immediately to management pursuant to EIG's policy. (Hitchcock Dep. 105:2-6.)

The undisputable facts demonstrate that EIG had knowledge of the Refinery's forwarding after March 27, 2012. While EIG made the decision not to sue immediately, under 17 U.S.C. § 507(b) and *Petrella*, it is barred from recovering for all acts of infringement. Rather, EIG's scope of recovery is limited to those infringing acts occurring between January 18, 2013 and January 18, 2016.

C.     **The Refinery had constructive notice of the Refinery's forwarding of** *Petroleum Intelligence Weekly* **since at least as early as 2012.**

Lastly, EIG is also barred from recovering for infringing acts with regard to *Petroleum Intelligence Weekly* because when EIG acquired actual knowledge of the Refinery's forwarding of *Oil Daily* on March 27, 2012 with regard to *Oil Daily*, it also acquired constructive knowledge of the Refinery's forwarding of *Petroleum Intelligence Weekly*. As stated previously, the standard for constructive knowledge is "whether a reasonably prudent person in [the p]laintiff's position would have become aware of the alleged infringement." *Warren Freedenfield Assocs, Inc. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008). A reasonably diligent plaintiff in EIG's position—a company sensitive to issues of infringement and knowledgeable that the Refinery held single subscriptions to both Publications—would have at least investigated the Refinery's use of the *Petroleum*

*Intelligence Weekly* publication. Thus, if EIG had been acting diligently, it would have investigated the Refinery's use of its *Petroleum Intelligence Weekly* subscription in light of the Refinery's admission to forwarding its *Oil Daily* publication. However, EIG did not take action in either 2008 or 2012 to investigate the Refinery's forwarding practices. (Hitchcock Dep. 68:14-25.) For this reason, EIG cannot receive damages for claim occurring prior to January 18, 2013.

III.   **EIG'S CLAIM FOR DAMAGES FOR EACH INDIVIDUAL PUBLICATION FAILS AS A MATTER OF LAW BECAUSE EIG CHOSE TO REGISTER ITS COPYRIGHTS AS A MONTHLY COMPILATION.**

The Refinery also seeks summary judgment on EIG's claim that, should this Court find copyright infringement, EIG is entitled to statutory damages for each individual publication infringed from 2004 to 2016. Under the Act, a copyright owner can select statutory damages for "all infringements involved in the action, with respect to any *one work*." 17 U.S.C. § 504(c)(1).[1] Compilations[2] and collective works[3] are considered "one work" for the purpose of calculating statutory damages. *Id.* Two

---

[1] Statutory damages in copyright law were created as an alternative to the recovery of actual damages in order to provide some compensation to copyright owners when damages and profits were difficult to prove. *See* Patry on Copyright, § 22:153 (2017). EIG is not interested in actual damages, but only in an oppressive claim for damages grossly out of proportion with its rather limited actual damages.

[2] A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works. 17 U.S.C. § 101.

[3] A "collective work" is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole. *Id.*

competing approaches exist for determining whether a compilation constitutes one work[4]: (1) the registration-determinative approach, and (2) the independent-economic value approach.

Under the registration-determinative approach, EIG's damages should be limited per registration as a matter of law. When a number of works are registered as a compilation, the registration constitutes "one work." This is so regardless of the number of works included therein. *See e.g., Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 711 (D. Md. 2001) (limiting statutory damages on the grounds that plaintiff had registered several individual photographs as a compilation; therefore, the whole of all the photographs combined constituted "one work" for the purpose of calculating statutory damages); *Bryant v. Media Right Productions, Inc.*, 603 F.3d 135, 142 (2d Cir. 2010) (holding that because the plaintiff had issued and registered his works "as a unit," he was entitled only to statutory damages for the album as a whole and not to each individual song that was included on the album). This approach "more strictly follow[s] the language of the statute." *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083, at *16 (D. Kan. Dec. 9, 2015).

Like the parties in the cases cited above, EIG has consistently submitted its applications to register *Oil Daily* and *Petroleum Intelligence Weekly* with the Copyright Office on a monthly basis since 2005. Even when requesting expedited registration for impending litigation, EIG's submitted these works for registration as a monthly set. (Ex.

---

[4] Neither the 10th Circuit or the District of Kansas has adopted either test. *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576-EFM-TJJ, 2015 WL 8375083, at *16 (D. Kan. Dec. 9, 2015).

1, John Hitchcock Dep. 216:1-3; Ex. 2, Hitchcock Dep. Ex. at Ex. 21, p. 2.) Until 2008, *Oil Daily* was marked specifically as a compilation. However, no evidence exists suggesting that the issues have changed in such a manner that the post-2008 applications are not to be considered compilations as well. (Ex. 1, John Hitchcock Dep. 2:16-20-25; 217:12-16.) Rather, Hitchcock testified at his 30(b)(6) deposition that *Oil Daily* has always been registered "as a set." (Ex. 1, John Hitchcock Dep. 216:1-3.) EIG's statutory damages should be limited as such. *See e.g.*, *Bryant*, 603 F.3d, at 142 (limiting statutory damages per compilation when the works were registered "as a unit."). *Petroleum Intelligence Weekly* has always been registered as a collective work—a compilation for the purpose of determining statutory damages. *See* 17 U.S.C. § 101. Accordingly, because EIG has consistently applied for registration of its works either as a compilation or "as a set," this Court should find these registrations determinative and limit EIG's statutory damages per monthly compilation.

Some courts apply an "independent economic value" test to determine what a "work" is within the meaning of the statute. Even if the Court applies the independent economic value test, EIG's statutory damages should be limited per compilation as a matter of law. The independent economic value approach considers whether each individual work included in the registration has independent economic value apart from the compilation as a whole. For instance, in *Yellow Pages Photos, Inc. v. Ziplocal, LP*, the Eleventh Circuit declined to find independent economic value where the plaintiff had marketed its photographs as "collections" for customer appeal and efficiency, and had registered the photographs with the Copyright Office "as collections rather than as

individual photos," supporting the conclusion that "the 178 headings and not the 10,411 individual photos, are the 'works' in this case." 795 F.3d 1255, 1277 (11th Cir. 2015). Similarly in *Grady v. Swisher*, the District of Colorado found no independent economic value in each of the plaintiff's photographs where they had been registered as a group. No. 11-cv-02880-WYD-KLM, 2014 WL 3562794, at *2 (D. Co. July 81, 2014).

   The undisputed facts demonstrate that EIG's individual publications lack independent economic value. Their value derives from their being a part of the greater whole—the annual subscriptions.  In fact, EIG testified through its 30(b)(6) witness that the pricing of its individual articles is "less of a concern . . . because it's not a major business line." He elaborated:

REDACTED

> For all the publications across a year, we might sell      individual articles. So, at an average of, say, somewhere between $9 and $24, you'd end up with maybe      a year from selling individual articles. It's not a lot of money. It's mostly in hopes that people who read an article, having paid for it, they really want it. And having paid for it and wanted it, well, then, turn around and say, gee, would love to subscribe to the whole publication."

(Ex. 1, John Hitchcock Dep. 223:5-15.) He estimated that any sales of individual articles or issues was "de minimis. . . It's, you know, a fraction of a percent. It's not much." (Ex. 1, John Hitchcock Dep. 224:14-23.) When asked whether EIG does any marketing or advertising for sales by article, Hitchcock responded:

> No. Its annual subscriptions and packages. The individual articles may be promoted; but, again, the aim is to promote the publication rather than the individual article. And by "promotion," I mean the marketing department might make a social media push because of a really good piece in PIW or Oil Daily, but again, that's presented as here's something you missed form

> the publication. Buy the publication or an annual subscription to the publication by contacting us.

(Ex. 1, John Hitchcock Dep. 224:4-13.) Thus, the only value derived from the sale of individual articles and issues is the possible sale of an annual subscription. As described by EIG's corporate representative, these individual articles and issues have no independent economic value apart from the annual subscription.

In sum, this Court should follow the registration-determinative test and find that each monthly registration constitutes "one work," limiting EIG's claim to statutory damages as provided by the Copyright Act. In the alternative, however, even if this Court elects to follow the independent economic value approach, it should find that EIG has no claim to statutory damages for every individual publication included in its monthly registration as a matter of law. EIG's individual publications lack independent economic value as their only value stems from their inclusion as part of an annual subscription. Furthermore, these publications were intentionally registered "as a set." Accordingly, if this Court finds copyright infringement and EIG elects statutory damages, this Court should limit those damages by defining each monthly compilation as "one work" for the purpose of statutory damages.

## CONCLUSION

The Refinery seeks partial summary judgment on two parts of EIG's claim for damages. First, the Refinery requests that this Court limit EIG's claim for damages to three year period of January 18, 2013 to January 18, 2016 under 17 U.S.C. § 504(b) because EIG had actual or constructive knowledge of the Refinery's unauthorized

forwarding at least as early as 2012 and was, therefore, required to file suit within three

years. However, because EIG failed to file suit until January 18, 2016 it cannot recover

damages for acts of infringement occurring before January 18, 2013. Second, the

Refinery requests that this Court limit EIG's claim for statutory damages by holding

that each of EIG's monthly compilations constitute "one work" within the 17 U.S.C. §

504(c). The two questions addressed in this motion are legal in nature and the

undisputed determinative facts require judgment in the Refinery's favor.


Dated March 17, 2017                          Respectfully submitted,


                                              KLENDA AUSTERMAN LLC

                                              By  /s/ Christopher A. McElgunn
                                                  Christopher A. McElgunn #13359
                                                  Michelle L. Brenwald #19287
                                                  1600 Epic Center
                                                  301 N. Main
                                                  Wichita, KS 67202-4816
                                                  Phone: 316-267-0331
                                                  Fax: 316-267-0333
                                                  cmcelgunn@klendalaw.com
                                                  mbrenwald@klendalaw.com

                                              and

                                              GRAY, PLANT, MOOTY, MOOTY,
                                              BENNETT, P.A.

                                                  Dean C. Eyler (#267491)
                                                  Loren L. Hansen (#387812)
                                                  Molly R. Littman (#398449)
                                                  500 IDS Center
                                                  80 South Eighth Street
                                                  Minneapolis, Minnesota 55402
                                                  Phone: (612) 632-3000

Fax: (612) 632-4444

**ATTORNEYS FOR DEFENDANT CHS
McPHERSON REFINERY, INC. (f/k/a
NATIONAL COOPERATIVE
REFINERY ASSOCIATION).**

GP:4762940 v3

31