## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP,
INC. and ENERGY INTELLIGENCE
GROUP (UK) LIMITED,

       Plaintiffs,

       v.

CHS MCPHERSON REFINERY, INC
(F/K/A NATIONAL COOPERATIVE
REFINERY ASSOCIATION),

       Defendant.

Civil Action No. 6:16-CV-01015
(EFM)(GLR)

## PLAINTIFFS' MOTION CHALLENGING THE ADMISSIBILITY OF
## EXPERT REPORT AND TESTIMONY OF WILLIAM R. ROSENBLATT

**TABLE OF CONTENTS**

I.       **INTRODUCTION**................................................................................................. 1

II.      **LEGAL STANDARD** ........................................................................................ 2

    A.   Admissibility of Expert Testimony................................................................2

III.    **ARGUMENT** .................................................................................................... 3

    A.   Mr. Rosenblatt's Report and Testimony Is Not Relevant.............................3

    B.   EIG Had No Obligation to Mitigate Its Damages.........................................6

    C.   Mr. Rosenblatt's Report and Testimony Is Not Based On Reliable Principles and Standards..............................................................................................8

    D.   Mr. Rosenblatt's Report and Testimony Consists of Conclusory Opinions .........................9

    E.   Mr. Rosenblatt's Report and Testimony Will Not Assist the Trier of Fact.........................13

    F.   Mr. Rosenblatt's Testimony Related To the Timeline of the facts of this Case Is Based On Legal Conclusions, is Unduly Prejudicial, and Misleading, and Should Be Excluded ......................................................................................15

IV.    **CONCLUSION** .............................................................................................. 177

i

# TABLE OF AUTHORITIES

## **CASE LAW**

*Arista Records, Inc. v. Flea World, Inc.*, 356 F.Supp.2d 411 (D.N.J. 2005) ..................................5

*Beginner Music v. Tallgrass Broad., LLC,* 2009 WL 2475186 (D. Kan. Aug. 12, 2009)..............4

*Elsevier, Inc. v. Comprehensive Microfilm & Scanning Servs., Inc.*,
2013 U.S. Dist. LEXIS 197660 (M.D. Pa. Nov. 27, 2013) .........................................................6

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP*, No. CV H-14-1903,
2017 WL 363004 (S.D. Tex. Jan. 24, 2017)  .............................................................................16

*Home Design Servs., Inc. v. Trumble*, 2011 WL 843900 (D. Colo. 2011) .....................................5

*Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) .........................................................3

*F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276
(1952)............................................................................................................................................4

*Goebel v. Denver and Rio Grande W.R. Co.,* 346 F.3d 987 (10th Cir.2003) ...............................14

*In re Trasylol Prod. Liab. Litig.,* 709 F. Supp. 2d 1323 (S.D. Fla. 2010) ....................................10

*Jones v. Otis Elevator Co.*, 861 F.2d 655 (11th Cir.1988) ...........................................................14

*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496 (10th Cir.1996) ...................................................13, 14

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)............................................................2

*Malibu Media, LLC v. Ryder*, 2014 WL 1040478 (D. Colo. 2014)............................................4, 5

*Malibu Media, LLC v. Yamaguchi*, 2014 WL 2021973 (D. Colo. 2014) .......................................4

*Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242 (10th Cir. 1999)......................................10

*Moothart v. Bell*, 21 F.3d 1499 (10th Cir.1994) ............................................................................5

*Nat. Gas Co. v. LaRue*, 156 F.3d 1244 (10th Cir. 1998) ...............................................................4

*Purzel Video GmbH v. St. Pierre*, 10 F.Supp.3d 1158 (D. Colo. 2014) .........................................5

*Schmidt v. Holy Cross Cemetery, Inc.,* 840 F. Supp. 829, 835 (D. Kan. 1993).............................4

*Thomas v. City of Wichita, Kan.,* No. 13-1040-CM,
2014 WL 3565476 (D. Kan. July 18, 2014) ...................................................................3

*Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206 (10th Cir. 2004) ..............................8

*Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643 (10th Cir.1991) ..................................14

## **STATUTES**

17 U.S.C.A. § 401 ...............................................................................................................6

17 U.S.C. § 504(c) ..............................................................................................................4

## **RULES**

Fed R. Civ. P. 702 ...........................................................................................................2, 8

Fed. R. Evid. 403 .............................................................................................................3, 7

Fed. R. Evid. 703 ................................................................................................................9

## **SECONDARY SOURCES**

*Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*,
138 F.R.D. 631 (1991) .......................................................................................................3

Plaintiffs Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited (collectively, "Plaintiffs" or "EIG") by and through their counsel hereby challenge the admissibility of and move to exclude the expert report and testimony of William R. Rosenblatt, the designated expert of Defendant CHS McPherson Refinery, Inc. (F/K/A National Cooperative Refinery Association) ("Defendant" or "CHS").  As discussed below, Mr. Rosenblatt's expert report and testimony must be excluded on numerous grounds.

## I.      INTRODUCTION

On January 23, 2017, Defendant served the Expert Report of William R. Rosenblatt ("Rosenblatt Report"), attached as Exhibit A to the Declaration of Stephen M. Ankrom in Support of Plaintiffs' Motion to Exclude Expert Report and Testimony of William R. Rosenblatt ("Ankrom Decl").  There are three sections of analysis in the Rosenblatt Report.  In the first, which is titled "Summary of Opinions," Mr. Rosenblatt provided his opinion that EIG did not take "substantive measures to mitigate infringements of its copyrights." Rosenblatt Report at 10.

The second section of analysis in the Rosenblatt Report is titled "EIG Has Chosen to Publish Content in Ways Especially Amenable to Unauthorized Copying" *Id.* at 28.  This section amounts to a summary of Rosenblatt's understanding of EIG's publishing practices based on (1) his conversations with Defendant's counsel; (2) his review of materials provided to him by Defendant's counsel and (3) information and materials available on EIG's website.  The section contains numerous unsubstantiated conclusions and inappropriate and prejudicial legal opinions.[1]

The last section of analysis in the Rosenblatt Report is titled "EIG Has Not Adopted Specific Measures to Mitigate Unauthorized Copying." *Id.* at 35.  This section, in particular, is

---

[1] Indeed, the section title itself is a prejudicial legal conclusion.  *Id.*

rife with inconsistencies, inaccurate and unsupported factual statements, groundless opinions and unsubstantiated conclusions of law.

Mr. Rosenblatt's report also contains what amounts to factual conclusions under the guise of expert opinion, such as conclusions regarding EIG's business decisions and the business practices of a few of EIG's competitors.  Due to numerous flaws, discussed in further detail below, Plaintiffs submit that neither Rosenblatt Report nor Mr. Rosenblatt's testimony should be permitted at trial.

## II.    LEGAL STANDARD

### A.  Admissibility of Expert Testimony

According to Rule 702 of the Federal Rules of Evidence:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> a.    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> b.    the testimony is based on sufficient facts or data;
>
> c.    the testimony is the product of reliable principles and methods; and
>
> d.    the expert has reliably applied the principles and methods to the facts of the case.

The testimony must be both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  The trial court serves as the gatekeeper "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.*  Under the plain language of Rule 702, the expert must be both qualified, and provide testimony that is relevant to a disputed issue.

2

The seminal case of *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993) set forth non-exhaustive and non-exclusive factors that may be considered to determine whether the expert testimony will assist the trier of fact, such as whether the methodology can/has been tested and whether the theory or technique has been subjected to peer review or publication.

Even probative expert testimony can be excluded when probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403; *see, e.g.*, *Thomas v. City of Wichita, Kan.,* No. 13-1040-CM, 2014 WL 3565476, *3 (D. Kan. July 18, 2014).  The Supreme Court in *Daubert* recognized that "'[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631 (1991)).

## III.    ARGUMENT

### A.  Mr. Rosenblatt's Report and Testimony Is Not Relevant

Mr. Rosenblatt's Report and Testimony is based on the faulty hypothesis, proffered to him by Defendant's counsel,[2] that the issue of mitigation of copyright infringement is relevant to the Court's determination of damages in this case. "[M]y report is based on an understanding given to me by counsel that these measures [efforts to mitigate copyright infringement] would have an effect on the determination of damages. *That's a hypothesis on which my report is based*." Rosenblatt Depo. at 232 (Ex. B to Ankrom Decl.) (emphasis added).

_____

[2] Rosenblatt repeatedly states that the sole basis of his understanding of the relevance of his testimony and report derives from what he was told by Defendant's counsel.  *See,* Rosenblatt Report at 10; Rosenblatt Depo. at 228-229.

Under the Copyright Act, "the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages . . . ." 17 U.S.C. § 504(c). *See also, Schmidt v. Holy Cross Cemetery, Inc.,* 840 F. Supp. 829, 835 (D. Kan. 1993) ("[A] plaintiff may elect to receive statutory damages at any time before final judgment is entered."). Plaintiffs are affirmatively electing statutory damages in this case. Copyright law sets the statutory damages for any one work at a range of $750 to $30,000 "as the court considers just." *Id.* at § 504(c)(1). Where the copyright owner proves that infringement was willful, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000 [per work infringed]." *Id.* at § 504(c)(2). The trial court has broad discretion to award statutory damages within the range provided by the statute. *Nat. Gas Co. v. LaRue*, 156 F.3d 1244 (10th Cir. 1998).

Statutory damages in copyright infringement cases exist for purposes beyond the mere compensation of the aggrieved party – there is a punitive and deterrent element to these damage awards which were meant to discourage infringing conduct. ("The Supreme Court has recognized that a statutory damage award must do more than take away profits in order to serve the principles of deterrence and discouragement of wrongful conduct." *Beginner Music v. Tallgrass Broad., LLC,* No. 09-4050-SAC, 2009 WL 2475186, *3 (D. Kan. Aug. 12, 2009) quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S. Ct. 222, 97 L. Ed. 276 (1952)). Courts in this Circuit have held that mitigation of damages is not a valid defense to copyright infringement where plaintiff affirmatively elects statutory damages. See, *Malibu Media, LLC v. Yamaguchi*, 2014 WL 2021973 (D. Colo. 2014). ("The Court agrees that a copyright plaintiff's exclusive pursuit of statutory damages invalidates a failure-to-mitigate defense."); *Malibu Media, LLC v. Ryder*, 2014 WL 1040478, *3 (D. Colo. 2014) (striking a

4

mitigation of damages defense where plaintiff pursued statutory damages*); Purzel Video GmbH
v. St. Pierre*, 10 F.Supp.3d 1158 (D. Colo. 2014) (striking mitigation of damages defense where
plaintiff pursued statutory damages); *Home Design Servs., Inc. v. Trumble*, No. 09–cv–00964–
WYD, 2011 WL 843900, *3 (D. Colo. 2011) (granting summary judgment on the affirmative
defense of failure to mitigate in a copyright case stating, "[e]ven if [Plaintiff] was aware of
possible infringements of its copyrights in the same geographic area as the [Defendants],
[Plaintiff] had no duty to preemptively warn individuals like the [Defendants] not to violate
copyright law."); *Moothart v. Bell*, 21 F.3d 1499, 1506–07 (10th Cir. 1994) (finding that
mitigation of damages did not apply to statutory penalty); *See also Arista Records, Inc. v. Flea
World, Inc.*, 356 F.Supp.2d 411, 422 (D.N.J. 2005) (mitigation of damages defense not
appropriate in copyright infringement case where plaintiffs pursued statutory damages).

Plaintiffs in this case are pursuing statutory damages, which in this Circuit invalidates
defenses and arguments regarding a copyright holder's mitigation of infringement damages.[3]
The Rosenblatt Report and Mr. Rosenblatt's testimony are based on the faulty hypothesis that the
subject matter of the Rosenblatt Report (and the resulting testimony) is relevant to this Court's
determination of damages in the instant matter. As Plaintiffs have elected to pursue statutory
damages in this case, the entire subject matter of Rosenblatt's Report and his testimony, i.e. that
Plaintiffs' efforts to mitigate against copyright infringement were insufficient, is irrelevant.
Therefore, the Rosenblatt Report and Mr. Rosenblatt's testimony must be excluded on the basis
that they are irrelevant to this case and will not assist the trier of fact in any way.

---

[3] The statute is clear that EIG may make an election of damages at any time before final judgment, and Defendant
was on notice since the filing of the Complaint (Dkt. No. 2) that EIG may elect statutory damages. Furthermore,
EIG's election here is known to Defendant, according to their own briefing papers. *See, e.g.,* Dkt. No. 53 at 2 ("EIG
alleges that it is entitled to recover statutory damages for the Refinery's alleged infringement dating back to 2004
and encompassing more than 2,500 publications."); *Id*. at 25, n. 1 ("EIG is not interested in actual damages…").

**B.  EIG Had No Obligation to Mitigate Its Damages**

There is, of course, no requirement that copyright owners undertake proactive measures to prevent infringement of their works beyond the limited (and optional) copyright notice provisions[4] which Plaintiffs have consistently complied with on all of the issues of Plaintiffs' publications at issue in this case. See Rosenblatt Depo. at 210-213.  Plaintiffs submit that all testimony regarding mitigation of damages is irrelevant to the availability of and/or measure of statutory damages. *Cf. Elsevier, Inc. v. Comprehensive Microfilm & Scanning Servs., Inc.*, Case No. 3:10-CV-02513, 2013 U.S. Dist. LEXIS 197660, *6 (M.D. Pa. Nov. 27, 2013) (finding that, because plaintiff elected to receive statutory damages, "[a]ny evidence concerning economic damages would therefore be irrelevant if offered at trial").

In Rosenblatt's own words, "[c]ounsel for the Defendant has informed me that [whether EIG has taken substantive measures to mitigate infringement of its copyrights] is relevant to a Court's determination of damages for copyright infringement." Indeed, Rosenblatt could not attest to why his report, opinions and testimony to the same were relevant to this case beyond Defendant's counsel's say-so. See, Rosenblatt Depo. at 109-110.

> Q – If [EIG] didn't take any proactive steps, why should that affect the outcome of the results, you know, trademark copyright infringement lawsuit?
> A – Well, all I'm saying here is what I said at the beginning of my report, which is the – let me make sure I get it right here. Counsel has informed me that the issue of taking reasonable steps to mitigate infringement is relevant to a damages determination.
> Q – But you don't know if it has any bearing on the damages other than what you were told by counsel?
> A – Correct.
> Q – [Y]our whole report is based on various techniques that are available out there today to mitigate infringements, either about them or somehow try to prevent them, and so if your report is suggesting that if by EIG not doing what you've set forth in this report, then that

---

[4] Copyright notice is optional under 17 U.S.C.A. § 401, but providing visually perceived copyright notices on copyrighted materials, as Plaintiffs do on all their publications, affords certain advantages for the copyright holder including that no evidentiary weight shall be given to a defense of innocent infringement of such materials in mitigation of actual or statutory damages.

6

somehow that would have an impact on the award of damages, whether it's the number of an award or not at all, correct?

A – Again, my report is based on an understanding given to me by counsel that these measures would have an effect on the determination of damages. *That's a hypothesis on which my report is based.*

Rosenblatt Depo. at 232.  (Emphasis added)

Moreover, expert testimony regarding the availability and implementation of mitigation efforts would be unduly prejudicial and confusing to the jury. Even if the Court finds that Mr. Rosenblatt's testimony regarding Plaintiffs' mitigation efforts would be relevant in connection with the availability and/or extent of statutory damages, any probative value "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [and] misleading the jury . . . ." Fed. R. Evid. 403. A jury would give undue weight to the Rosenblatt Report and his testimony when there are numerous other, more probative factors for the jury to consider when determining statutory damages.

Numerous facts in this case are relevant to the determination of statutory damages, which are not addressed in Mr. Rosenblatt's testimony, such as:

- The number of years that the infringement lasted;
- Numerous correspondence between Defendant and EIG where Defendant misled EIG regarding Defendant's use of EIG's publications, including renewals for each year indicating only a single copy subscription was needed;
- Defendant's illegal distribution of OD behind its own company firewall;
- Defendant's modification of the PIW .pdfs in an attempt to conceal forwarding from Plaintiffs; *See* Ratzloff Depo. at 27—29 (Ankrom Decl., Ex. C.) (describing instructions received from another CHS employee to forward copies of PIW in a certain manner in order to conceal the infringement from EIG.); and
- Defendants' fraudulent concealment of its infringing distribution of OD and PIW. *Id.*

Allowing the Rosenblatt Report or his testimony at trial, including his incomplete analysis of the extent of EIG's actual mitigation efforts and the faulty foundation of his opinion based on irrelevant facts would unduly influence the jury in its broad discretion to determine

7

statutory damages within the ranges established by the statute. Such testimony would significantly prejudice Plaintiffs, confuse the issues, and mislead the jury, and should be excluded.

### C.   Mr. Rosenblatt's Report and Testimony Is Not Based on Reliable Principles and Standards

Federal Rule of Civil Procedure 702 sets forth the criteria for expert testimony. Proffered expert testimony must be excluded unless the testimony is (1) based on sufficient facts or data; (2) based on reliable principles and methods; and (3) the expert applied the principles and methods reliably to the facts of the case. Fed. R. Civ. P. 702. Mr. Rosenblatt's opinion is not based on reliable principles and standards because, by his own admission, there are no standards for DRM for newsletters like those that EIG publishes. *Truck Ins. Exch. v. MagneTek, Inc*., 360 F.3d 1206, 1211 (10th Cir. 2004) (excluding as insufficiently reliable an expert opinion regarding a process that was "quantitatively unidentified."). Mr. Rosenblatt's opinion is that EIG has not taken sufficient steps to protect itself from Defendant's copyright infringement. Mr. Rosenblatt's opinion is not based on any quantifiable fact and, by his own admission, is not based on any quantifiable standard:

> Q – Is there any accepted DRM standard for the publishing industry?
> A – You'd have to go segment by segment within books eBooks versus –
> Q – Electronic publications?
> A – Well there are so many different types of electronic publications, as you call them, that different standards would have to apply, it would make little sense for there to be a single standard.
> Q – Is there a standard that would apply to the EIG publications?
> A – No. But there needn't be. A DRM that works well is supposed to be transparent and not noticeable. And so, whatever the technology is, it works. It's like saying there is a standard web browser.
> Q – People use various types of DRM in the publication industry?
> A – Right. Just like people use various types of web browsers. They use Chrome or Safari or Internet Explorer. *There doesn't need to be a standard.*
> Q – And there isn't a standard?
> A – That's correct. There is *none for this type of publication.*

(Rosenblatt Depo. at 265-266) (emphasis added).

Without a quantifiable industry standard to compare EIG's practices against, there is no rational or reliable basis for an opinion that EIG's practices are inadequate. EIG's practices simply cannot fall short of a standard if no such standard exists. Mr. Rosenblatt attempts to quantify his opinion by stating no standard need apply, but in the absence of any industry standard, what the Court is left with is an empty opinion based on no quantifiable measure other than Mr. Rosenblatt's belief. *Id.* Such an opinion does not meet the qualifications for acceptable expert testimony.

### D.  Mr. Rosenblatt's Report and Testimony Consists of Conclusory Opinions

Mr. Rosenblatt should also be excluded from this matter because he simply repeats facts relating to alleged DRM techniques available to publishers, recites the DRM techniques that EIG previously researched and tried, and reaches conclusory opinions that EIG did not invest sufficient resources in protecting its copyrights. An expert cannot merely recite conclusory opinions. The expert's testimony must be based on sufficient facts or data, be the product of reliable principles and methods, and those principles and methods must be reliably applied to the facts of the case. Fed. R. Evid. 703.

Here, Mr. Rosenberg simply sets forth an extensive "technical tutorial" as he calls it, providing an overview on digital publishing (Rosenblatt Report ¶¶ 21-77). After he has completed his review of digital publishing, he discusses the technical methods EIG has chosen to publish its material, as he understands it. (Id. at 78-98.) Although he acknowledges that EIG had

for years tried various forms of DRM,[5] he concludes that EIG "appears" to have invested only

"minimal resources into tools and techniques for mitigating copyright infringement." (*Id*. at ¶

106.) These sorts of conclusory opinions are not permitted. *Matthiesen v. Banc One Mortg.*

*Corp.*, 173 F.3d 1242, 1247 (10th Cir. 1999) (rejecting testimony of an expert because it was

conclusory); *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010)

(finding that a proffered expert whose report repeated a factual history and then reached

conclusory opinions had assumed the role of advocate and invaded the province of the jury).

As the basis for his entire premise that EIG has failed to avail itself of software to prevent

infringement of its works, Mr. Rosenblatt cites selective examples, uncorroborated sample sizes,

out dated information and offers opinions with little or no supporting evidence. Absent from the

Rosenblatt Report are any foundational elements such as: (1) EIG's actual competitors in the

electronic publishing industry; (2) the number of EIG's competitors which utilize DRM

software; (3) the length of time the competitors identified used these DRM systems; (4) whether

these competitors are still utilizing these systems; (5) the size and resources available to these

identified competitors; (6) the business decisions and practices of these competitors; and (7)

empirical data and/or third party peer reviewed studies showing the effectiveness of DRM

software for EIG's publishing business. Merely identifying a few random examples of EIG

competitors which may have at one time used DRM systems for an undisclosed period of time

cannot serve as a factual basis for an expert opinion.

For instance, Mr. Rosenblatt states "[v]arious commercial publishers of professional

content have used DRM for their distributed PDF files" and then, merely lists examples of only

---

[5] Including, notably, Vitrium, which Mr. Rosenblatt recommends as a potential DRM solution for EIG, despite the fact that EIG tested this software for two years on two different publications before discontinuing use. Rosenblatt Report at 35; Rosenblatt Depo. at 113.

three (3) competitors which supposedly utilize various DRM systems.[6]  Rosenblatt Report at 39-40. Mr. Rosenblatt offers no substantiating facts to establish the sample size used to form the foundation of his opinion.[7] Without such information, the Court is left with mere speculation and potentially prejudicial testimony. If Mr. Rosenblatt's testimony showed that a majority of EIG's competitors utilized DRM techniques, this may support his conclusions. However, if a majority of EIG's competitors did not utilize DRM techniques, this significantly lessens the value of his opinion that EIG did not avail itself of available DRM techniques. Absent essential information regarding the sample size from which Rosenblatt's evidence is derived, the testimony could be interpreted to mean almost anything. It is therefore unreliable, will not assist the trier of fact and has great potential for confusion and prejudice to the Plaintiffs.

Additionally, when asked whether Mr. Rosenblatt had any empirical data the shows DRM prevents copyright infringement, Mr. Rosenblatt stated, "[s]o that's a very specific metric and there are no public studies that I am aware of that would apply to a situation such as EIG's." Rosenblatt Depo. at 263-4 (emphasis added). When asked whether he had any evidence that DRM benefits a copyright holder in preventing infringement, the only "evidence" Mr. Rosenblatt could point to was the fact that some publishers[8] "still continue to use [DRM software] is evidence that it is at least somewhat effective." Rosenblatt Depo. at 264.  The sole reasoning

---

[6] Rosenblatt cites dated materials from 2010 (Segmentation and Pricing Strategy Presentation, September 20, 2010 and 3v Ventures Pricing Presentation, September 29, 2010) in support of his assertion regarding competitors Argus and Infield Systems.
[7] Rosenblatt testified that he was unaware of whether any other of EIG's competitors (beyond the three examples cited in the Report) were using DRM software. Rosenblatt Depo. at 258.
[8] Notably, Mr. Rosenblatt did not qualify his answer to competitors of EIG or indeed even magazine publishers - when questioned regarding this subject, Rosenblatt mentioned distributors of movies (Rosenblatt Depo. at 264) and publishers of eBooks (Rosenblatt Depo. at 265 and 266). When asked about publishers of electronic newsletters such as EIG, Rosenblatt stated that there was no industry standard he was aware of for utilization of DRM. *Id.*

offered by Mr. Rosenblatt that DRM is an effective means of preventing copyright infringement is simply that it is used by some publishers and distributors of electronic content in general.

The Rosenblatt Report and Mr. Rosenblatt's testimony rest on faulty assumptions because they ignore or marginalize significant factors which an electronic publishing business like EIG would consider when deciding to implement the DRM systems suggested by Rosenblatt such as:

1) The cost of the systems to EIG;[9]

2) The effectiveness of the systems in preventing copyright infringement of EIG;[10]

3) The effect of implementing the systems on EIG's business;[11]

4) The effect of implementing the systems on EIG's customers;[12] and

5) The business decisions and practices of EIG.[13]

---

[9] Mr. Rosenblatt did not know what the cost of the systems he recommended would be for a publisher like EIG, which has numerous publications distributed at varying frequencies, including many daily publications. Rosenblatt Depo. at 154.

[10] Mr. Rosenblatt's opinion on what effective measures EIG could have adopted to mitigate copyright infringement was that EIG "could have fruitfully experimented with watermarking," a system consisting of marking the publication which did not prevent the copying or forwarding of the publication. (Rosenblatt Depo. at 279). (Defendant copied and forwarded Plaintiffs' publications without regard for the copyright notices and warnings on publications.) (Rosenblatt Depo. at 211-213.) Mr. Rosenblatt confirmed that watermarking still allows the type of infringement alleged in this case (reading and forwarding of electronic publications). (Rosenblatt Depo. at 279).

[11] Mr. Rosenblatt opines that "if EIG wished to inhibit unauthorized copying, a *reasonable* step would have been to simply stop distributing content in PDF" without comment or qualification on the possible consequences of this choice on EIG's business or customer relationships and without explanation as to why such a substantial policy change would be "reasonable." Rosenblatt Report at 41. Rosenblatt also cites an EIG competitor, IHS Herold, which "changed its business model from document publishing to custom research services," seemingly suggesting that EIG should actually have considered abandoning its publishing business altogether in an effort to avoid copyright infringements by its own customers. Rosenblatt Report at 42.

[12] Rosenblatt admits in many places that DRM systems are not well received by customers ("DRM is a technology that users don't like very much" Rosenblatt Depo. at 258)**,** and in many cases necessitate the downloading of software by the customer to be effective. Rosenblatt Depo. at 155-158.

[13] When questioned about the circumstances under which EIG decided to stop using the DRM program Vitrium which it used for two years, Rosenblatt replied: ". . . they could have possibly made some changes in the way they dealt with Vitrium, such as if there were firewall issues with their customers, they could have asked the customers to get their IT departments to address them. I don't have that level of detail of the interactions they had over that stuff. So I don't know. *I'm not going to opine on those circumstances because I don't have enough information to do so*." Rosenblatt Depo. at 239.

The Rosenblatt Report also fails because it is premised on the faulty assumption that EIG's alleged lack of sufficient DRM software would have prevented or mitigated the infringement in this case. Indeed, by Rosenblatt's own admission, that there is no way to completely prevent copyright infringement using DRM software ("…alleged infringement is not 100 percent protectible." Rosenblatt Depo. at 133; "As I said, no technique is 100 percent preventable of the misuse of copyrighted material." Rosenblatt Depo. at 220; "I've said a dozen times today that no method is perfect." Rosenblatt Depo at 221; "Again there is no foolproof method to prevent infringements . . . [n]one of [the DRM techniques discussed in the deposition] would be a 100 percent ironclad guarantee."  Rosenblatt Depo. at 267).

Accordingly, Mr. Rosenblatt's testimony should be excluded on the grounds that it is entirely conclusory.

**E.  Mr. Rosenblatt's Report and Testimony Will Not Assist the Trier of Fact**

The Rosenblatt Report should be excluded because it does not require specialized knowledge and would not assist the trier of fact. The Rosenblatt Report, in essence, is a recitation of Digital Rights Management software available generally to distributors of electronic content accompanied with some technical explanation as to how the software would work.

Despite being preceded by several pages of discussion and extraneous technical descriptions of the software identified by Rosenblatt, the Rosenblatt Report boils down to a list of digital rights management software options that can be located through a simple Google® search. A list of generally available software options and notes regarding whether or not such options were used by EIG does not require any particular expertise by Mr. Rosenblatt, and would not assist the trier of fact. Notably, Mr. Rosenblatt had no knowledge of the cost of such software, the implementation costs for EIG or the internal business decisions that EIG considered in the implementation of such products.

As part of the pretrial evaluation, the trial court also must determine whether the expert opinion is "based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).  The touchstone of admissibility is helpfulness to the trier of fact. *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991).

"To be reliable under *Daubert,* an expert's scientific testimony must be based on scientific knowledge ... and not mere subjective belief or unsupported speculation." *Goebel v. Denver and Rio Grande W.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003).  As noted above, Mr. Rosenblatt can point to no empirical data as to the effectiveness of DRM systems in preventing copyright infringement and has stated that no standard for the implementation of DRM software exists for publishers such as EIG. Simply listing available software techniques that have existed for many years and stating an unsubstantiated opinion based on speculation without reference to empirical data, scientific study, or even an industry standard takes no specialized understanding, would not assist the trier of fact, would likely mislead or confuse the jury in assessing statutory damages, and should be excluded.

Therefore, not only does Mr. Rosenblatt's opinion consist of a simple list of generally available software, many of which were evaluated or actually used by EIG,[14] but also his opinions as to the suitability and functionality of the software are based upon incorrect assumptions and facts. Such testimony would confuse and mislead, rather than assist, the jury.

---

[14] The Rosenblatt Report identifies nine examples of DRM technology (Rosenblatt Report at 21). Of these nine, EIG utilized the Vitrium software for two years (Rosenblatt Depo. at 223-4) and investigated the LockLizard software (Rosenblatt Depo. at 224). The Rosenblatt Report also identifies four copyright monitoring services (Rosenblatt Report at 25). Of these four, EIG utilized the MarkMonitor software (Rosenblatt Depo. at 224) and investigated the Attributor Guardian software. Id.

**F. Mr. Rosenblatt's Testimony Related to the Timeline of the facts of this Case Is Based On Legal Conclusions, is Unduly Prejudicial, and Misleading, and Should Be Excluded**

The Rosenblatt Report uses "the timeline of events in the instant litigation" to demonstrate "EIG's failure to take reasonable steps to mitigate infringement over a significant period of time." Rosenblatt Report at 38. This section of the report is based on incorrect and inappropriate legal conclusions which cannot form the basis for expert opinion, serve to confuse the issues and are far more prejudicial than probative. Mr. Rosenblatt makes several factual presumptions and legal conclusions that are simply not accurate:

(1)     Mr. Rosenblatt describes the start of the "chain of events" for this litigation in February of 2008 when Defendant contacted EIG customer service about potentially adding additional licenses to their existing subscription. He concludes this paragraph with the statement – "[t]his occurred about three years after EIG had communicated internally about its copyright problem." Rosenblatt Report at 38. This section contains two inappropriate legal conclusions and incorrect factual presumptions - the first being that the chain of events which started the litigation was a simple customer pricing inquiry which should have somehow put EIG on notice that Defendant was infringing EIG publications.[15] The second is that EIG somehow should have been

_____

[15] The CHS employee who initiated the 2008 customer pricing inquiry testified that he did not intend to inform EIG that CHS was making and distributing copies of EIG's publications. Menard Depo. at 172—73 (Ankrom Decl., Ex. D.) ("Q: And were you writing to EIG on February 27, 2008 to let them know the number of people that were receiving the publication at NCRA? A: No, I was not.")

           alerted to Defendant's infringing activities because EIG internally discussed issues

           with other subscribers three years prior.

(2)     Next, Mr. Rosenblatt describes an email four years later in March 2012 where he

           alleges EIG became aware that Defendant was infringing EIG's publications . . .

           "This email exchange *indicates EIG had treated this as evidence of infringement* and

           followed up accordingly by phone." This statement demonstrates Mr. Rosenblatt's

           lack of knowledge of EIG's business as well as common business practices in the

           newsletter publishing industry.[16]

(3)     Last, Mr. Rosenblatt notes that EIG instituted the current litigation after another email

           exchange with Defendant in March of 2015. Mr. Rosenberg states "[i]n other words,

           *EIG first learned of possible infringements more than three years before it initiated*

           *this litigation*, during which time it *implemented no measures to mitigate the*

           *Defendant's allegedly infringing activities*." Rosenblatt Report at 39.

Mr. Rosenblatt's timeline contains inaccurate legal conclusions, most pervasive of which is the

statement that EIG was on notice of Defendant's infringing activity in March of 2012 (and

further suggests that EIG was on notice of Defendant's infringing activities at least as early as

February of 2008). The issue of when a copyright holder is considered to have knowledge of

ongoing infringement is a legal issue which is currently the subject of a pending motion between

the parties in this litigation. Dkt. No. 52. Knowledge of ongoing infringement is particularly

---

[16] Plaintiffs are aware that many of EIG's subscribers are senior management who prefer to delegate management of their daily or weekly subscription to their assistants. As such, Plaintiffs have a long-standing policy that access to a subscription by an assistant for the purpose of sending the publication to a supervisor will not be treated as copyright infringement. Wallin Depo. at 92—93. (Ankrom Decl., Ex. E) In another litigation, Judge Sim Lake of the Southern District of Texas noted that this policy reflects the "common-sense reality of ordinary business practices." *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP*, No. CV H-14-1903, 2017 WL 363004, *7 (S.D. Tex. Jan. 24, 2017).

significant in copyright cases since it triggers the statute of limitations for bringing copyright claims and sets the boundaries for potential damage awards by limiting the amount of infringements at issue to a discrete period of time. Mr. Rosenblatt's bald, conclusory statements of EIG's knowledge of Defendant's infringement in this case are purely speculative, based on inaccurate legal assumptions and are highly prejudicial.

Moreover, even if Mr. Rosenblatt's opinion is found to pass muster under *Daubert*, the dangers of undue prejudice and misleading the jury far outweigh any relevance. As noted above, Mr. Rosenblatt has cherry-picked a few examples of EIG's competitors in support of the proposition that EIG has not taken sufficient steps to mitigate copyright infringement and has not cited to any empirical data, scientific theory or indeed industry standard on which his opinion is based. Mr. Rosenblatt's opinion on the sufficiency of EIG's mitigation efforts is not only irrelevant, but exists in a vacuum without any substantive connection to EIG's business practices or the extensive efforts undertaken by Defendant to conceal its infringements from EIG. Such testimony would significantly prejudice and mislead the jury and should be excluded.

## IV.    CONCLUSION

In light of all of the foregoing numerous defects in the opinion of William Rosenblatt, his report and testimony should be excluded in their entirety from trial in this matter.

By:    s/ Kim Donica Farha
       Richard L. Honeyman SC# 06116
       Kim Donica Farha SC#24389

       HITE, FANNING & HONEYMAN L.L.P.
       100 N. Broadway St.

17

Suite 950
Wichita, KS 67202
Telephone: (316) 265-7741
Facsimile: (316) 267-7803
honeyman@hitefanning.com
farha@hitefanning.com

Of Counsel:        Robert L. Powley
(admitted *pro hac vice*)
Keith E. Sharkin
(admitted *pro hac vice*)
Stephen M. Ankrom
(admitted *pro hac vice*)

POWLEY & GIBSON, P.C.
304 Hudson Street, Suite 202
New York, New York 10013
Telephone: (212) 226-5054
Facsimile: (212) 226-5085

rlpowley@powleygibson.com
kesharkin@powleygibson.com
smankrom@powleygibson.com

Counsel for Plaintiffs
ENERGY INTELLIGENCE GROUP, INC. and
ENERGY INTELLIGENCE GROUP (UK)
LIMITED

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of May, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Kim Donica Farha
Kim Donica Farha SC#24389