# EXHIBIT A



80 SOUTH EIGHTH STREET
500 IDS CENTER
MINNEAPOLIS, MN 55402
MAIN: 612.632.3000
FAX: 612.632.4444

DEAN C. EYLER
ATTORNEY
DIRECT DIAL: 612.632.3016
DIRECT FAX: 612.632.4016
DEAN.EYLER@GPMLAW.COM

January 23, 2017

**VIA EMAIL**

Robert L. Powley, Esq.
Stephen M. Ankrom, Esq.
Keith Sharkin, Esq.
POWLEY & GIBSON, P.C.
304 Hudson Street, Suite 202
New York, New York 10013

Richard L. Honeyman, Esq.
Kim Donica Farha, Esq.
Hite Fanning& Honeyman, L.L.P.
100 North Broadway, Suite 950
Wichita, KS  67202

Re:  *Energy Intelligence Group, Inc. et al. v. CHS McPherson Refinery*
Case No.:  6:16-cv-01015-EFM-GLR

Dear Counsel:

Enclosed and served upon you by email in the above-referenced matter, please find the Expert Report of William R. Rosenblatt.

Very truly yours,

**GRAY, PLANT, MOOTY,**
**MOOTY & BENNETT, P.A.**

By: _____
Dean C. Eyler

Enclosure

GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.
A FULL-SERVICE LAW FIRM
MINNEAPOLIS, MN • ST. CLOUD, MN • WASHINGTON, DC • FARGO, ND
WWW.GPMLAW.COM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP, INC.
and ENERGY INTELLIGENCE GROUP
(UK) LIMITED,

                Plaintiffs,

vs.

CHS McPHERSON REFINERY, INC.
(F/KA/NATIONAL COOPERATIVE
REFINERY ASSOCIATION),

             Defendant.

**CASE NO. 6:16-cv-01015-EFM-GLR**

---

## EXPERT REPORT OF WILLIAM R. ROSENBLATT

---

**<u>TABLE OF CONTENTS</u>**

| | | |
|---|---|---|
| I. | Educational Background, Professional Experience and Qualifications | 2 |
| II. | Materials Reviewed | 6 |
| III. | Summary of Opinions | 10 |
| IV. | Technical Tutorial | 11 |
| | A. Tools and Processes Used for Publishing Periodical Content in Digital Form | 12 |
| | B. PDFs of Periodical Content Are Much Easier Than Web Pages to Copy for Use Without Authorization | 16 |
| | C. Tools and Processes Used for Converting Print-Oriented Content to Web Pages | 19 |
| | D. Techniques for Reducing Potentially Unauthorized Copying of Digital Content | 20 |
| | E. Techniques for Reducing Unauthorized Access to Websites | 25 |
| V. | EIG Has Chosen to Publish Content in Ways Especially Amenable to Unauthorized Copying | 28 |
| VI. | EIG Has Not Adopted Significant Measures to Mitigate Unauthorized Copying | 35 |

1.    I am president of GiantSteps Media Technology Strategies ("GiantSteps"), a consulting firm based in New York City.  I have been retained as an expert by Gray Plant Mooty in connection with the above-captioned matter.  This report represents my professional opinion on the failure of the Plaintiff in this matter ("EIG") to take significant proactive steps to mitigate infringement of its copyrights over the past several years.

## I.    Educational Background, Professional Experience and Qualifications

2.    I received a B.S.E degree *cum laude* in Electrical Engineering and Computer Science from Princeton University in 1983.  I subsequently received a M.S. degree in Computer and Information Science from the University of Massachusetts in 1990, and I completed coursework and examinations toward a Ph.D. in that field at the same university.

3.    Before founding GiantSteps in June 2000, I held information technology ("IT") management positions in two large publishing companies: Times Mirror Co. (Director of Publishing Systems, 1994-1996) and McGraw-Hill Cos. (VP of Technology and New Media, 1999).  At Times Mirror, I managed and contributed to a series of projects involving implementation of content management systems ("CMS") (see ¶36 below) in several of the company's divisions. I also represented the company on an industry committee concerned with management of copyrights in the digital age (AAP Enabling Technologies Committee).

4.    At McGraw-Hill, I had responsibility for information technology for the company's vertical industry publishing division, which published information on industries such as aviation, energy, and construction in magazines, newsletters, websites, and other forms. As part of those responsibilities, I investigated copyright protection techniques for the Platt's energy industry newsletter publishing group (which serves the same market as EIG), served as chief technical architect for the aviation industry web portal AviationNow.com, which used a CMS for

web content ("Web CMS") (see ¶36 below), and managed the group that converted desktop publishing files for print magazines to web pages (see ¶48 below).

5.      Before joining Times Mirror, in the early 1990s, I served as Manager of Information Resources at Moody's Investors Service, the debt rating agency. During that time, I helped design Moody's first system for digital distribution of its corporate credit reports using the then-new Adobe PDF file format (see ¶19 below).

6.      In between my positions at Times Mirror and McGraw-Hill, I worked at Sun Microsystems in positions related to the media and publishing market as a pre-sales consultant and market strategist.  In this role, I managed partnerships with vendors of software technologies such as digital publishing tools, CMS (see ¶36 below) and digital rights management ("DRM") (see ¶8 and ¶¶52-55 below).

7.      I began my professional career as a software engineer at Motorola, where I developed software for data communications equipment.  Immediately before founding GiantSteps, I was VP and Chief Technology Officer of Fathom.com, an e-learning startup company founded by Columbia University.

8.      A large portion of my consulting practice at GiantSteps concerns "rights technologies," i.e., technologies for addressing copyright infringement and content licensing such as DRM and digital watermarking, both of which I describe below.  I am the author of the book *Digital Rights Management: Business and Technology* (Wiley, 2001), the chapter "Digital Rights and Digital Television" in *Television Goes Digital* (Springer, 2010), and several articles and white papers on technologies for managing rights to digital content.  I was a designer of an open standard DRM technology for e-books (Readium Licensed Content Protection, or Readium

LCP), and the Digital Object Identifier, a content identifier widely used in various segments of the publishing market as well as for motion picture content.

9.     I am the editor and principal author of the industry blog Copyright and Technology (copyrightandtechnology.com) and program chair of the Copyright and Technology conferences.  I have spoken at other conferences on five continents (including the World Economic Forum in Davos, Switzerland) and guest lectured at several universities and law schools on subject matter related to copyright and digital media.

10.     I have consulted to several technology vendors, content owners (including several types of publishers), and service providers on issues related to rights technologies, including selection of rights technologies for use by publishers and publishing service providers.  I have consulted to or testified before public policy bodies in the United States, Europe, and Asia on this subject matter, including the U.S. Copyright Office, Federal Trade Commission, National Academies, Business Software Alliance, European Commission, and Korean Copyright Commission.

11.     I have also worked with several publishers of professional, scientific, and consumer periodicals in converting their print-oriented publishing processes to processes for producing digital content in various forms, including those I discuss below.  I have written various articles in industry publications and given conference presentations on content management and digital publishing.

12.     Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(iv), my curriculum vita is attached hereto as Exhibit A, and a list of publications I have authored in the previous ten years is attached hereto as Exhibit B.

13.     Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(v), I have testified at deposition or trial in the following litigations over the previous four years:

- *Achates Reference Publishing v Symantec et al*, Eastern District of Texas, 2:2011-cv-00294.

- *In Re Petition of Pandora Media* related to *U.S. v. American Society of Composers, Authors and Publishers*, Southern District of New York, 1:12-cv-08035.

- *Perfect 10 v. Giganews et al*, Central District of California, 2:11-cv-07098.

- *Broadcast Music, Inc., v. Pandora Media, Inc.* related to *U.S. v. Broadcast Music, Inc.*, Southern District of New York, 1:13-cv-04037.

- *BMG Rights Management et al v. Cox Enterprises, Inc. et al*, Eastern District of Virginia, 1:14-cv-01611.

14.     Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)(vi), I am being compensated at the rate of $480 per hour for consulting and $720 per hour for testimony.  My compensation is in no way related to the outcome of any aspect of this case.

**II.     <u>Materials Reviewed</u>**

15.     I have relied on the following materials produced in this litigation for purposes of this report:

- First Amended Complaint for Copyright Infringement.

- Defendant's Answer to Plaintiff's First Amended Complaint for Copyright Infringement.

6

- Plaintiffs' Supplemental Responses to Defendant's Second Set of Interrogatories, containing a response to Interrogatory No. 16.

- Plaintiffs' Responses to Defendant's Third Set of Interrogatories, containing responses to Interrogatories No. 19-23.

- Plaintiffs' Responses to Defendant's Third Set of Requests for the Production of Documents and Things.

- Plaintiffs' Responses to Defendant's Fourth Set of Requests for the Production of Documents and Things.

- Deposition of John Hitchcock, January 12, 2017 ("Hitchcock Depo").

- Email from Derrick Dent to LeAnn Flickinger, March 30, 2012 re "RE: NCRA - Oil Daily follow-up", EIG044471-3 ("Dent Email").

- Email from Peter Buttrick to Deborah Brown, February 28, 2008 re "RE: Related to My Subscription or Account: Subscription Renewal", EIG044502 ("Buttrick Email").

- Email from Galen Menard to Derrick Dent, March 31, 2015 re "RE: Energy Intelligence - Oil Daily", EIG046163 ("Menard Email").

- Oil Daily Product Profile, EIG046256-65 ("OD Profile").

- 3v Ventures Pricing Presentation, EIG047291-306 ("3v Ventures").

- Segmentation and Pricing Strategy presentation, Sept. 20, 2010, EIG047309-26 ("Segmentation").

- Memo from Tom Wallin to Lara Sidawi, Mark Wellman, and George King re "Profit improvement plan 2005", May 31, 2005, EIG47348-53 ("Profit Improvement Plan 2005").

- Email from Tom Wallin to EIG Editors, June 1, 2007, EIG047686 ("Wallin Email").

- Memo from "Tom" to "Raja, Lara, Mark W. George, Mark H.", March 13, 2008, EIG047703-4 ("ProtectedPDF Memo").

- EIG Combined Income Statements and Balance Sheets for 2004 through 2013: EIG047815-27 (2004), EIG047839-52 (2005), EIG047865-76 (2006), EIG047926-37 (2007), EIG047755-66 (2008), EIG047828-38 (2009), EIG047853-64 (2010), EIG047767-79 (2011), EIG047780-801 (2012 through July 31), EIG047975-87 (2013 through August 31) (referred to below as "Financial Statements 20xx" where "20xx" is the year).

- Deposition of John Hitchcock in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. The Royal Bank of Scotland, PLC and ABN AMRO Bank, N.V., July 12, 2012, EIG048201-81 ("Hitchcock RBS Depo").

- Deposition of John Hitchcock in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. Canal Barge Company, Inc., June 24, 2013, EIG048829-9096 ("Hitchcock Canal Barge Depo").

- Deposition of Thomas Wallin in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. Canal Barge Company, Inc., June 24, 2013, EIG049097-203 ("Wallin Canal Barge Depo").

- Deposition of John Hitchcock in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. Plains All American Pipeline, L.P.; and Plains Marketing, L.P., December 20, 2012, EIG049886-50042 ("Hitchcock Plains Depo").

- Deposition of Thomas Wallin in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. Plains All American Pipeline, L.P., September 13, 2012, EIG050480-764 ("Wallin Plains Depo").

- Email from David Babski to Stefan Ford, September 24, 2015, EIG050858-61 ("ProtectedPDF Email").

- Deposition of Thomas Wallin in Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited v. The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC, May 1 2012, EIG051338-493 ("Wallin United Steelworkers Depo").

- Overview of PDF Protection Options, EIG051557-61 ("Overview of PDF Protection Options").

- David Babski – CONTENT IMPROVEMENT SUGGESTIONS, EIG051566-7 ("Babski Memo").

- Online manual for WPS, EIG051568-95 ("WPS User Guide").

- Publication Checklist and Instructions, EIG051676-81 ("Publication Checklist and Instructions").

### III.   <u>Summary of Opinions</u>

16.   I have been asked to provide an opinion on whether EIG has taken substantive measures to mitigate infringements of its copyrights, and in particular whether it has taken reasonable steps given its own recognition of problems with copyright infringement.  Counsel for the Defendant has informed me that this issue is relevant to a Court's determination of damages for copyright infringement.  My opinion is that EIG has not done so.

17.   EIG uses digital publishing methods that make it particularly easy for users to copy its content, including PDF files and full text HTML emails, and it continues to do so despite its knowledge that these methods are the sources of much alleged infringement.

18.   Despite the fact that EIG identified copyright infringement as a major concern starting in 2005, it has only minimally availed itself of proactive measures to prevent infringement.  It has expended little effort in investigating, experimenting with, investing resources in, and adopting many techniques for inhibiting infringements, and has it apparently made no efforts to learn what its peer organizations are doing to protect their copyrights, when in fact at least some of its peers are taking significant proactive steps.

10

19.     A variety of such measures and techniques have been available since 2005 and earlier.  As I will explain below, these include technologies such as DRM, security settings on files in the Portable Document Format ("PDF"), digital watermarks, and various techniques for searching for potentially unauthorized copies of copyrighted materials.  They also include publishing digitally in the form of web pages (in HTML format) that must be accessed on servers; limiting or ceasing publication of content as PDF files, which are much easier to reproduce than web pages; and only emailing HTML with links to online content instead of HTML containing full text of articles, which are also very easy to reproduce. They also include various techniques for securing access to websites beyond simple usernames and passwords, such as password strength policies and two-factor authentication.

20.     I understand that discovery in this litigation is ongoing.  I reserve the right to supplement my opinions as more information becomes available through discovery.  I also reserve the right to use demonstratives at trial.

**IV.     Technical Tutorial**

21.     In this section, I provide a tutorial on digital publishing, techniques for mitigating unauthorized copying, methods of making content available on websites, techniques for securing access to websites, and other issues relevant to my opinions herein.  I offer this tutorial with the objective of assisting the Court in evaluating and contextualizing my opinions.

22.     The type of content that EIG publishes is known generically in the publishing field as professional information.  This includes periodicals that include news, analysis, and data pertaining to a specific industry, such as healthcare, finance, aerospace, engineering, or – in the case of EIG – energy.  Professional information publishers' subscribers include professionals in the given field, including employees of companies as well as investment analysts, consultants,

attorneys, government officials, and so on.  Professional information publishers also typically

offer data feeds, market research, consulting, and other forms of information and expertise in

their given markets.

**A.  Tools and Processes Used for Publishing Periodical Content in Digital Form**

23.     Starting in the 1980s, publishers of professional periodicals began to use

computer-based tools and techniques known as desktop publishing ("DTP") for producing their

publications.  Editors at professional periodical publisher would typically use DTP tools which

ran on a desktop computer that could display graphical images, such as an Apple Macintosh, to

edit text, lay out pages, and perform other tasks to prepare a publication for distribution in print.

24.     The most commonly used DTP programs included QuarkXPress (commonly

known as "Quark") from Quark, Inc. and PageMaker from Adobe (later succeeded by Adobe

InDesign).  These would store information about publication content, layouts, graphics, fonts,

etc., in "native" files, such as .qxp files for Quark, analogous to .doc or .docx files for Microsoft

Word. The output of desktop publishing tools was originally files in formats suitable for printing,

such as PostScript and TIFF.  These would be sent to printing facilities.

25.     In 1993, Adobe released the Portable Document Format (PDF) file format and

associated tools, including Acrobat Distiller (for producing PDF files; now called simply

Acrobat) and Acrobat Reader (for reading them on computers; now called Adobe Reader).

These enable publishers to create documents that could be displayed on computer screens as well

as printed. The appearance of PDF documents on computer screens emulates the look of the

same documents in print.  In addition, PDF files (or simply "PDFs" for short) contain text

characters that can be searched, selected, and copied to the computer's "clipboard" for pasting

into other places, such as email messages or word processor files.

26.    In order to read PDF files, users needed to obtain and install Acrobat Reader

software on their computers.  Nowadays, web browsers have PDF reading functionality built into

them, so that users can read PDF files within web browsers without having to obtain extra

software.  PDF reading applications ("apps") are also available for mobile devices such as

iPhones and Android smartphones.  In short, PDF files can be read on just about any digital

device with a screen today.

27.    From the publisher's perspective, the most important thing about PDF production

is that it is a very straightforward byproduct of print production.  In fact, Acrobat works by

acting as a printer.  Within a desktop publishing program (or word processing program,

spreadsheet, graphics package, or any program that produces print output), all the user has to do

is to select the Print command and choose Acrobat as the "printer."  (Today, the option often

appears as "Save as PDF," but it does the same thing.)

28.    As the Internet proliferated in the mid-1990s, the next logical step for publishers

was to distribute digital versions of their publications.  Many publishers delivered them as PDF

files.  Publishers would use Acrobat Distiller in a simple process to create PDF files from within

their desktop publishing programs in the same way that they would print them. Publishers could

then distribute PDFs in various ways, such as by email.

29.    PDF was a very attractive format for publishers at that time.  It was easy to

generate from desktop publishing programs, required little technical expertise to use once

initially set up, and cost almost nothing to distribute.  PDF enabled publishers to get content to

subscribers more quickly and cheaply than in print, without major disruption to their print publishing processes, and giving users the option of reading on a computer or in print.

30.     The next important format to appear for information publishing was HyperText Markup Language (HTML), the basic language of web pages.  For most commercial publishers, including professional periodical publishers, web pages have many advantages over PDF files. Not least of these are the lack of restrictions on the length of text content due to physical page constraints and the ability to update content at any time instead of on fixed publication schedules.

31.     Although HTML was first released in 1990, it did not become widely used until the proliferation of the web in the mid-1990s.  By the late 1990s to early 2000s, most commercial publishers were publishing their content as web pages.

32.     HTML content can also be sent by email.  Unlike PDF files, which must be sent as file attachments to email messages and read in an external application (such as Adobe Reader), most email programs can display HTML in messages directly.  For example, Microsoft's popular Outlook email program was able to display HTML in messages starting in 1998.[1]  In this case, the email program essentially acts as a web browser; for example, hyperlinks in HTML sent as email are clickable just like links in web pages viewed on web browsers.  If a user receives a web page in an email message, it means that the user's email server delivered the HTML page, just as a web server delivers an HTML web page to a web browser.

33.     A web page consists of one or more files; most web pages from commercial websites include dozens of files each.  At a minimum, a page includes an HTML file that contains text and other elements.  It usually also includes other files such as images (in formats

---

[1] See https://blogs.technet.microsoft.com/exchange/2004/11/17/how-different-versions-of-outlook-and-exchange-deal-with-html-message-body/.

such as JPEG or GIF), executable code (in languages such as JavaScript), audio, video, etc.   In addition to text, HTML contains "markup" that indicates type fonts, text colors, indentation, line spacing, the placement of the other files on the page, hyperlinks to other web pages, and so on. A web page may also include extra "stylesheet" files (in the CSS format) that specify the overall graphical style of the page.

34.     If a web page is sent as email, usually only the HTML file is sent; the other files will be on servers somewhere on the Internet. When the email program displays one of the other files (an image, for example), it will retrieve that file from the server.

35.     If an entire issue of a periodical is published on the web, it will consist of several web pages, one for each article.  In addition, the publisher's website will usually include pages with other information on topics such as subscribing to the publication, advertising, the editors, help, contact information, and so on.

36.     The usual way in which publishers produce HTML pages is through Web CMSs, which help automate the process and make it possible for editors and authors to create web pages without much technical skill.  With Web CMSs, website producers can set up web page templates with fields for text and other content.  Templates specify things like where the text of an article goes, where navigation menus go, the type font scheme, background color, images, and so on.  Editorial staff fills and edits the contents of templates to create web pages. When a page is ready to be published, the Web CMS will copy all of the associated files to a web server.

37.     Users view websites with web browsers such as Microsoft Internet Explorer, Google Chrome, and Apple Safari.  When a user requests a web page (by typing an address into

the browser address bar, or clicking on a link), the server transmits the files for that page to the browser over the user's Internet connection.

**B. PDFs of Periodical Content Are Much Easier Than Web Pages to Copy for Use Without Authorization**

38.     A major advantage of web pages over PDFs for publishers concerned with protecting their copyrights is that web pages are considerably more difficult for users to copy for use without authorization.  PDF files that contain mainly text and are created directly from desktop publishing software are usually small (roughly the size of a typical Microsoft Word document of similar length)[2] and trivially easy to copy.  This can be done through email forwarding, by copying files onto local file servers, or by other methods that do not require special technical expertise.  In particular, it is much easier and cheaper to make copies of PDF files than to make photocopies of printed documents.

39.     This has led to concerns among publishers about unauthorized copying.  Such concerns were especially acute among publishers of professional periodicals, given their often very high subscription prices and the fact that many of their subscribers were employees of institutions that may have had multiple people interested in viewing the content.  In fact, some professional periodical publishers were initially reluctant to distribute their publications in PDF because of the ease of copying.

40.     An issue of a print or PDF periodical consists of multiple articles, a table of contents, and other information in a single document.  If someone gets a copy of a PDF, he can make the same use of the publication as the user who sent him the copy, including using the table of contents to find articles. In contrast, a web version of an entire periodical issue is much more

---

[2] As opposed to PDFs created from scanners, which can contain a lot of extraneous information and thus can be much larger.

difficult than a PDF to copy in a usable way. It has separate web pages – meaning separate sets of HTML and other files – for each article. In lieu of a table of contents with page numbers, a website has a "navigation structure" with links to web pages with articles and other content on them, including links to content that is not part of the periodical issue (and separate from the periodical or the publisher). For example, a professional periodical article may contain links to websites of companies mentioned in the article or news reports on other websites.

41.     It is possible for a user to save a copy of a single web page (containing a single article) on his computer with one command in a web browser. This will create several files on the user's computer. Then, to send that copy of the web page to another user, the user would have to add all of the files of the given web page to an email message as file attachments – and that's just for a single article.

42.     Even then, the HTML for a given web page will contain links that will not refer to the user's local copies of files; they will refer to files on a web server online. For example, say User A is a subscriber to a periodical. User A may want to make a copy of a periodical issue, which contains ten articles. Article 1 is on a web page, which consists of an HTML file and various other files, such as images. The user makes a copy of Article 1 on his PC. The local copy of Article 1 contains a link to Article 7. But the link will be to the online copy of Article 7, not the local copy. Now assume that User A sends an email to User B, who is not a subscriber, with all the files for Article 1 attached. User B will click on the link to Article 7. The link will be to the online version of Article 7, and since User B is not a subscriber, he will not be able to see it. This is the case even if User A also makes a copy of Article 7 and sends all the Article 7 files to User B.

43.     As a specific example, it is possible – as I have done – to save EIG's home page (www.energyintel.com) to a PC via the "Save page as…" command of my web browser (Google Chrome).  Doing so results in an HTML file, plus a folder containing 106 other files, being stored on the PC.  The latter files break down roughly evenly into image files, executable code files, and stylesheet files (see ¶33 above).  For each image on the web page, the "Save" operation makes a local copy and adjusts the HTML code to refer to that local copy instead of the online image file.  But the article links in the HTML code still refer to pages on the energyintel.com website.  In fact there are over 100 references to other pages on energyintel.com, some of which require a subscription to view.  In other words, this locally-saved copy of the energyintel.com home page is not very useful without a subscription.

44.     If a user wishes to make a copy of an entire issue of an online periodical, he must copy many web pages in the above manner, one at a time.  But even if the user does this, as explained above, links on one web page to other web pages are to the pages on the online website, not to local copies of those web pages.  In other words, the "Save" operation invoked on multiple web pages does not adjust links from one web page in the issue to another.  Web browsers do not have built-in commands to save entire websites to users' computers.

45.     In sum, if a periodical is published online as web pages, it is quite impractical to make a local copy of a complete issue that is useful to non-subscribers – in contrast with the ease of copying and forwarding PDFs.

46.     It is also possible for a publisher to send an entire issue of a periodical to a user as an HTML page within an email message (instead of as one or more file attachments).  A publisher can do this in one of two ways.  One way is to send an HTML email message with just clickable headlines (and maybe a sentence or paragraph describing each article). If a user clicks

on a headline, his web browser opens and requires him to log in as a subscriber (if he is not already logged in); then it shows a web page containing the full text of the article, which is delivered from the web server. With this scheme, an issue copied and forwarded to another user would not be readable unless the other user is also a subscriber.

47.   The other way is to include the full text of every article in the issue in the HTML email message. This way makes it much easier for users to copy the issue and send to others – as easy as it would be for a PDF of the issue. It merely requires forwarding the email message to other users.

## C. Tools and Processes Used for Converting Print-Oriented Content to Web Pages

48.   When publishers first started to create online versions of their periodicals, they kept their DTP environments in place and added conversion processes for producing web pages. This way they could produce web pages while maintaining their print publications (and possibly PDFs) concurrently.

49.   The conversion process has typically involved a combination of tools for exporting or converting from native DTP files to HTML and other files for web pages, Web CMS templates (see ¶36 above), and human editors to "massage" the web content in various ways and add content for the website such as hyperlinks to other articles. For small-to-medium-size publishers that have not abandoned print, this process is much the same today as it was in the late 1990s, though the automation afforded by the conversion tools has improved somewhat.

50.   The other way of producing web versions of periodicals is with a "web-native" process, where the HTML content is produced directly in a Web CMS rather than converted or exported from DTP files. This is the usual process for publishers that do not publish in print or

PDF, or that intend to phase out their print/PDF editions eventually. It is possible to do the converse of the above: to produce content primarily in a Web CMS and convert it to print/PDF layouts.

### D. Techniques for Reducing Potentially Unauthorized Copying of Digital Content

51.     Although HTML web pages are not as easy as PDF files for users to copy, all digital content is much easier and cheaper to copy than print content. This is especially true of files sent over networks such as the Internet, as they are not tied to physical media such as CDs or DVDs, and can be copied using standard general-purpose computers in various simple ways such as using file copying commands or attaching files to email messages.

52.     This has given rise to a number of techniques for reducing unauthorized copying of digital content. The best-known of these has been digital rights management (DRM).

53.     A DRM system includes software on a server that encrypts digital content before sending it to a user's computer or other device. Software on the user's device checks to make sure that the device or user is has the proper credentials to view the content, and if so, it decrypts the content on an as-needed basis. DRM systems for static visual (as opposed, say, to video or audio) content can control not only viewing but also printing and copying to the clipboard for pasting into another application, such as a word processor or email message. If a user sends a DRM-encrypted file to another user, the other user will (in the usual case) not have the proper credentials, and therefore the other user's device will not be able to decrypt and display the content. Some DRM systems maintain user accounts that can be linked to multiple devices belonging to the same user (for example, his desktop PC, laptop, and smartphone) so that he can read a given file on any of those devices.

54.     The first commercial DRM technologies became available in the mid to late 1990s. Although DRM can be used with any type of digital content, its first major use was for text-based content, because such files were small enough to send over networks easily. (In contrast, DRM for video files, which are much larger, was not widely used until the mid-2000s.)

55.     In fact, many of the first set of commercial DRM technologies worked with PDF files. One reason for this was that Adobe designed the Acrobat Reader to enable DRM systems from other vendors to integrate with it through software "plug-ins." Adobe also offered its own DRM scheme for PDF files, called Adobe Content Server.

56.     Adobe still offers Content Server today. Several other vendors also offer DRM technologies for commercially-distributed PDF files today. I understand that EIG asserts that the timeframe for its infringement claims goes back to 2004. Vendors of this technology whose solutions have been available since that time include Adobe,[3] Aries Sytems.[4] ArtistScope,[5] Authentica,[6] Drumlin Security,[7] FileOpen,[8] LockLizard,[9] SealedMedia,[10] and Vitrium Systems.[11] There have also been related solutions that use security technology to limit forwarding of files as email attachments.[12]

---

[3] See http://web.archive.org/web/20041211190125/http://www.adobe.com/security/main.html, http://www.adobe.com/aboutadobe/pressroom/pressreleases/200706/061907DigitalEditions.html, and http://www.adobe.com/aboutadobe/pressroom/pressreleases/200809/090908ACS4.html.
[4] See http://web.archive.org/web/20040828033845/http://www.docurights.com/.
[5] See http://web.archive.org/web/20081105152907/http://www.artistscope.com/copysafe_pdf.asp.
[6] See http://web.archive.org/web/20041230081033/http://www.authentica.com/.
[7] See http://web.archive.org/web/20071017121229/http://drumlinsecurity.com/.
[8] http://web.archive.org/web/20041209023451/http://www.fileopen.com/.
[9] See http://web.archive.org/web/20041229192158/http://www.locklizard.com/.
[10] See http://web.archive.org/web/20041218014338/http://www.sealedmedia.com/.
[11] See http://web.archive.org/web/20051207045241/http://www.vitrium.com/.
[12] See for example GigaTrust:
http://web.archive.org/web/20050207171233/http://gigatrust.com/prod_email.htm.

57.     No DRM technology is one hundred percent secure against hacks or workarounds. But DRM generally prevents average users without special technical expertise from copying DRM-protected files without authorization.

58.     As for securing HTML content on web pages, the type of DRM technique that is used with PDF files does not apply very well to HTML files in web browsers.  The security of a DRM system depends on its ability to keep encryption keys (and other sensitive information) from being discovered by would-be hackers.  This has been difficult to do in web browser environments.[13] Therefore DRM for HTML content *per se* is hardly ever used.

59.     Instead, other techniques are available to make web content even harder to copy than as described above. For example, there are techniques for showing text on a web page as an image, which allows text to be viewed but not to be selected and copied to the clipboard.  Users can copy these pages (in their entirety) in the same way as they can other web pages, as described above.  But it is difficult to use the text on these pages in any way other than reading it on the web page.  Extracting text in order to paste it into another document (such as an email message) is not possible unless one were to take a "screenshot" (screen image capture), run each screenful of text through an optical character recognition (OCR) routine, and then concatenate all of the OCR output files into a single document.

60.     In other words, this process is not really DRM, because the content is not encrypted, but it acts as a deterrent to copying and reuse of copyrighted material; I refer to it as "screenshot DRM."

---

[13] Many of the most recent web browsers (at this time of writing) do support integrated DRM, but for audiovisual content embedded into web pages, not for HTML content itself.

61.     Adobe also offers certain techniques within Acrobat for making text in PDF files harder to copy.  A publisher can configure Acrobat to encrypt the entire contents of a document when creating a PDF version of it.  There are two basic settings for encrypted PDFs.  In the simplest setting, anyone can read the PDF file, but it is not possible to select text for copying to the computer's clipboard (for pasting into another document).  In the other setting, a user has to type in a password to be able to read the PDF, and then may or may not be able to copy text to the clipboard, depending on how the publisher has configured it.

62.     The most recent technique for deterring unauthorized copying of PDF files is digital watermarking, or simply watermarking for short.  Digital watermarking means inserting data into digital files.  The technique has existed since at least the 1990s; it has more recently been applied to PDFs.

63.     There are various purposes for watermarks and various different techniques for inserting them into PDFs.  In this context, where the objective is to inhibit unauthorized copying, the data inserted as a watermark is usually some identifier of the user who originally obtained the PDF file.  This could be the user's name, a user ID, email address, etc.  The data can be understandable to human readers, such as a plain-text email address, or it could be a numerical ID that the publisher or distributor can look up in a database but is otherwise not meaningful to anyone, so as to protect user privacy.

64.     A watermark can be visible, or it can be made invisible by certain techniques such as hiding it as binary codes in illustrations or a using it as input to an algorithm for kerning (determining the precise spacing between text characters in a line).  If it is invisible, special software is necessary to detect the watermark and extract the data.  A watermark can appear once in the file or multiple times, such as on every page.  The watermark is typically inserted into the

23

PDF file just before it is sent to the user.  This can be done with some code that retrieves user information from the distributor's user database and inserts the watermark into an existing PDF or as the PDF is created.[14]  There are also software packages that insert these types of watermarks, such as WP PDF Stamper (see ¶104 below); in addition, some of the DRM vendors mentioned above also offer the ability to watermark PDFs with user information.[15]

65.     The presence of a watermark in a PDF file does not restrict a user's ability to read, use, print, or copy the file, or to select text within the PDF for copying to the clipboard.  Instead, it acts as a deterrent to unauthorized copying because the user knows that an indication of his identity is embedded in it.  For example, if the publisher were to find a PDF file in a suspicious location, such as on a file-sharing network, website, company file server, or computer belonging to a non-subscriber, the publisher could read the watermark and determine which user obtained it in the first place.  This may cause a user to "think twice" before copying a PDF file to a location where it is widely accessible.  For this reason, watermarking is sometimes known in the industry as "social DRM."

66.     Publishers can employ copyright monitoring services to search for potentially unauthorized copies of files.  These typically search publicly accessible locations on the Internet, such as websites, blogs, file-sharing networks, and so on.  There are also separate techniques to search company IT infrastructures for files with certain content; publishers can use these to audit subscribers if permitted to do so.  It is possible to include the right to audit in this manner in publishers' digital content license agreements.

---

[14] https://acrobatusers.com/tutorials/watermarking-a-pdf-with-javascript shows an example of this technique.
[15] See for example http://www.locklizard.com/document-watermarking/, https://drumlinsecurity.com/wordpress/adobe-and-drumlin-pdf-watermarking-static-and-dynamic-watermarks/, and https://www.fileopen.com/solutions/watermarks.

67.     Monitoring services can use a variety of techniques to identify potentially unauthorized files. There are various techniques for doing this.  Some will only identify files that match copyrighted works exactly (byte for byte), while others will match the text or other salient characteristics of works. For example, the latter type of technique may match HTML text on a website where the original was a PDF file.  Copyright monitoring services can also work with watermarked files.  In such a case, watermarks serve as identifiers of not only the work but possibly also the user who originally obtained it.  Some providers of watermarking technology also offer copyright monitoring services. Examples of copyright monitoring services available over the past few years for text-oriented content include Covington & Burling,[16] Digimarc Guardian (f/k/a Attributor Guardian),[17] MarkMonitor,[18] and Muso.[19]

### E.  Techniques for Reducing Unauthorized Access to Websites

68.     In addition to techniques for restricting access to content, making content more difficult to copy, and detecting potentially unauthorized files, there are various techniques for restricting website access to authorized users only.  The generic term for proving that a user or device has legitimate access to an online service is "authentication."

69.     The most widely used website authentication technique is usernames and passwords.  Another technique is IP address authentication, where access is allowed from a computer with a given IP address.  An IP address is a group of four numbers that denotes the "location" on of a device on the Internet.  Publishers of online content sometimes offer so-called site licenses that identify specific IP addresses within the subscribing company; devices at those IP addresses are authorized to access the publisher's content.  Another type of site license is one

---

[16] See for example http://us.macmillan.com/piracy.  The law firm has a division that does this work.
[17] See https://www.digimarc.com/application/copyright.
[18] See https://www.markmonitor.com/services/antipiracy.
[19] See https://www.muso.com/.

in which the subscribing company has a fixed number of users who can access the content simultaneously from within that company's internal network.

70.     Passwords can be shared, guessed, or stolen.  Website operators can implement various measures to mitigate password guessing, theft, and sharing.

71.     Techniques to inhibit password guessing and theft are known generically as "password policies."  These include password "strength" requirements, which can include minimum number of characters and character variety (upper as well as lower case letters, numerals, and punctuation marks), and forbidding certain character combinations, such as the letters in the user's name or address, character strings like "password" or "12345," or any characters repeated more than twice.  Password policies can also include requiring users to re-enter their passwords periodically, such as every two weeks, and to change their passwords periodically, such as every 90 days; they can also include locking users out of the website after a set number of incorrect password attempts.  Many leading technology companies have published or implemented best practices for password policies, including Microsoft,[20] Google,[21] Oracle,[22] Amazon,[23] and Apple.[24]

72.     Web browsers can save passwords so that users don't have to remember them, but website operators can help prevent password theft by adopting certain technical measures to prevent browsers from doing this.  This helps prevent situations where someone not authorized to access a website uses the device of an authorized user without his permission. One such technique is to set an HTML flag called "autocomplete" to "off" for a given form on a web page

[20] See https://technet.microsoft.com/en-us/library/ff741764.aspx.
[21] See https://support.google.com/accounts/answer/32040.
[22] See https://docs.oracle.com/cd/E27559_01/admin.1112/e27149/oim_admin.htm#OMADM2985.
[23] See https://www.amazon.com/gp/help/customer/display.html?nodeId=10412241.
[24] See https://support.apple.com/en-us/HT201303.

that includes password entry.  This technique is often used for forms that take credit card numbers as input, so that any credit card numbers that the browser has saved can't be used with that website.

73.    Website operators can also require extra authentication methods, in addition to passwords.  A common example is a "validation email" containing a link with an individualized code that a website operator will send to a user once he creates an account; the user can only use the account after he opens the email and clicks on the link.

74.    A website operator can also send a code to a user's smartphone, where an app such as Duo Mobile or Authy has the user touch the smartphone screen or enter the code on the website to approve the access; or the user can be required to push a button on a small device (called a "security token") plugged into the computer's USB port.

75.    The latter techniques are known as two-factor authentication ("2FA" for short) or two-step verification.  Other 2FA techniques involve biometrics devices such as fingerprint readers. Many laptop PC models intended for business use nowadays come equipped with fingerprint readers.[25] The concept behind 2FA is that there are three essential ways to authenticate oneself: with something you know (such as a password), something you have (such as a smartphone or token card), and something you are (such as a biometric).  2FA requires two of these three factors for authentication.

76.    Publishers can also take steps to ensure that users who sign up for subscriptions are actual humans and not automated "bots" that access websites fraudulently.  One technique

---

[25] See for example http://www.bestbuy.com/site/searchpage.jsp?id=pcat17071&st=fingerprint+reader, a list of laptops with fingerprint readers available from the retailer Best Buy.

for this is the CAPTCHA[26]: the website shows an image containing characters that are visually

distorted so that an automated OCR mechanism cannot identify them but a human can; the user

is required to type the characters in.  Another technique called reCAPTCHA accomplishes the

same thing but (in most cases) only requires the user to check a box.

     77.     Finally, publishers can monitor their websites for suspicious activities that suggest

password sharing or other forms of unauthorized access.  A publisher can detect when a given

account is accessed from different web browsers, each of which has a different identifier that is

captured in web server logs.  This suggests that multiple users <u>may</u> be accessing the same

account.  Yet this technique is not foolproof: the same user may legitimately use different web

browsers, on different devices (e.g., a work PC and a personal laptop or tablet), or even on the

same computer.  A more reliable technique is to detect and block simultaneous logins to the

same account from different devices.

### V.    EIG Has Chosen to Publish Content in Ways Especially Amenable to Copying Despite the Additional Effort

     78.     EIG makes subscription content available on its website and in email.  Some of its

publications are also available in print (see Wallin United Steelworkers Depo at EIG051403 line

24 through EIG051404 line 9 and EIG051432 line 17 through EIG051433 line 2).  The format of

emailed issues is PDF (see ¶¶25-29); see for example

http://www.energyintel.com/pages/about_piw.aspx (Petroleum Intelligence Weekly).  A few EIG

publications are also distributed by email in HTML, including Oil Daily and International Oil

Daily; see for example http://www.energyintel.com/pages/about_tod.aspx (Oil Daily).  PDFs can

also be downloaded from EIG's website (Hitchcock Depo at 177:16).  .

---

[26] Completely Automated Public Turing test to tell Computers and Humans Apart.  The Turing Test was a scheme that the celebrated British mathematician Alan Turing devised to determine whether a computer could be distinguishable from a human based on its responses to text-based conversations.

79.    EIG began making Oil Daily available as PDFs around 1999 (Hitchcock Plains Depo at EIG049925, lines 5-17).

80.    John Hitchcock suggested that EIG began publishing its content in HTML on its website in 1999 (Hitchcock Depo at 206:7-8).  However, pages from the Internet Archive suggest that this may not be true, that EIG instead began offering its content on web pages around May 2001.  A page from August 2000, http://web.archive.org/web/20000819011337/http://www.energyintel.com/Products.htm, shows that subscriptions were available via "E-mail ... Fax ... Mail", the latter meaning in print and sent through postal mail.  A page from April 2001, https://web.archive.org/web/20010414030840/http://www.energyintel.com/Products.htm, shows the same thing. Yet https://web.archive.org/web/20010517034741/http://www.energyintel.com/, from May 2001, shows a redesigned website with headlines and links to news stories in publications such as Oil Daily.  These links led to a subscriber login page, implying that if one were to log in successfully, one could view stories as web pages.  In other words, EIG appears to have launched a new website in the April-May 2001 timeframe that included subscription content for users who logged in.

81.    EIG did make its content available through SageMaker's SageWave Oil & Gas Portal since May 2000 or earlier.[27]  SageMaker offered information portals for Oil & Gas as well as various other industries, which aggregated content and data from many different sources and ran on "intranet" (Internal web) servers within subscriber companies – in this case large energy companies.  EIG would have done this by feeding content to SageMaker on a regular basis; in turn, SageMaker fed all of the content that it aggregated to servers located within its customers'

---

[27] See http://www.prnewswire.com/news-releases/sagemaker-launches-enhanced-version-of-sagewave-oil-gas-portal-73266502.html.

facilities.  The SageWave Oil & Gas Portal featured content from EIG alongside content from competitors such as Platt's and Argus.[28]

82.    As was typical for publishers of its type, EIG evolved its publishing processes and tools over time from standard DTP for print (see ¶23 above) to HTML publishing for the web (see ¶¶30-33 above).

83.    From 1992 or earlier (OD Profile at EIG046259) until at least June 2007 (Wallin Email), EIG, following widely used practices, maintained a desktop publishing environment based on the Quark layout program (see ¶24 above) for its print publishing.  I assume that EIG used this environment to generate PDF versions of its publications, because it is easy to generate a PDF from a DTP tool like Quark (see ¶27 above).

84.    It is not clear how EIG created HTML pages during the first couple of years of publishing on the web; it may have been through a conversion process similar to that described in ¶¶48-49 above.  Yet by 2012, EIG had transitioned to a "web-native" process (see ¶50 above) which entails publishing directly in HTML and then converting to print/PDF layouts; this is the process that it appears to use today.

85.    EIG uses a Web CMS (see ¶36 above) called WPS (Web Publishing Solution) from Reed Technology (WPS User Guide at EIG051569) for publishing HTML content on its website.  WPS maintains all web content for EIG, including content from back issues (Hitchcock Depo at 205:10-14).  Mr. Hitchcock suggested that EIG's use of WPS dates back to about 2001 (Hitchcock Depo at 185:2-4).  Financial statements imply that EIG acquired a version of WPS in or before 2004, since the asset was on its balance sheet (as "Reed Project") that year (Financial

---

[28] *Id.*

Statements 2004 at EIG047824 and EIG047826). This version of WPS employed the Microsoft Word program ("Word") as its user interface (WPS User Guide at EIG51569). This meant that authors and editors would write or edit articles in Word, and WPS would create HTML pages for EIG's website.

86.     This in turn suggests that EIG was maintaining two parallel publishing environments, for print/PDF and for HTML, simultaneously until at least June 2007. Yet when EIG switched to a new version of WPS, it shifted to a "web-native" process (see ¶50 above) in which the print/PDF versions of publications were byproducts of the HTML editorial workflow that required extra effort to create.

87.     EIG acquired a new version of WPS in the late 2000s and appears to have deployed it in early to mid-2012. The former is evident from financial statements, where "EIG WPS Project" was first listed on the 2008 balance sheet (2008 Financial Statements at EIG047765). The latter is evident from the WPS User Guide and Babski Memo. The WPS User Guide is undated, but it refers to versions of system software that needed to be on users' computers in order to use WPS (WPS User Guide at EIG051569); these references place that document in the July 2011 to July 2012 timeframe.[29] Babski Memo includes a "Timetable" for WPS roll-out that includes "through end of Jan ... mid-Feb: begin staged roll-out ... full roll-out should be completed in 3-6 weeks from then" (Babski Memo at EIG051567). This suggests that the roll-out of the new web-based WPS took place in early-mid 2012.

---

[29] The document mentions "Apple's Safari (Windows and Macintosh)" and "The version of Java should be at least Java 6 ... For now Java 7 updates produce some display glitches and it is not recommended" (the latter implying that Java 7 had been released). (WPS User Guide at EIG051569.) Apple launched the Safari web browser for Windows in June 2007; see https://www.apple.com/pr/library/2007/06/11Apple-Introduces-Safari-for-Windows.html. It stopped supporting the product in July 2012; see http://appleinsider.com/articles/12/07/25/apple_kills_windows_pc_support_in_safari_60. Sun Microsystems released Java 7 in July 2011; see https://java.com/en/download/faq/release_dates.xml. Taken together, this information places the WPS User Guide between July 2011 and July 2012.

88.    This newer version of WPS did not use Word; instead it was entirely web-based, meaning that editorial staff accessed it through web browsers (WPS User Guide at EIG051569).

89.    The Publication Checklist and Instructions document describes the editorial process for creating print and PDF editions of EIG publications that was in place after the above version of WPS was rolled out.  The document is undated, but references to a mock Petroleum Intelligence Weekly layout dated August 29, 2016 (Publication Checklist and Instructions at EIG051678-81) suggest that it is quite recent and thus likely to represent current editorial workflow.

90.    The mockups are labeled with instructions including four references to "pull from WPS" or "pulled from WPS" (*id.*).  This indicates that EIG editorial staffers take extra steps beyond their web publishing process to produce the print/PDF editions.  It is reasonable to assume that EIG editorial staff still uses Quark to lay out its print/PDF editions and that the mockups represent Quark page layouts; Quark is still a popular tool for print-oriented page layout today.

91.    EIG continues to make its content available in PDF files, which are very easy for users to copy compared to web pages on a website.  See ¶¶38-45 above.  It does this even though it admits that only a small number of subscribers receive publications by emailed PDFs and that "the preponderance" use the website instead (Wallin United Steelworkers Depo at EIG051390, lines 4-18).

92.    EIG also admits that the PDF versions take additional cost and effort to produce with EIG's current editorial processes: "… we can produce [a publication] as an HTML publication in a highly automated fashion and it saves labor[;] it saves effort by our production

department.  To produce a PDF, you have to have a production editor get involved with the final

layout and the look of it and so forth." (Wallin United Steelworkers Depo at EIG051392, lines

16-24, capitalization added.)  See also Hitchcock Depo at 186:22-25: "Well, Ivan [Sandrea, COO

of EIG in January 2012] wanted to look at ways to trim costs, and one of the things that he

spotted was the extra effort that goes into the [PDF] page layout of Oil Daily.") See also

Hitchcock Depo at 191:9-15: "We're eating costs because we're doing it both ways.  I mean,

HTML doesn't really cost anything.  This is just essentially coming out of whatever entity the

WPS produces as they stream[,] and applying HTML markup is not a hard thing, and then you're

done.  And the PDF, then, has to be reconfigured from the HTML."

    93.    EIG also continues to make back issues available as PDF files on its website,

which also makes them more accessible for users to download and copy (OD Profile at

EIG046259).

    94.    EIG does this even though it understands that PDFs are especially easy for users

to copy and distribute: "Our judgment has been that the e-mail PDF is particularly easy for

people to forward[,] and it's something that, from the evidence that we've received, mainly

through customer service from various subscribers, that occurs quite commonly. … the other

form of infringement that occurs on the website more often is with people downloading PDF and

distributing that.  We think that happens, you know, we think that's fairly preval[e]nt …".

(Wallin United Steelworkers Depo at EIG051393 line 20 to EIG051394 line 7, capitalization

added.)  See also ProtectedPDF Memo at EIG047703 ("We know from experience that a

significant amount of copyright abuse occurs in the unauthorized forwarding of PDFs")

    95.    In addition, EIG made the decision to supply emailed HTML issues with full text

instead of links to article content on its website.  See for example

http://www3.energyintel.com/WebUploads/sample-pages/DE130618.htm, a sample issue of Oil

Daily from 2013 that EIG makes available to non-subscribers on its website.  This makes them

much easier for users to copy than if the HTML issues contained only headlines with links to

EIG's website; see ¶¶46-47 above.

96.    EIG switched Oil Daily and International Oil Daily from PDF to HTML in early

2012 (Wallin United Steelworkers Depo at EIG051391, lines 6-7) and subsequently reintroduced

the PDF version (Hitchcock Depo at 190:6-11).  EIG understands that the HTML version "… is

still an attachment, it still has many of the same characteristics of the PDF[;] instead of being a

PDF file it is an HTML file." (Wallin United Steelworkers Depo at EIG051391, lines 8-11,

capitalization added.)

97.    One advantage of full text HTML over HTML with headlines and links to full text

on the website is that the latter requires Internet connectivity while the former can be read on a

disconnected device.  Thus it might have been preferable to distribute full text HTML instead of

HTML with links to website content on the EIG website in the early 2000s, when EIG began

publishing HTML content on its website, even though EIG did not start distributing full text

HTML until 2012.  In the early 2000s, some of EIG's subscribers may not have had reliable,

continuous Internet access, which would have been required in order to click on article headlines

and read article text online.

98.    However, this was no longer the case in 2012, and it certainly is not the case

today.  It is very reasonable to assume that businesses – particularly those of the type that can

afford subscriptions to publications like EIG's – have continuous Internet connections.  They

need not even be very high speed Internet connections, as EIG's content (text and images) does

not require much bandwidth to transmit.  EIG understands and admits this: "In terms of customer

service, now it seems more and more people are, you know, basically online all the time, high-speed connection all the time and, you know, not – it's less of an obstacle th[a]n, say, 10 years ago." (Wallin Canal Barge Depo (in 2013) at EIG049154, lines 8-12.)

## VI.   EIG Has Not Adopted Significant Measures to Mitigate Unauthorized Copying

99.   EIG has been concerned with copyright infringements by its subscribers since at least 2005. In that year, it determined "… that there was likely a lot of copyright infringement possible among our subscriber base as a result of changes in the way information technology allowed us to distribute our publications" and "definitely considered [it] a threat to our existence" (Hitchcock Depo at 75:17-25). See also Profit Improvement Plan 2005 at EIG47350 ("our copyright problem").

100.   Yet EIG has done little to mitigate alleged infringements proactively since that time. EIG filed five copyright lawsuits[30] from June 2005 until June 2007. It was not until that time – two years after the filing of the first lawsuit, and thus even longer since EIG found its first evidence of possible infringement – when EIG even evaluated any techniques for mitigating the "threat to our existence." This was despite the fact that various tools to address copyright infringement, such as those mentioned in ¶¶53-67 above, had been available for years and had been evaluated and/or used by publishers situated similarly to EIG.

101.   EIG evaluated a single DRM solution for PDFs, ProtectedPDF from Vitrium (see ¶56 above). It tried ProtectedPDF out on two of its smaller publications, EI Finance and Jet Fuel Intelligence, from early 2009 to the end of 2011 (ProtectedPDF Email at EIG050858). There is no evidence that EIG researched other solutions, besides a solution that "Thomas Tech had proposed" ( ProtectedPDF Email at EIG050859) and that is not otherwise identified.

---

[30] Search on PACER of litigations filed by EIG and classified as "820 Copyright" by Nature of Suit Code.

102.    I understand that EIG discontinued its limited use of ProtectedPDF due to certain technical issues (Hitchcock Canal Barge Depo, EIG048948 line 13 through EIG048949 line 5). There was no effort at that time to evaluate other copyright protection solutions, even though several others were available (see ¶56 above).

103.    Other DRM solutions were available at that time that worked differently from ProtectedPDF; thus they may have overcome the technical issues that EIG experienced with ProtectedPDF.  For example, one of the technical issues cited was that ProtectedPDF had to communicate with an outside server every time a user opens a PDF file for reading, and some of EIG's customers would not allow such communication through their firewalls.[31]  Not all DRMs have this requirement.

104.    Yet rather than investigating alternatives before it discontinued its use of ProtectedPDF, EIG did not look at copyright technologies again until sometime in 2012, by which time it had filed at least 20 additional copyright lawsuits.[32]  The document "Overview of PDF Protection Options" is undated, but metadata on the file fixes the date as July 25, 2012, and the author as Robert Clayton, EIG's Chief Technology Officer at the time.  It shows the results of what I would characterize as limited research of a few options for inhibiting unauthorized distribution of PDFs that were available at that time: WD PDF Stamper, ProtectedPDF, LockLizard, and Attributor Guardian.  Of these, I believe "WD PDF Stamper" is a reference to WP PDF Stamper,[33] a "plug-in" to the WordPress blogging platform that creates watermarked and/or simply encrypted PDFs;  ProtectedPDF was discussed above; LockLizard is another DRM for PDF files (see ¶56 above); Attributor Guardian is a copyright monitoring service (now

---

[31] A firewall is a security system that monitors communications going into and out of an organization's network and blocks potentially harmful data.  EIG would have had to get those customers' IT departments to allow the ProtectedPDF communication through their firewalls.

[32] See *supra* note 30.

[33] https://www.tipsandtricks-hq.com/wp-pdf-stamper/.

Digimarc Guardian; see ¶67 above).  The memo stopped short of making specific

recommendations and merely suggested further discussion by management (Overview of PDF

Protection Options at EIG051558).  It is unclear whether any such discussion actually took place

(Hitchcock Depo at 192:17-194:18), but none of the technologies and services mentioned in the

document were ever evaluated or deployed (*Id.*).

105.    EIG experimented briefly with the MarkMonitor copyright monitoring service (a

competitor to Digimarc Guardian; see ¶67 above) but discontinued it after only six weeks

(Hitchcock Depo at 195:14-20).  EIG tried the Meltwater monitoring service and may still use it

today.  Mr. Hitchcock claimed that Meltwater could be used to catch potential infringements.

Yet Meltwater is not known in the industry as a service for detecting copyright infringements.

Instead it is known as a means of searching for content on the web for publicity tracking

purposes, such as finding which websites mentioned a brand name or news story; and that is how

EIG is using or has used it (Hitchcock Depo at 196:1-21).

106.    In general, EIG appears to have invested only minimal money and resources into

tools and techniques for mitigating copyright infringement. By its own admission, the amount of

money that EIG spent on ProtectedPDF "… wasn't a lot.  I think it was something [o]n the order

of $30,000, $40,000 a year." (Hitchcock Depo at 179:23-25.)  I have found no evidence of

significant monetary expenditures on copyright infringement mitigation resources other than

that.  EIG gave one of its existing employees copyright enforcement responsibilities in 2007, but

that person had no technical background, did not himself investigate technical solutions, and

merely worked with the IT department to monitor website access logs, a process that was

unavailing and did not address EIG's primary concerns about infringement, which was

distribution of PDFs (see ¶94 above) (Hitchcock Depo 86:21-90:9).  In all, I consider this less

than a reasonable investment of resources, particularly considering the level of concern that EIG had about its copyrights.

107.     In contrast, EIG appears to have expended vastly more resources on copyright litigation. EIG filed a total of about 47 such lawsuits before this one was filed.[34]  EIG initiated an expense line item for "Legal Fees – Copyright" in 2006, separate from "Legal Fees".  Its expenditures in that category rose from $158,947.98 that year to over $2 million in 2013.  From 2006 through 2013, EIG spent over $9 million on copyright legal fees (EIG Financial Statements 2006-2011 and 2013 at EIG047869, EIG047930, EIG047759, EIG047832, EIG047857, EIG047772, and EIG047981).[35]

108.     The timeline of events in the instant litigation also provides an example of EIG's failure to take reasonable proactive measures to mitigate infringements over a significant period of time.  The chain of events appears to have started in February 2008, when the Defendant ("NCRA," as it was known then) contacted EIG about potentially taking additional subscriptions to EIG's publications, indicating that more people within NCRA were interested in reading them (Buttrick Email).  This occurred about three years after EIG had communicated internally about its copyright problem (see ¶99 above).

109.     An email exchange four years later (March 2012) shows that EIG had become aware that NCRA had been "forward[ing Oil Daily] to one of the other executives" when the named subscriber was out of the office.  The email exchange indicates that EIG had treated this as evidence of infringement and had followed up accordingly by phone (Dent Email).

---

[34] See *supra* note 30.
[35] The 2012 and 2013 expenses are only through August of each year ; I have not seen financial statements covering those entire years.  (The 2012 8-month figure was taken from the 2013 statement.)  The total was $8.96 million; it is reasonable to infer that EIG's expenses for September through December 2012 and 2013 put the total well over $9 million for 2006-2013.

110.    Further communication regarding the copyright issue did not occur until three years after that, in March 2015, when another email exchange indicates EIG's concern about possible infringements and NCRA's offer to consider additional subscriptions (Menard Email). The following January, EIG filed the instant lawsuit. In other words, EIG first learned of possible infringements more than three years before it initiated this litigation, during which time it implemented no measures to mitigate the Defendant's allegedly infringing actions.

111.    There are various reasonable technical measures that EIG could have been taking – or at least experimenting with – to mitigate unauthorized use of its content in a proactive fashion, as opposed to recovering damages from infringements alleged to have already taken place.  These are described in ¶¶51-67 above.  EIG does not currently use DRM, PDF security, "screenshot DRM," watermarking, or similar methods to curtail unauthorized uses of its content (see also Overview of PDF Protection Options at EIG051558: "As it stands now [in July 2012], EIG applies no DRM digital right management or protection of any kind to our PDF products"), nor does it appear to be experimenting with any of these techniques.  There is also no evidence that EIG uses strong password policies (see ¶71 above), let alone CAPTCHA (see ¶76 above) or two-factor authentication (see ¶¶74-75 above), even though most such techniques (except the latter) cost little or nothing to implement.  EIG should have hired or assigned someone with a technical background to investigate such techniques on a more active and focused basis than it did.

112.    Various commercial publishers of professional content have used DRM for their distributed PDF files.  These include some of EIG's competitors in the energy market, such as Argus Media (see for example Wallin Plains Depo at EIG050676 lines 16-18 and Segmentation

at EIG047325) [36] and Infield Systems, a division of Wood Mackenzie (3v Ventures at

EIG047302-5).[37] Mr. Hitchcock appears to be unaware of this (Hitchcock Depo at 181:6-14).

Platt's, another competitor, uses has a password strength requirement (passwords must be at least

eight characters long, begin with an upper case letter, and include at least one numeral) and uses

a CAPTCHA scheme to help validate new user accounts.[38]

113.    Other professional periodical publishers in different vertical markets also use

DRM. Examples in financial services include American Banker,[39] The Nilson Report, and

Euromoney.[40] Examples in engineering include Engineers Media[41] and ASME (American

Society of Mechanical Engineers).[42] In the information technology field, O'Reilly Media uses a

form of watermarking for its PDF e-books.[43]

114.    Apart from the investigation of "WD PDF Stamper" noted in ¶104 above, EIG

has never investigated the possibility of watermarking its PDFs. As described in ¶¶62-65 above,

watermarking has the advantage over DRM (by itself) of not interfering with a user's normal use

of the PDFs or requiring network connectivity to open the file for reading, as some (though not

all) DRM technologies do.

115.    Watermarking could also help EIG reduce opportunities for the kinds of abuses

that EIG is concerned with by helping to eliminate the need for PDF distribution in the first

place. EIG has stated that some of its customers may prefer to receive publications digitally (to

---

[36] See http://www.vitrium.com/document-security-protection-drm-blog/case-study-argus-media/.
[37] See http://www.infield.com/market-forecast-reports/pdf-report-access.
[38] See http://www.platts.com/login-register.
[39] See http://webcache.googleusercontent.com/search?q=cache:32f_bEhsk4sJ:m.vitrium.com/document-protection-for-media-publishing+&cd=6&hl=en&ct=clnk&gl=us.
[40] See http://www.vitrium.com/industries/media-publishing/.
[41] *Id.*
[42] See https://www.fileopen.com/.
[43] See for example https://news.ycombinator.com/item?id=2368705. I also have personal knowledge of this, being both an author and user of books published by O'Reilly.

avoid the delay in postal mail) but then read them in print; see for example Hitchcock Depo at 58:22-59:2. For those customers, EIG could make a "print entire issue" option available on its website to subscribers who log in. Although it would be possible to use one's own copy of Adobe Acrobat (or "Save as PDF"; see ¶27 above) to create and save a PDF this way, this is still an impediment to copying – a "speed bump" that requires a modicum of technical skill to overcome. This technique would also enable the resulting printed copy to be visibly watermarked to identify the account from which it was printed. As described above, this could discourage unauthorized distribution and provide forensic evidence of potential infringements. This would be a limited, economical use of watermarking, as opposed to watermarking every download of every PDF. This is just one example of a technique that EIG could have potentially implemented to reduce opportunities for unauthorized distribution of its content, but did not even investigate.

116.    Even without evaluating or investing in any of these technological solutions, if EIG wished to inhibit unauthorized copying, a reasonable step would have been to simply stop distributing content in PDF, both in emails and as downloadable files on its website. (It could still distribute publications in print.) Another reasonable and simple step would be to change the way it provides HTML in emails, for Oil Daily and other publications, by distributing linked headlines only instead of full text. These could also have been significant steps toward mitigating copyright infringement, even though they would have cost nothing to implement (beyond the one-time costs of making changes to production processes).

117.    I note that some of EIG's competitors do not distribute PDFs but instead only appear to make their content accessible online, i.e., through logins to websites. These include PIRA and CERA (now IHS Energy) (3v Ventures at EIG047304-5). There is also evidence

suggesting that another one of EIG's competitors, John S. Herold (now IHS Herold) (*Id.*),

changed its business model from document publishing to custom research services (Profit

Improvement Plan 2005 at EIG047350, citing John S. Herold's "movement to a retainer-only

system", where "Retainer" means custom research for individual clients (Hitchcock Canal Barge

Depo at EIG048837, lines 5-8)).

118.    In addition to its limited research on copyright technologies for its own use (see

also Hitchcock Canal Barge Depo at EIG048954, lines 4-13), EIG has apparently not done much

to research the techniques that its competitors may be using (Hitchcock Depo at 181:2-14) or to

share best practices with professional publishers in non-competitive vertical markets. (Wallin

Canal Barge Depo at EIG09152 line 25 through EIG09153 line 6 refers to "... some software out

there that I know some of our competitors use to try and track people opening emails ... the kind

[of] thing that somebody has to click, 'I received an email,' or something like that." But this

simply refers to email return receipts, a standard email feature that has little to do with copyright

protection.)

Dated: January 23, 2017

Respectfully submitted at New York, NY,

By: /s/ William Scott/

**EXHIBIT A: CURRICULUM VITA**

# William R. Rosenblatt

33 West 60th St., 4th Floor
New York, NY 10023
+1 212 956 1045
Email: billr@giantstepsmts.com
Web: http://www.giantstepsmts.com/

Seasoned, experienced strategist in digital media technology and markets with deep knowledge of content industries including publishing, music, and video, as well as online education. Skilled in market strategy, technology architecture, digital transformation, and intellectual property issues.

## Experience

### GiantSteps Media Technology Strategies
*President,* June 2000 – Present.
- Management consultancy focused on digital media technology. Clients include content providers and technology vendors, ranging from startups to Fortune 500 media and IT companies.
- Expert witness in copyright, patent, and antitrust litigations.
- Program Chair of conferences on copyright issues in the digital age including Digital Rights Strategies (2004-2007) and Copyright and Technology (2009-present).

### Morningside Ventures Inc./Fathom
*VP & Chief Technology Officer,* August 1999 – June 2000.
- CTO of Morningside Ventures, Columbia University's internet business incubator.
- Led technical implementation of Fathom.com, a Morningside Ventures spinoff. Fathom.com was a destination website for online courses, authenticated knowledge, and e-commerce affiliated with Columbia, London School of Economics, and other educational and cultural institutions. Responsibilities included technology architecture, project management, selection of and negotiation with technology partners, web hosting, e-commerce, and internal IT management. Managed internal staff and various vendor relationships.

### McGraw-Hill
*VP, Technology and New Media,* March-August 1999.
- CIO for McGraw-Hill's vertical market trade publishing division, covering aviation, energy, construction, and other verticals. Responsible for front and back office IT, including online media, desktop publishing, back-office systems. Managed department of 30 people.
- Defined technology strategy for vertical market web portals; chief architect of AviationNow.com, an aviation industry information portal associated with *Aviation Week* magazine.
- Architected intranet front end to legacy mainframe customer service system for all McGraw-Hill magazines including *Business Week*.
- Internal consultant on cross-divisional content management architecture.

### Sun Microsystems
*Market Development Manager, Media & Publishing*, 1997-1999.
- Set market strategy for Sun in publishing industry, focusing on content management, web technologies for publishers, newspaper systems, and digital rights management. Drove strategy through sales force.
- Recruited and managed alliances with software vendors and other partners. Drove over $20 Million revenue through partner investments.
- Consultant to media industry customers. Example projects: content management and online delivery for educational publisher; online rights management for scientific publisher.

- Author of whitepapers and articles; maintainer of Sun's media industry web site.

*Enterprise IT Architect,* 1996-1997.

- Technology consultant to Sun's major media industry customers.  Example projects: enterprise content management architecture for trade periodical publisher; next-generation editorial system strategy for consumer magazine division of diversified media company; digital asset management strategy for major film studio.
- Did business development work for Sun MediaCenter streaming media server product line.
- Developed Sun's Digital Media Management solutions strategy & reference architecture.
- Conceived and launched Sun Digital Media Solutions Center in New York City.

## Times Mirror Co.

*Director, Publishing Systems*, 1994-1996.

- Corporate technology management position reporting to CIO with responsibility for digital content technologies across Times Mirror's newspaper, book, and professional information businesses.
- Technology leader of Times Mirror Digital Library, a family of digital content management projects across several Times Mirror divisions involving distributed editorial libraries for newspapers; mass-customized textbook publishing; editorial process reengineering; intellectual property management and control.   Managed project budgets totaling over $16 Million.
- Technology consultant to Times Mirror operating units and Corporate Strategic Development.  Projects included MDConsult.com, a web service for physicians; online aircraft maintenance documentation, custom publishing of professional training materials; evaluation of companies for potential investment or acquisition.
- Company representative on publishing industry committee to address intellectual property issues in the digital age.  Participated in the design of the Digital Object Identifier (DOI), a standard for online intellectual property identification in academic, STM, and other publishing market segments.  DOI is currently the basis for the EIDR identifier system for film and TV content.

## Moody's Investors Service

*Manager, Information Resources*, 1992-94.

- Responsibilities included emerging technologies R&D and software quality assurance.
- Architect of Moody's first-ever service for digital publication of credit reports and ratings data.  The service was launched in the pre-Internet era and was based on Lotus Notes, Adobe Acrobat, and relational database technologies.
- Led global rollout of Lotus Notes platform.
- Introduced technologies to company: groupware, expert systems, automated software testing.

## The Rustin Group

*Senior Software Developer,* 1991-92.

- Developed sales tracking system for international barter company.
- Managed benchmark of production system for financial information publishing division of (then) Citicorp on Unix-based multiprocessor computers.
- Software product initiatives in software development tools and computer music composition.
- Established and managed the company's college recruiting program.

## Intermetrics, Inc.

*Software Engineer*, Electronic Systems Group, 1985-86.

- Data center manager and software tool developer for secure telephony project.
- Developed software for Free Software Foundation's GNU Emacs editor.

## Motorola Information Systems Group

*Software Engineer*, Computer Services Group, 1984-85.

- System administrator and software tool developer for network of UNIX servers.
- Served as company-wide authority on UNIX; gave tutorials on UNIX-related topics.

*Associate Engineer*, Modulation Products, 1983-84.

- Project team member for 2600 series of high-speed modems.  Implemented network control interface; designed and developed remote datascope feature.

## Freelance Writer & Editor
1991-present.
- Columnist, Media & Entertainment, Forbes.com.
- Editor, *Copyright and Technology* (copyrightandtechnology.com).
- Managing Editor, *DRM Watch* ([www.drmwatch.com](www.drmwatch.com)); see above.
- Co-author of multi-client market studies on digital editions of periodicals and Enterprise Rights Management, 2008.
- Author, *Digital Rights and Digital Television*, chapter in *Television Goes Digital* (Springer, 2009).
- Lead author, *Digital Rights Management: Business and Technology* (John Wiley & Sons, 2001).
- Author of white papers on digital media technologies and digital content business models, including a definitive white paper on major Hollywood studios' content protection requirements.
- Editor of Harris Kern, *Discipline: Six Steps to Unleashing Your Hidden Potential* (FirstBooks, 2001)
- Author and editor of books on UNIX and Java related topics (O'Reilly & Associates).
- Contributing Editor of IDG's *Advanced Systems*, *SunWorld*, and *Unix Insider*.
- Author of articles in *Forbes, GigaOm, Publishing Trends, Salon, The Seybold Report, Journal of Digital Asset Management, Slate, eContent, Serials Review, Journal of Electronic Publishing, Online Information Review, Communications of the ACM,* and other periodicals.

## Education
- B.S.E. (*cum laude*) in Electrical Engineering and Computer Science, Princeton University, 1983.
- M.S. in Computer and Information Science, University of Massachusetts, 1990.
- Coursework for Ph.D. in Computer Science, University of Massachusetts; dissertation topic: *Specification Level Interoperability in Software Development Environments.*
- Continuing education in business and finance: NYU, Harvard, University of Southern California.
- Language skills: proficient in German, basic knowledge of French.

## Affiliations
- Advisory Trustee and former President, Princeton Broadcasting Service, Inc., corporation overseeing WPRB-FM, Princeton, NJ.

## Interests
- Cooking
- Cycling
- Collecting Sherlock Holmes pastiche fiction
- Rock music history

## EXHIBIT B: LIST OF PUBLICATIONS AUTHORED SINCE JANUARY 2007

- Copyright and Technology blog (copyrightandtechnology.com), 2009 to present.

- Amazon's New Music Service Misses An Opportunity: Android.  Forbes.com, October 14, 2016.

- FCC Postpones Vote On Set-Top Box Rule.  Forbes.com, September 29, 2016.

- The Vinyl Resurgence Ends, While On-Demand Music Reigns Supreme.  Forbes.com, September 29, 2016.

- The FCC's Vote On Open Set-Top Boxes Pits Cable, Tech And Media Industries Against One Another.  Forbes.com, September 27, 2016.

- Amazon's Audible Changes The Podcast Game.  Forbes.com, July 8, 2016.

- Music Revenue Figures Show An Industry Running In Place.  Forbes.com, March 27, 2016.

- AT&T's New DirecTV Offerings Will Open Up OTT Video.  Forbes.com, March 2, 2016.

- Digital Editions: The Little Engine That Could Of Magazine Publishing.  Forbes.com, December 21, 2016.

- With Apple, Google And Pandora, On-Demand Music Market Goes Sideways.  Forbes.com, November 22, 2015.

- How Long Can the Beatles Remain Digital Holdouts? The Curious Case of the Fake Beatles Cover.  Forbes.com, October 31, 2015.

- Publishing Startup Pronoun Looks for Path Around Amazon.  Forbes.com, October 2, 2015.

- 'Netflix for E-Books' Looks Doubtful with Oyster's Shutdown.  Forbes.com, September 24, 2015.

- Apple's Ad Blocking: Is This The New Piracy?  Forbes.com, September 21, 2015.

- Is Apple Losing Its Music Mojo?  Forbes.com, June 1, 2015.

- TiVo Moves Towards Legal Aereo Offering.  Forbes.com, May 20, 2015.

- Apple Will Expand the On-Demand Music Market, Without Freemium.  Forbes.com, May 14, 2015.

- Subscription Services for E-Books: Like Netflix, Like Spotify, or Not at All? Forbes.com, April 24, 2015.

- Strategies for Secure OTT Video in a Multiscreen World.  GiantSteps White Paper, March 2015.

- New Music Industry Revenue Figures Show an Illusion of Stability.  Forbes.com, March 21, 2015.

- TiVo Buys Aereo Assets at Auction. Is a Legal Aereo Coming?  Forbes.com, March 1, 2015.

- Net Neutrality, the Mob and the Man.  Forbes.com, Feburary 26, 2015.

- Podcasts Ready for the Bigtime, Except for One Thing: Revenue.  Forbes.com, February 20, 2015.

- Despite New Internet Video Services from Time Warner and Viacom, Cord-Cutting Fails to Live Up to the Hype.  Forbes.com, Feburary 5, 2015.

- High-Res Audio Makes Slow Progress as Sony and Neil Young Show Off New Products at CES 2015.  Forbes.com, January 8, 2015.

- High-Res Audio for the Masses: Innovations in Sound Encoding Technology. Forbes.com, December 15, 2014.

- Yahoo's Flickr Angers Professional Photographers with Photo Printing Service. Forbes.com, December 10, 2014.

- Going Hi-Fi To Compete With Spotify (And Google And Apple).  Forbes.com, November 30, 2014.

- Apple's Bold Move to Reprice Digital Music.  Forbes.com, November 17, 2014.

- DRM and Content Protection Reference Table.  GiantSteps document, November 4, 2013

- The right to resell: a ticking time bomb over digital goods. PaidContent.org, December 15, 2012.

- Will There Ever Be a Universal, MP3-Like Standard for E-Books? PaidContent.org, December 22, 2011.

- Content Security Requirements for Multi-Screen Video Services. GiantSteps White Paper, December 2011.

- The New Technologies for Pay TV Content Security.  GiantSteps White Paper, August 2011.

- The New Content Monetization Opportunities for Publishers: Best Practices, Strategy and Architecture.  GiantSteps White Paper, April 2010.

- The Trajectory of DRM Technologies: Past, Present, and Future, September 2009. Keynote presentation at ODRL/Virtual Goods Workshop, September 2009, Nancy, France.

- Digital Rights and Digital Television.  GiantSteps White Paper, March 2009.

- DRM: E-Publishing's Ticking Time Bomb. Publishing Trends, Vol. XVI, No. II, February 2009.

- E-Publishing's Ticking Time Bomb: DRM. The Seybold Report, Vol. 9, No. 2, January 20, 2009.

- Google's Settlement with the Publishing Industry: Opportunities and Strategies for Publishers.  GiantSteps White Paper, January 2009.

- Rights management and its role in social media markets. Journal of Digital Asset Management, Vol. 4, No. 2, April 2008, pp. 112-122.

- Enterprise Rights Management - Implementation Imperatives & Business Readiness, coauthors Bill Trippe and David Guenette, Gilbane Group Research Report, August 2008.

- Digital Editions Redux. The Seybold Report, Vol. 8, No. 12, June 19, 2008, p. 7+.

- Digital Magazine and Newspaper Editions - Growth, Trends, and Best Practices. Co-author Steve Paxhia, Gilbane Group Research Report, May 2008.

- Content Identification Technologies: Business Benefits for Content Owners.  GiantSteps White Paper, April 2008.

- BusinessWeek Unifies Its Newsroom After All. The Seybold Report, Vol. 7, No. 13, July 12, 2007