IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP, INC.                    Civil Action 6:16-cv-1015-EFM-GLR
and ENERGY INTELLIGENCE GROUP
(UK) LIMITED,

        Plaintiffs,

v.

CHS McPHERSON REFINERY, INC.
(F/K/A NATIONAL COOPERATIVE
REFINERY ASSOCIATION),

        Defendant.

## CHS MCPHERSON REFINERY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO EIG'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant CHS McPherson Refinery, Inc. (the "Refinery") submits this response to

Energy Intelligence Group, Inc. and Energy Intelligence Group (UK) Limited's (collectively

"EIG") Partial Motion for Summary Judgment in accordance with District of Kansas Local Rules

7.1 and 56.1.

## INTRODUCTION

Summary judgment may be granted only where no reasonable jury could find in favor of

the Refinery as to the challenged affirmative defenses, and where EIG is entitled to judgment as

a matter of law. EIG cannot meet this high threshold. The Refinery has provided evidence to

support all of its affirmative defenses, including evidence that EIG failed to take steps to mitigate

damages, that EIG has used abusive litigation tactics to secure rights not granted by the

Copyright Office, that through its conduct EIG has granted the Refinery an implied license to

forward EIG publications to Refinery employees, and that EIG does not hold valid copyright

registrations in *Oil Daily* as required by the Copyright Act. EIG is not entitled to summary judgment as a matter of law on any of these defenses, or the Refinery's adequate remedy at law defense or violation of due process defense.

This Court must view all evidence in favor of the Refinery. And in that light, EIG's motion for partial summary judgment fails. EIG's motion fails because it makes blanket and unsupported statements for why this Court should dismiss these defenses, and ignores relevant case law and important facts that weigh in the Refinery's favor.  For these reasons, this Court should deny EIG's motion for partial summary judgment.

## THE REFINERY'S RESPONSE TO EIG'S STATEMENT OF FACTS

Pursuant to District of Kansas Local Rule 56.1(b), a genuine issue of material fact exists as to the following facts set forth by EIG in its Motion for Summary Judgment:

1.   The Refinery denies EIG's Fact ¶ 2. The relevant time period for this litigation is January 18, 2013 to January 18, 2016. (*See generally* Refinery's Mot. for Partial Summ. Judg. [Dkt. 75]; Refinery's Reply Br. in support of Mot. Partial Summ. Judg. [Dkt. 77].)

2.   The Refinery denies EIG's Fact ¶ 3. There is a genuine issue of material fact as to whether EIG holds valid federal copyright registrations for *Oil Daily*. (*See generally* Refinery's Mot. For Referral to Register of Copyrights [Dkt. 98].)

3.   The Refinery denies EIG's Fact ¶ 6. There is a genuine issue of material fact as to whether "the Refinery's subscription to OD has always been for a single copy of the publication." The Refinery's subscriptions did not identify what type of subscription the Refinery held until May 2013. (*See* EIG's Mot. Partial Summ. Judg., Ex. A, OD Renewal Notices [Dkt. 100] ("EIG's Ex. A"). Rather, from 2006 to 2007, the copyright notice merely stated that EIG's written consent was necessary to use the publications in any way, and made no

indication that the subscription agreement did not constitute such written consent. (*Id.*) After

2007, the license agreement explicitly stated that the "individuals or employees of the entity

identified under the 'Shipped to' notation" were the "authorized users." (*Id.*) The Refinery listed

both Galen Menard and NCRA in the "Shipped to" notation on every renewal notice. (*Id.*) The

Refinery also denies EIG's statement that the subscription has "never permitted copying of OD"

because the Refinery's subscription explicitly allowed use of *Oil Daily* with EIG's consent (aka

the license agreement) and that employees of the entity listed in the "Shipped to" notation could

receive the publication. (*Id.*) When the Refinery received *Oil Daily* in print, it was permitted to

route the *Oil Daily* publication to other Refinery employees. (Littman Decl. Ex. A, Dent. Dep.

71:19-72:10.)

      4.    The Refinery denies EIG's Fact ¶ 7. There is a genuine issue of material fact as to

whether the annual OD renewal notices and/or invoices contained the terms and conditions of the

Refinery's subscriptions to OD. EIG's copyright policy is the only information included on the

renewals and invoices until April 2013. (EIG's Ex. A.) Before then, the only notice contained on

the renewal notices and invoices was EIG's copyright policy which stated, among other things,

that:

> [n]o material from any part of any EIG publication, product, service, report, e-mail or web site may be downloaded, transmitted, broadcast, transferred, assigned, reproduced or in any other way used or otherwise disseminated in any form to any person or entity, without the explicit written consent of EIG.

(*Id.*) From April 2013 to May 2015, the Refinery's subscription agreements contained a section

titled "Use of EIG Publications," which stated:

> The subscriber(s) for the publication(s) identified on the front of this Invoice is for the sole use and/or access by the individual(s) or the employee(s) of the entity identified under the "Shipped to" notation on the front of this Invoice only ("Authorized User(s)") and may not be shared electronically or by any means now known throughout the universe or hereinafter devised. The number of Authorized

3

Users listed on the front of this Invoice may not be exceeded and an Authorized User is only an individual and never an entire entity, organization, or company.

(*Id.*)

5.    The Refinery denies EIG's Fact ¶ 8. The Refinery testified that it is not aware of any written document authored by EIG that explicitly stated that the Refinery could distribute copies of *Oil Daily* via email, not necessarily that no such document exists. (*See* Littman Decl., Ex. B, Beckman Dep. 204:17-22.)

6.    The Refinery denies EIG's Fact ¶ 9. The terms of EIG's license agreement required that an individual be named on the license agreement, even though employees of the entity were permitted to receive the publication. (EIG's Ex. A.) Galen Menard was named as that individual. LeAnn Flickinger, the Refinery's Product Distribution Specialist and secretary to the Crude Oil Group took over the duty of receiving *Oil Daily* when the previous secretary retired. (*See* Littman Decl., Ex. C, Flickinger Dep. 15:1-24.)

7.    The Refinery denies EIG's Fact ¶ 10. As permitted by the license agreement, (EIG's Ex. A), LeAnn Flickinger would send the *Oil Daily* publication electronically to Galen Menard and some of the Refinery employees on a daily basis. (Ex. C, Flickinger Dep. 22:20-23:13, 27:10-14.) When Flickinger was out of the office, her backups (which were a number of different people) would electronically route the publication. (*Id.* 19:24-20:9.)

8.    The Refinery denies EIG's Fact ¶ 11 in part. The relevant time period for this litigation is January 18, 2013 to January 18, 2016. (*See generally* Refinery's Mot. for Partial Summ. Judg. [Dkt. 75]; Refinery's Reply Br. in support of Mot. Partial Summ. Judg. [Dkt. 77].)

9.    The Refinery denies EIG's Fact ¶ 12 in part. The relevant time period for this litigation is January 18, 2013 to January 18, 2016. (*See generally* Refinery's Mot. for Partial Summ. Judg. [Dkt. 75]; Refinery's Reply Br. in support of Mot. Partial Summ. Judg. [Dkt. 77].)

10. The Refinery denies EIG's Fact ¶ 13 in part. The relevant time period for this litigation is January 18, 2013 to January 18, 2016. (*See generally* Refinery's Mot. for Partial Summ. Judg. [Dkt. 75]; Refinery's Reply Br. in support of Mot. Partial Summ. Judg. [Dkt. 77.])

11. The Refinery denies EIG's Fact ¶ 14 in part. The relevant time period for this litigation is January 18, 2013 to January 18, 2016. (*See generally* Refinery's Mot. for Partial Summ. Judg. [Dkt. 75]; Refinery's Reply Br. in support of Mot. Partial Summ. Judg. [Dkt. 77.])

12. The Refinery denies EIG's Fact ¶ 16. There is a genuine issue of material fact as to whether "the Refinery's subscription to PIW was for a single copy of the publication." The Refinery's subscriptions did not identify what type of subscription the Refinery held until April 2015. (*See* EIG's Mot. Partial Summ. Judg., Ex. B, PIW Renewal Notices [Dkt. 100] ("EIG's Ex. B"). Rather, from 2005 to 2007, the copyright notice merely stated that EIG's written consent was necessary to use the publications in any way, and made no indication that the subscription agreement did not constitute such written consent. (*Id.*) After 2007, the license agreement explicitly stated that the "individuals or employees of the entity identified under the 'Shipped to' notation" were the "authorized users." (*Id.*) The Refinery listed Kathy Swanson and NCRA in the "Shipped to" notation from 2005 to 2011, after which Debbie Ratzloff and NCRA were named. The Refinery also denies EIG's statement that the subscription has "never permitted copying of PIW" because the Refinery's subscription explicitly allowed use of *Petroleum Intelligence Weekly* with EIG's consent (aka the license agreement) and that employees of the entity listed in the "Shipped to" notation could receive the publication. (*Id.*) When the Refinery received *Petroleum Intelligence Weekly* in print, it was permitted to route the publication to other Refinery employees. (Ex. A, Dent. Dep. 71:19-72:10.)

13. The Refinery denies EIG's Fact ¶ 17. The Refinery testified that it is not aware of any written document authored by EIG that explicitly stated that the Refinery could distribute copies of *Petroleum Intelligence Weekly* via email. It is not necessarily the case that no such document exists. (*See* Ex. B, Beckman Dep. 204:17-22.)

14. The Refinery denies EIG's Fact ¶ 18. There is a genuine issue of material fact as to whether the annual PIW renewal notices and/or invoices contained the terms and conditions of the Refinery's subscriptions to PIW. EIG's copyright policy is the only information included on the renewals and invoices until April 2011. (EIG's Ex. B.) Before then, the only notice contained on the renewal notices and invoices was EIG's copyright policy which stated, among other things, that:

> [n]o material from any part of any EIG publication, product, service, report, e-mail or web site may be downloaded, transmitted, broadcast, transferred, assigned, reproduced or in any other way used or otherwise disseminated in any form to any person or entity, without the explicit written consent of EIG.

(EIG's Ex. B.) From April 2011 to May 2015, the Refinery's subscription agreements contained a section titled "Use of EIG Publications," which stated:

> The subscriber(s) for the publication(s) identified on the front of this Invoice is for the sole use and/or access by the individual(s) or the employee(s) of the entity identified under the "Shipped to" notation on the front of this Invoice only ("Authorized User(s)") and may not be shared electronically or by any means now known throughout the universe or hereinafter devised. The number of Authorized Users listed on the front of this Invoice may not be exceeded and an Authorized User is only an individual and never an entire entity, organization, or company.

(EIG's Ex. B.)

15. The Refinery denies EIG's Fact ¶ 20. The Refinery's subscription to PIW was in the name of either Kathy Swanson or Debbie Ratzloff and NCRA. (EIG's Ex. B.)

16. The Refinery denies EIG's Fact ¶ 21 for the same reasons it denies EIG's Fact ¶ 16.

17. The Refinery denies EIG's Fact ¶ 22. Kathy Swanson, assistant to Jim Loving, would download the most recent copy of PIW as it was received and forward to Refinery executives employees as permitted by the license agreement. (*See* Littman Decl., Ex. D, James Loving Dep. 69:13-23.)

18. The Refinery denies EIG's Fact ¶ 24. Swanson instructed Debbie Ratzloff to also download the most recent copy of PIW as it was received and forwarded it to Refinery executives. (Littman Decl., Ex. E, Deborah Ratzloff Dep. 16:2-23; 26:23-27:3.)

19. The Refinery denies EIG's Fact ¶ 25. Ratzloff stated testified that EIG did not permit the Refinery's downloading and forwarding of PIW, but that she never confirmed this with anyone at EIG or the Refinery. (*Id.* at 29:3-8.)

20. The Refinery denies EIG's Fact ¶ 26. Ratzloff downloaded the most recent copy of PIW as it was received and forwarded it to Refinery executives. (*Id.* at 16:2-23; 26:23-27:3.)

21. The Refinery denies EIG's Fact ¶ 34. On September 25, 2007, Menard thought that there might be problem with the fact that the number of Refinery employees receiving the OD publication had expanded from the small group of executives that had previously received it. (Littman Decl., Ex. F, Galen Menard Dep. 152:6-17). Menard reached out to EIG, and the Refinery temporarily suspended routing the electronic publications while Menard waited for a response. (*Id.* at 155:12-155:25.)

22. The Refinery denies EIG's Fact ¶ 36. After Flickinger's February 26, 2008 email, Menard told Jeff Sinnett, a Refinery executive, that he was going to negotiate a group discount with EIG. (Littman Decl., Ex. G, Email Between Menard and Sinnett.) Menard reached out to Peter Buttrick on February 27, 2008 in an attempt to negotiate a broader subscription. Menard's

negotiation attempt failed. (Littman Decl., Ex. H, Email Between Menard and Buttrick.) The

Refinery suspended all forwarding of OD on February 26, 2008 until April 4, 2008.

23. The Refinery denies EIG's Fact ¶ 40. On April 2, 2008 and April 3, 2008, Menard

wrote to Buttrick requesting pricing for an OD subscription for two or three additional copies, to

which no one at EIG ever responded. (*Id.*) Having received no response from EIG since February

28, 2008, the Refinery resumed electronically routing *Oil Daily* to a small group of executives as

it historically had done. (Ex. F, Menard Dep. 152:6-19.)

24.  The Refinery denies EIG's Fact ¶ 41. In April 17, 2008, EIG sent a final renewal

notice to the Refinery for its same annual subscription. (Littman Decl., Ex. I, Renewal Notice

#4.) The Refinery continued to distribute the publication to those Refinery employees in the

same manner as it had previously done. (Ex. F, Menard Dep. 152:6-19.)

25. The Refinery denies EIG's Fact ¶ 44. The testimony cited by EIG does not

support its alleged fact. From Ms. Flickinger's email, EIG would have known that *Oil Daily* was

being forwarded to at least one other person at the Refinery. (*See* Littman Decl., Ex. M, Email

Exchange Between Dent and Flickinger.)

26. The Refinery denies EIG's Fact ¶ 45. Before Flickinger had her conversation with

Dent in which she told him why she received the *Oil Daily* emails over Menard, she

electronically routed copies of *Oil Daily* to a small group of executives in the same manner as

she had done previously. (Littman Decl., Ex. J, March 27th Email Forward; Ex. B, Flickinger

Dep. 106:24-107:5.)

27. The Refinery denies EIG's Fact ¶ 47. The Refinery's 30(b)(6) designee testified

that after the 2012 email exchanged between Dent and Flickinger, the Refinery believed it was

permitted to forward EIG's publications to the same small group of individuals that had received

it when the Refinery received the publications in print. (Ex. B, Beckman Dep. 120:12-121:1; Ex. F, Menard Dep. 137:3-138:9.)

28. The Refinery denies EIG's Fact ¶ 50. EIG spoke to the Refinery for the third time about the Refinery's subscriptions, and confirmed, again, that the Refinery was routing its electronic publications to a small group of Refinery executives as it had done when the publications were in print. (Ex. F, Menard Dep. 114:5-116:6; 137:3-138:9.)

29. The Refinery denies EIG's Fact ¶ 53. Galen Menard testified that in late September 2007 he reached out to EIG to discuss the Refinery's subscription. It was at this time that the Refinery stopped forwarding temporarily while Menard waited for a response. (*Id.* at 153:9-155:25.)

30. The Refinery denies EIG's Fact ¶ 54. Flickinger testified that she told EIG that she received the *Oil Daily* emails instead of Menard in case he was out of the office. (Ex. C, Flickinger Dep. 102:15-25.) She has no knowledge of whether EIG knew or did not know "the extent of the forwarding." (*Id.* at 121:20-25.)

31. The Refinery denies EIG's Fact ¶ 55. Menard testified in that he understood the Refinery's subscription to include the ability to distribute the publications to some users at the Refinery as the Refinery historically had. This was based on conversations that the Refinery had had with Derrick Dent on prior occasions.  (Ex. F, Menard Dep. 114:5-116:6; 137:3-138:9.)

32. The Refinery denies EIG's Fact ¶ 57. As stated in EIG's Fact ¶ 56, Ratzloff never had discussions with EIG other than for renewal of *Petroleum Intelligence Weekly*. (Ex. E, Ratzloff Dep. 68:24-69:4.)

33. The Refinery denies EIG's Fact ¶ 59. The Refinery's corporate representative testified that in general EIG's copyright notices state that electronic forwarding is prohibited

without a valid subscription agreement or license with EIG. (Ex. B, Beckman Dep. 220:4-11.) EIG has not alleged that the Refinery did not have a "valid subscription agreement or license with EIG." (*See* Compl. [Dkt 2]; Amend. Compl. [Dkt. 28].)

34. The Refinery denies EIG's Fact ¶ 60. The Refinery's corporate representative testified that the Refinery had a firewall to prevent spam and viruses, and that third party programs would have been blocked if they were found to have a virus. (Ex. B, Beckman Dep. 51:17-52:19.)

## THE REFINERY'S STATEMENT OF THE FACTS

### The Refinery Subscribes to EIG's Publications

35. In 1992, the Refinery began its annual subscription to EIG's *Oil Daily* publication. (Am. Compl. ¶ 34 [Dkt 28]; Ans. Am. Compl. ¶ 34 [Dkt. 31].)

36. The Refinery initially received *Oil Daily* by print delivery and routed it to a handful of executives. (Ans. Am. Compl. ¶ 35 [Dkt. 31].) In 1999, the Refinery elected to receive *Oil Daily* as a PDF attachment to an email when EIG moved from print to electronic delivery. (Am. Compl. ¶ 36 [Dkt. 28]; Ans. Am. Compl. ¶ 36 [Dkt. 31]; Ex. A, Derrick Dent Dep. 66:16-24.)

37. From 2004 to 2015, Galen Menard was the Refinery's named employee on the *Oil Daily* publication, and NCRA was named as the company entitled to receive it. (*See* EIG's Ex. A.)

38. In 1982, the Refinery began its annual subscription to EIG's *Petroleum Intelligence Weekly* publication and routed that publication. (Am. Compl. ¶ 41 [Dkt. 28]; Ans. Am. Compl. ¶ 41 [Dkt. 31].)

39. The Refinery initially received *Petroleum Intelligence Weekly* by print delivery, but later elected to receive *Petroleum Intelligence Weekly* via web access. (Ans. Am. Compl. ¶ 42 [Dkt. 31].)

40. From 2005 to 2011, Kathy Swanson was named on the Refinery's subscription to *Petroleum Intelligence Weekly*, along with NCRA. After 2011, Debbie Ratzloff and NCRA were named on the subscription agreements for *Petroleum Intelligence Weekly*. (*See* EIG's Ex. B.)

41. At most, the Refinery has paid $3,395 for its annual subscription to *Oil Daily*. (*See* EIG's Ex. A.)

42. At most, the Refinery has paid $4,195 for its annual subscription to *Petroleum Intelligence Weekly*. (*See* EIG's Ex. B.)

**EIG Ignores The Refinery's Request to Add More Subscribers; Renews Same Subscription**

43. On February 26, 2008, Galen Menard emailed EIG requesting a breakdown of costs associated with adding up to ten users to its subscription for *Oil Daily*. (*See* Ex. H.)

44. EIG's Peter Buttrick responded with the following pricing schedule:

> 1 User-- $1,910.00 annually
> 5 Users- $7,863.00 annually
> 10 User--$ 14,708.00 annually

(*Id.*)

45. Menard emailed Refinery executives explaining that he had tried to negotiate pricing with EIG to no avail. (*See* Littman Decl. Ex. K, Email from Menard to Executives.)

46. Menard followed-up with Buttrick on April 2, 2008 and again on April 3, 2008 requesting pricing for two or three additional users. (*See* Ex. H.)

47. No one at EIG responded to Menard's additional requests.

11

48. Despite the Refinery's negotiation attempts to add more subscribers, EIG received a renewal notice from EIG two weeks later the same annual subscription to *Oil Daily*. (*See* Ex. I.)

49. The Refinery continued to receive the same type of annual subscription to *Oil Daily* that it had previously. (*See* EIG's Ex. A.)

**EIG Knows of the Refinery's Forwarding and Renews Its Annual Subscription**

50. On or about March 27, 2012, LeAnn Flickinger, employee of the Refinery and assistant to Galen Menard, spoke with Derrick Dent about the Refinery's subscription to *Oil Daily*. (Ex. M.)

51. During those communications, Flickinger communicated to Dent that she forwarded *Oil Daily* to other employees at the Refinery. (*Id.*)

52.  Pursuant to EIG's policy that upon encountering potential infringement an account representative is to wait for instruction from management to "contact the customer and ask them to confirm the scope of their usage of EIG's publication(s)," (Ex. N, Decl. of Thomas Wallin, ¶ 10), Dent sent the following email:

> Thank you for providing information on how you distribute the publication. It would be very helpful if you could take just a moment to provide the names of the persons on your distribution list. Any details you can provide would be appreciated. We want to update our records as well.

(Ex. M.)

53. Flickinger then provided Dent with a summary of the Refinery's forwarding practices:

> As per our phone conversation, the Energy Oil Daily is forwarded to Galen Menard by me and if he is out it is forwarded to one of the other executives. I get the e-mail since Galen is out of the office on occasions and then someone else in the Executive office can see the information.

(*Id.*) Flickinger elaborated in her deposition testimony that in her email to Dent she was clarifying that she received the emails instead of Menard since he was out of office on occasions. (Ex. B, Flickinger Dep. 102:11-25.)

54. EIG did not initially respond to Flickinger's email.

55. Pursuant to EIG's copyright infringement policy, Dent reported this information to John Hitchcock who reported it to in-house counsel. (Ex. L, Hitchcock Dep. 105:2-6.)

56. The Refinery was placed on a potential litigation list. From that point forward, Dent was required to get permission from Hitchcock and counsel to renew the Refinery's subscriptions. (Ex. A, Dent Dep. 100:20-101:8, 102:11-103:25.)

57. Two days later, on March 29, 2012, EIG processed the Refinery's single subscription renewal to *Oil Daily*. (Littman Decl., Ex. O, Email Confirming Renewal.) Only <u>after</u> allowing the Refinery to renew its single subscription, did Dent issue the following warning:

> Thank you for your recent renewal to Oil Daily. You are one of our valued subscribers and we appreciate your business. This is just a gentle reminder to inform you that our publications are licensed for use by named authorized user as provided in the license (subscription) agreement for their sole use and are priced accordingly. All single user subscriptions such as yours are intended soly for the designated named recipient and not anyone else or any entire organization or a group within it. A single user subscription cannot be shared by electronic means among multiple readers by forwarding or posting on an intranet, or by sharing of a log-in name and password. If access if required by others beyond the current subscription agreement, a multiple named user suscription could be purchased.

(Ex. M.)

58. The Refinery was then added to a "potential litigation" list circulated periodically among EIG employees from counsel. (Ex. A, Dent Dep. 100:20-101:8.)

59. No further action was taken by Dent or EIG. (Ex. L, Hitchcock Dep., 68:5-12.)

60. The Refinery continued to receive the same type of subscription to *Oil Daily* as it previously had. (EIG's Ex. A.)

**EIG Sues Four Years Later Based on Information Known to EIG in at Least 2012.**

61. On or about March 30, 2015, the Refinery reached out to EIG regarding its *Oil Daily* subscription. On March 30th, Dent issued a new warning to the Refinery that "the terms of [EIG's] subscription agreement with [the Refinery] for the Oil Daily publication does not permit the kind of usage you described during our phone call." (Littman Decl., Ex. P, Email Exchange Between Menard and Dent.)

62. Nonetheless, Dent offered to discuss a license that would "be in keeping with the usage [the Refinery] is making of Oil Daily." (*Id.*)

63. Menard immediately apologized for the misunderstanding and requested a quote for additional users. (*Id.*)

64. Like in 2008, Menard's request went unanswered.

65. Pursuant to EIG's copyright enforcement policies, on or about November 10, 2015, EIG pitched its "Global Enterprise License" to the Refinery. (Littman Decl., Ex. Q, EIG Settlement Proposal.)

66. The Refinery declined EIG's offer to purchase the Global Enterprise License. EIG filed this lawsuit on January 18, 2016. (Compl. [Dkt. 2].)

**EIG Sues Subscribers to Extend Rights Beyond What is Granted by the Copyright Office**

67. Realizing that its subscription model had become an "anachronism in the electronic age," EIG began the aggressive enforcement of its copyrights and pursuit of potential copyright infringers in 2005. ((Littman Decl., Ex. R, VISAs and Other Email, p.1.)

14

68. EIG testified that the alleged copyright infringement of its subscriptions had become "a threat to [EIG's] existence" and that "some among the board and senior management felt that we needed to take strong steps to counter that." (Ex. L, Hitchcock Dep. 75:23-76:3.)

69. In a May 31, 2005 memorandum titled "Energy Intelligence Profitability Improvement Plan," Tom Wallin—then president of EIG—proposed copyright enforcement as a potential revenue stream. (Littman Decl., Ex. S, EIG Profitability Improvement Plan.)

70. Calling it an "aggressive area of [EIG's] business," Wallin indicated that EIG could gain potential revenue from both legal settlements and improved subscription revenues "due to better compliance by subscribers." (*Id.*)

71. EIG filed its first copyright infringement lawsuit in 2005. (Littman Decl., Ex. T, Docket Report.)

72. EIG's goal was clear: "aggressively pursue the rest of [its] large clients with lawsuits." (Ex. R, p.1.) It even sought to streamline its executives' "random entrapment efforts," by hiring someone for a "copyright job." (*Id.*)

73. In 2010, John Hitchcock joined EIG as managing director. (Ex. L, Hitchcock Dep. 9:23-10:5.) On February 23, 2010 he emailed his team a memorandum "which represent[ed] a ratcheting-up of [EIG's] efforts to thwart copyright abuse." (Littman Decl., Ex. U, Monitoring Copyright Infringement Email.)

74. In the memorandum, EIG rolled out its bonus plan, calling upon the "sales force and customer service representatives to act as another line of defense in identifying incidents of unauthorized usage among [its] customers." (Littman Decl., Ex. V, Monitoring Copyright Infringement Memorandum.)

75. Under the plan, all "credible, well-documented information regarding suspicious activity by a customer or, of course, direct evidence of authorized usage" is to be "reported immediately" to Hitchcock. (*Id.*)

76. EIG account representatives are required to "immediately contact John Hitchcock" or the "top supervisor," "and he would then bring on Stefan Ford," EIG's in-house counsel. (Ex. A, Dent. Dep. 19:16-22.)

77. EIG has allegedly deemed forwarding to one's boss to be permissible "because, in today's market, CEOS are extremely, extremely busy. And so the individual who receives the publication is permitted  . . . to forward it to his or her boss because that are the ones who are reporting directly to him and he or she, they don't have time to access, you know, the numerous publications or services they receive. So, they rely on the person who gets that particular publication to access it and send it directly to them . . . to the boss." (*Id.* at 26:12-27:11.)

78. Flickinger described this behavior as the reason why she received *Oil Daily* as opposed to Galen Menard.  (Ex. C, Flickinger Dep. 102:15-25.)

79. Under EIG's copyright infringement policies, if management "determines that the circumstances reported by sales and customer service staff are ambiguous as to whether unauthorized copyright actually occurred, the applicable Account Representative would be instructed to contact the customer and ask them to confirm the scope of their usage of EIG's publication(s)." (*See* Ex. N.)

80. This is precisely what Dent did in 2012. (*See* Ex. A, Dent Dep. 88:9-90:4; Ex. L, John Hitchcock Dep. 61:21-63:12.)

81. If a salesperson reports suspicious behavior to management and EIG commences a copyright infringement lawsuit on the basis of such reporting, "a payment of $5,000" is

provided to the reporting employee. Should the lawsuit lead to a settlement or court-ordered award to EIG, an additional $5,000 payment is made to the reporting employee. (Ex. V.)

82. Since 2005, "EIG has remained vigilant in protecting its copyrights and has aggressively enforced them when confronted with explicit evidence of infringement." (Ex. N.)

83. EIG has filed approximately 100 copyright infringement lawsuits against its subscribers. (*See* Ex. T.)

## ARGUMENT AND AUTHORITIES

EIG cannot meet its burden to show "that there is no genuine issue as to any material fact and that [it is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Magruder v. Runyon*, 844 F. Supp. 686, 700-01 (D. Kan. 1994). "A fact is 'material' when it is essential to the claim, and issues of fact are 'genuine' if the proffered evidence permits a reasonable jury to decide the issue in either party's favor." *Tomelleri v. Zazzle, Inc.*, 2015 WL 8375083, at *7 (D. Kan. Dec. 9, 2015). In considering this motion, "[t]he Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). Here, EIG fails to view the facts in the light most favorable to the Refinery throughout its argument, making unsupported assertions that are not persuasive or appropriate for consideration on a motion for summary judgment. If there is any doubt as to whether EIG could prevail on these affirmative defenses, that doubt must be resolved in favor of the Refinery. *Schwasinger v. Price*, 789 F. Supp. 347, 349 (D. Kan. 1992).

I.    **The Refinery Presents Strong Evidence that Supports a Reasonable Jury Finding that EIG Failed To Mitigate Damages and to Adjust Statutory Damages Calculation Accordingly**

EIG is not entitled to summary judgment on the Refinery's failure to mitigate defense because a reasonable jury could find that EIG failed to mitigate damages which has a direct

bearing on the amount of statutory damages a jury might award within the statutory range provided in 17 U.S.C. § 504(c). EIG also has not shown that, as a matter of law, the Refinery's failure to mitigate damages defense is barred by EIG's election of statutory damages. All evidence and reasonable inferences viewed in the light most favorable to the Refinery show that in order for a jury to make a "just" determination of statutory damages it should be informed of both Parties' conduct, including EIG's failure to mitigate damages.

### A. EIG's Failure to Mitigate Bears Directly on the Amount of Statutory Damages a Jury Might Award Within the Statutory Range

Contrary to EIG's assertions, the failure to mitigate defense is viable and taken into consideration when a jury calculates the amount of statutory damages to award within the statutory range. Section 504(c) of the Copyright Act vests in the trier of fact, "broad discretion to determine whether it is more just to allow a recovery based on calculation of actual damages and profits, as found from evidence, or one based on a necessarily somewhat arbitrary estimate within the limits permitted by the Act." *F.W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 231-32 (1952); *see, e.g.*, *Stockart.com, LLC v. Engle*, 2011 WL 10894610, at *13 (D. Colo. Feb. 18, 2011) (relying on *F.W. Woolworth* to deny maximum statutory damages and award damages within the statutory range). When calculating statutory damages the jury weighs factors such as, "(1) the expenses saved and profits reaped by defendants in connection with the infringements; (2) revenues lost by plaintiffs; and (3) whether the infringement was willful and knowing or whether it was accidental or innocent." *Big Tree Enters., Ltd. v. Mabrey*, No. 93-4024-SAC, 1994 WL 191996, at *7 (D. Kan. Apr. 15, 1994). A jury may also take into account "the conduct and attitude of the parties." *Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 473-74 (S.D.N.Y. 2001). *See also Big Tree Enters., Ltd.*, 1994 WL 191996, at *7 (taking into account the fact that the plaintiff was persistent in contacting the defendant and

his counsel about the alleged infringement); *Beginner Music v. Tallgrass Broadcasting, LLC*, No. 09-4050-SAC, 2009 WL 2475186, at *3 (D. Kan. Aug. 12, 2009) (same).

The Refinery's failure to mitigate defense is about EIG's "conduct and attitude." Evidence that EIG did not take reasonable steps to mitigate damages provides the jury with the entire picture necessary to calculate a "just" statutory damages award, not just information favorable to EIG. *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 186 F. Supp. 3d 1370, 1378-79 (N.D. Ga. 2016) (explaining that courts have allowed this defense because courts have broad discretion in determining how to award statutory damages and may consider actual damages as a factor in making that determination). The facts relevant to EIG's conduct and attitude include:

- That EIG learned of the alleged infringement years before filing this lawsuit (¶¶ 50-64);

- That even though the Refinery requested information about adding more subscribers and even attempted to negotiate a broader subscription, EIG did not attempt to sell the Refinery more subscriptions and even ignored the Refinery's repeated attempts to add subscribers (¶¶ 43-64);

- That when LeAnn Flickinger told Derrick Dent of the forwarding in 2012, he immediately emailed his boss, John Hitchcock, pursuant to EIG's copyright-infringement reporting policies (¶¶ 50-58);

- That even though Dent, Hitchcock, and counsel were aware of the forwarding, EIG allowed the Refinery to keep the same annual subscription that it had always held (¶¶ 50-60);

- That, for years, companies similarly-situated to EIG have been using software and techniques to guard against copyright infringement that EIG's own technology personnel told EIG was important, but EIG refused to take on (Refinery's Br. Opp. Motion to Exclude [Dkt. 91]);

- That when EIG confronted the Refinery about its alleged infringement in 2015, Menard apologized for the misunderstanding and asked EIG what it could do to remedy the situation. EIG did not respond (¶¶ 61-66);  and

- That EIG essentially attempted to extort the Refinery by pushing it to purchase EIG's multi-million dollar Global Enterprise License in exchange for EIG's promise not to file suit (¶¶ 64-65).

This information is critical to a "just" statutory damages calculation. These facts, in addition to other evidence that both Parties may present, will provide the jury with the entire picture necessary, including EIG's failure to mitigate damages. EIG's motion for partial summary judgment should be denied.

### B. EIG's Has Not Established that Failure to Mitigate is Not a Proper Defense

While EIG alleges that because it elected statutory damages, the Refinery's failure to mitigate defense is automatically barred, it has not provided sufficient evidence that this is the case. EIG asks the Court to apply the bright-line rule that electing statutory damages bars a failure to mitigate damages defense without persuasive reasoning or support. For example, EIG and the cases it cites rely on *Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411 (D.N.J. 2005), a case that is inapposite. In *Arista Records*, the defendants <u>voluntarily withdrew</u> their failure to mitigate defense after the plaintiffs elected to pursue statutory damages. *Id.* at 422. Thus, the court held that because the defendants had waived the defense they could no longer assert it. *Id.* The Refinery has not waived its failure to mitigate defense. *See Malibu Media, LLC v. Reeves*, 2013 WL 5487372, at *2 (S.D. Ind. Sept. 27, 2013) (finding *Arista* inapplicable); *Malibu Media, LLC v. Julien*, 2013 WL 5274262, at *2 (finding *Arista* and *Moothart* inapplicable); *Malibu Media, LLC v. Doe*, No. 2:13-CV-135-RLM-JEM, 2014 WL 1031336, at *2 (N.D. Ind. Mar. 17, 2014) (denying motion to strike failure to mitigate defense).

EIG also relies on *Moothart v. Bell*, 21 F.3d 1499 (10th Cir.1994), and a few District of Colorado cases that cite it, to support its claim. But *Moothart*, an ERISA case, is also inapplicable and should not be used to interpret the Copyright Act. Under ERISA, 29 U.S.C. §

20

1132(c)(1), statutory damages have the sole purpose of "penaliz[ing] competitors for noncompliance and do[] not take into account plaintiff's actual damages." *Malibu Media, LLC v. Julien*, 1:12–CV–01730–TWP, 2013 WL 5274262, at *2 (S.D. Ind. Sept.17, 2013) (distinguishing *Moothart* and allowing the defendant to proceed with its failure to mitigate defense).  Statutory damages under the Copyright Act, on the other hand, serve a dual purpose: "restitution of profit and reparation for injury" and "discourag[ing] wrongful conduct." *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952). As a result, "[a] party should be entitled to have a jury make factual findings relevant to determining the amount of damages to be assessed, whether they are actual damages or statutory damages." *Cass County Music Co. v. C.H.L.R., Inc.*, 88 F.3d 635, 644 (8th Cir. 1996). And [s]o long as the statutory minimum and maximum amounts are observed, the trial court enjoys broad discretion in setting the amount of statutory damages." *Big Tree Enters., Ltd.*, 1994 WL 191996, at *7.

Because the jury has broad discretion to award statutory damages within the range provided by 17 U.S.C. § 504(c), a failure to mitigate damages defense should not be barred merely because the plaintiff elects statutory damages. The defense bears directly on a statutory damages calculation because it is evidence of the "conduct and attitude of the parties," which the jury may take into account. EIG has not shown that a bright-line rule barring the failure to mitigate defense is appropriate. EIG's attempt to arbitrarily limit the evidence the jury may hear is fundamentally unjust. As a result, EIG's motion for partial summary judgment should be denied.

**II.    Evidence of EIG's Pattern of Abusive Litigation Tactics Against At Least 100 Other Subscribers Could Lead a Reasonable Jury to Conclude that EIG Has Used These Lawsuits to Extend Its Copyright Beyond the Limited Rights Granted by the Copyright Office.**

EIG is also not entitled to summary judgment on the Refinery's copyright misuse defense for two broad reasons. First, the allegation of copyright misuse is a theory that "involves the issue of motive, which is generally reserved for the factfinder." *Malibu Media*, 2015 WL 1280783, at 9 (*citing In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. at 1175). Second, EIG cannot prevail as a matter of law since a reasonable jury could find that EIG has used its abusive litigation tactics to extend its monopoly to minimally-protected composite works beyond that granted by the Copyright Office.

Copyright misuse forbids the use of a copyright "to secure an exclusive right or limited monopoly not granted by the copyright office and is contrary to public policy to grant." *Malibu Media v. Cuddy, LLC*, No. 13-cv-02385-WYD-MEH, 2015 WL 1280783, at *8 (D. Colo. Mar. 18, 2015) (declining to strike the copyright misuse defense); *see also In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1175 (D. Kan. 2000); *Malibu Media LLC v. Miller*, No. 13-cv-02691-WYD-MEH, 2014 WL 2619558, at *4-5 (D. Colo. June 12, 2014). To prevail, a defendant must prove either: "(1) a violation of the antitrust laws; (2) that the copyright owner otherwise illegally extended its monopoly; or (3) that the copyright owner violated the public policies underlying the copyright laws." *AF Holdings, LLC v. Olivas*, 2013 WL 4456643, at *3 (D. Conn. Aug. 16, 2013) (denying motion to strike copyright misuse defense because defendant had alleged a pattern of litigation abuse which could constitute copyright misuse). Antitrust is not a requirement, and courts have found copyright misuse beyond the bounds of antitrust in circumstances where the copyright owner uses an infringement suit to obtain property protection that copyright law clearly does not grant in the hopes of forcing settlement or achieving an

outright victory.  *Id.* (*quoting Assessment of Techs. of WI, LLC v. WIREdata*, 350 F.3d 640, 647

(7th Cir. 2003)). This constitutes an "abuse of process." *Id.*

In a factually similar case, *Design Basics, LLC v. Petros Homes, LLC*, the court denied

summary judgment on the defendant's copyright misuse defense based on this abuse of process.

The court held:

> Defendants further assert that the very business model utilized by plaintiff—to
> financially incentivize employees to find alleged copyright infringement, to sue
> alleged infringers, and to force settlements of cases by leveraging the onerous
> burden placed on the alleged infringers to disprove plaintiff's presumptive
> damages—is evidence of a misuse of copyrights that completely undermines the
> purpose behind the protection afforded under copyright law. Defendants have
> shown how this business model has manifested itself by plaintiff's filings over 80
> similar lawsuits in 12 states  . . . . Defendants have produced specific information
> that, if true, could be construed by a jury to support the misuse of copyright
> defense.

2017 WL 898003, at *4-5 (N.D. Ohio Mar. 7, 2017). Other courts have held similarly. *See*

*HomeDesign Services, Inc. v. Park Square Enters., Inc.*, 2005 WL 1027370, at *12 (M.D. Fla.

May 2, 2005) (denying summary judgment on the defendant's copyright misuse defense where

the defendant alleged that the plaintiff "misused its copyrights by threatening millions of dollars

in damages through disgorgement of profits to force settlements on the basis of claims which

allege infringement of common layouts, room placements and other non-original elements.");

*AF Holdings, LLC*, 2013 WL 4456643, at *3 (declining to strike the defendant's copyright

misuse defense where the defendant alleged a pattern of litigation abuse based the plaintiff's use

of nearly-identical complaints against all of its defendants and settlement demands for millions

of dollars).

Like in these cases, the Refinery has provided evidence of EIG's abusive litigation

tactics. In particular, EIG has used this copyright infringement lawsuit as an attempt to extort

millions of dollars from the Refinery (¶¶ 64-65), which is far more money than EIG could ever

reasonably have expected to receive from the Refinery's subscriptions to EIG's publications.[1]

Further evidence of EIG's abusive litigation tactics includes: (1) that EIG has filed similar law

lawsuits against at least 100 other subscribers (¶ 83); (2) that EIG engaged in "random

entrapment efforts" which it sought to streamline by hiring someone for a "copyright job" (¶ 72);

(3) that EIG paid its company employees for finding and reporting potential copyright

infringement (¶¶ 40, 47); and (4) that EIG attempted to push the Refinery into purchasing a

multi-million dollar Global Enterprise License to prevent EIG from filing this copyright

infringement lawsuit (¶¶ 65-66). EIG has not satisfied its burden of showing that a reasonable

jury could not find that EIG has extended its rights beyond that granted by the Copyright Office.

As such, several issues of fact exist with regard to the Refinery's copyright misuse defense, and

EIG is not entitled to summary judgment as a matter of law. EIG's motion should be denied.

### III.  A Question of Fact Exists As to Whether EIG, Through Its Conduct,  Granted the Refinery an Implied License to Forward EIG's Publications to a Small Group of Executives

"The existence of a license authorizing the use of copyrighted material is an affirmative

defense to an allegation of infringement." *Kid Stuff Marketing, Inc. v. Creative Consumer

Concepts, Inc.*, 223 F. Supp. 3d 1168, 1181 (D. Kan. 2016). An implied license arises most often

in circumstances where: (1) the licensee requests the work, (2) the licensor creates the work and

delivers it to the licensee, and (3) the licensor intends for the licensee to copy and distribute the

work. *Id.* at 1181. However, these factors are not required for an implied license to exist. *Id.* at

1181, n.8 ("That fact [that licensee didn't specifically request the work], standing alone, does not

---

[1] The most the Refinery would have paid for its subscription to *Oil Daily* is $3,995 (EIG's Ex. A), and $4,195 for its subscription to *Petroleum Intelligence Weekly* (EIG's Ex. B). If the Refinery added five users at the same rate, it would have paid somewhere around $19,975 for the five subscriptions to *Oil Daily* and $20,975 for the five subscriptions to *Petroleum Intelligence Weekly*. Even if the relevant time period is ten years as EIG claims, the most the Refinery would have paid is $199,750 for *Oil Daily* and $209,750 for *Petroleum Intelligence Weekly*.

preclude the finding of an implied license."). Rather, a license may be implied from conduct. *See id.* (holding that an implied license existed permitting the defendant to use copyrighted characters beyond the scope of the parties' agreement); s*ee also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (finding implied license where copyright owner had allowed defendant to repeatedly play song despite no explicit agreement); *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999) (finding implied license where copyright owner wrote jingle for radio station and allowed station to air it for seven years without issue).

Unless a licensor expresses the intent to limit a license, the assumption is that it is an unlimited license. *Kid Stuff Mktg., Inc.*, 223 F. Supp. at 1183. In this District, whether a licensor intends to grant an implied license is determined by considering the following factors:

> 1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; 2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and 3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Id.* at 1182 (*citing Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008)). EIG has not shown that no genuine issue of fact exists as to its intent to create an implied license. In fact, these factors weigh in favor of finding that EIG granted the Refinery an implied license to forward the *Oil Daily* and *Petroleum Intelligence Weekly* publications to its employees.

The first factor weighs in favor of finding an implied license because the parties were engaged in an ongoing relationship. The Refinery has subscribed to *Oil Daily* since 1992 and *Petroleum Intelligence Weekly* since 1982. (¶¶ 35, 38). When the Refinery received these publications in print it would routinely route the publications to other executives at the Refinery via inter-office mail. (¶¶ 3-4, 12). Apparently, this has always been permitted by EIG. (Ex. A, Dent Dep. 71:19-72:10.) When EIG moved all publications from print to electronic in the early

2000s, and the Refinery could no longer receive them in print (¶¶ 2-5), the Refinery routed them to the same group of executives electronically, (¶¶ 3-4, 12).

The second factor also weighs in favor of an implied license because the subscription agreements explicitly allow for "the individual(s) <u>or employee(s) of the entity</u> identified under the 'Shipped to' notation on the front" of the invoice to use and/or access the publication. (¶¶ 3-4, 12). EIG's permission is only necessary when someone other than the individual or employees of the entity named on the invoice seek to access the publication. (*Id.*) As an example, the May 2011 invoice names both Galen Menard and NCRA on the front of the invoice. As an employee of NCRA, Menard was properly permitted to access *Oil Daily*. (EIG's Ex. A.) And under these terms and conditions, other NCRA employees were properly permitted to access it as well. It was not until May 2013 that EIG even began listing the number of authorized users. (*Id.*) EIG's unilateral attempt to limit the Refinery's subscription did not change the terms. During the parties' long term relationship, the Refinery believed that it could use the electronic publications in the same way that it had used to the print publications.

Lastly, the third factor weighs in favor of an implied license because EIG's conduct during the course of the Refinery's subscriptions indicated to the Refinery that EIG found its electronic routing to employees permissible. EIG has previously claimed to have a "long standing policy that access to a subscription by an assistant for the purpose of sending the single subscribed copy of the publication to a supervisor is not copyright [infringement]." (EIG's Opp. to the Refinery's Mot. Partial Summ. Judg. 29 [ECF 78].) EIG has also claimed that "EIG's concern is not with the number of readers of a single copy of a given subscription, but with the number of copies made . . . ," providing that "a printed copy of an EIG publication may be placed in a library and read by any number of individuals at a company." (*Id.*) Neither of these

facts had ever been communicated to the Refinery explicitly prior to this litigation, but were apparently followed by EIG. (¶¶ 3-4, 12). EIG's conduct, however, illustrates that it did allow the Refinery's electronic forwarding to occur.

For instance, in 2008, Galen Menard at the Refinery reached out to EIG sales representative, Peter Buttrick, to inquire about adding more subscriptions and to negotiate a package for adding more subscribers. (¶¶ 43-49.) EIG ignored the Refinery's repeated requests and instead renewed the same subscription that the Refinery had previously held. (*Id.*) In 2012, after the Refinery told EIG that it was electronically routing *Oil Daily* to a number of the Refinery's employees but before EIG warned the Refinery about the alleged infringement and placed the Refinery on a "potential litigation" list, EIG renewed the same subscription that the Refinery had always held. (¶¶ 50-60.) Even after issuing a warning to the Refinery, EIG never followed-up with the Refinery to discuss adding more subscribers even though the Refinery had already expressed an interest in doing so. (*Id.*) Even in 2015, when EIG allegedly learned of the Refinery's forwarding, the Refinery asked EIG how it could remedy the situation, offering to pay for the additional subscriptions. (¶¶ 51-66.) EIG never responded to the Refinery's offer. EIG's conduct illustrated to the Refinery that it was permitted to route the publication electronically to the same number of executives that had received it when it was in print. The Refinery relied on this understanding and limited its number of forwards. (¶¶ 3-4, 12.) This factor also weighs in favor of finding an implied license.

EIG relies heavily on its copyright notices as evidence that no implied license exists. (EIG's Mot. Summ. Judg. 18-19 [ECF 100].) But this Court has held that simply including a copyright notice does not negate the license to use the work. *Kid Stuff Mktg., Inc.*, 223 F.3d at 1183. In fact, this Court has stated that use of a copyright notice "simply speaks to the [copyright

owner's] intent to retain copyright ownership over the [works]—an intent that is not inconsistent with its right, as the copyright owner, to grant a license . . . ." *Id.*; *see also Asset Mktg Sys., Inc.*, 542 F.3d at 757 (use of copyright notice has no bearing on existence or scope of implied license).

In light of the Parties' ongoing relationship, the subscription agreements permitting employees of the Refinery to access the publications, and EIG's conduct, a reasonable jury could find that EIG granted the Refinery an implied license to forward *Oil Daily* and *Petroleum Intelligence Weekly* to its employees in the same manner as when the publication was in print. EIG is not entitled to prevail on this issue as a matter of law. For these reasons, the EIG's motion for summary judgment should be denied.

## IV.   EIG Has Not Proven That It Will Be Prejudiced by the Refinery's Adequate Remedy at Law Defense, So the Defense Should Not Be Dismissed.

EIG is not entitled to summary judgment on the Refinery's "adequate remedy at law" defense. The Refinery raised this defense because EIG seeks damages <u>as well an injunction</u>. (*See* Compl. [Dkt. 2]; Amend. Compl. [Dkt 28].) In order to prevent waiver, the Refinery properly alleged that EIG has an adequate remedy at law and is not entitled to an injunction. This is an appropriate use of the adequate remedy at law defense.

This Court has held that "it is not necessarily appropriate to strike these theories just because they have been mislabeled as affirmative defenses." *FTC v. Affiliate Strategies, Inc.*, No. 9-4104-JAR, 2010 WL 11470103, at *7 (D. Kan. June 8, 2010) (allowing adequate-remedy-at-law to be pled as an affirmative defense). Because an affirmative defense might be deemed waived if not timely pled, "the cautious pleader is fully justified in setting up as affirmative defenses anything that might possibly fall into that category, even though that approach may lead to pleading matters as affirmative defenses that could have been set forth in simple denials." *Id.* (*citing Bobbitt v. Victorian House, Inc.*, 532 F. Supp. 734, 736 (N.D. Ill.

1982)). The appropriate procedure to challenge the propriety of allegations of an affirmative defense is a motion to strike, which will not be granted "unless the defense is patently defective," *Bobbitt*, 532 F. Supp. at 736, and will prejudice the moving party, *FTC*, 2010 WL 11470103, at *7. Other courts have ruled similarly. *See Home Design Servs, Inc. v. Schroeder Const.*, 2012 WL 527202, at *2 (D. Colo. Feb. 16, 2012) ("While the court agrees that a number of Defendant's 'affirmative defenses' are more accurately characterized as denials, the Court does not find it necessary to grant summary judgment on that basis.'"); *Home Design Servs. v. Trumble*, No. 09-cv-00964-WYD-CBS, No. 09-cv-01437, WJM-GJR, 2011 WL 843900, at *3 (D. Colo. Mar. 8, 2011) (denying summary judgment when denials were mislabeled as affirmative defenses). EIG has not demonstrated any prejudice. Therefore, EIG's motion for summary judgment on this issue should be denied.

EIG's motion should also be denied because the Refinery's adequate remedy at law defense still stands. EIG is still holding on to the possibility of seeking an injunction even though it has not demonstrated likelihood of future infringement, which it admits it has the burden to do. EIG's claim for an injunction makes no sense in light of the lack of evidence of future infringement. There is still a question of fact as to whether EIG can prove that a likelihood of future infringement exists, and for these reasons, EIG's motion for partial summary judgment on the Refinery's adequate remedy at law defense should be denied.

## V.   A Reasonable Jury Could Find that EIG Has Not Satisfied the Requirements to Bring a Copyright Infringement Claim.

As EIG states, "[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copyright of constituent elements of the work that are original." (EIG's Mot. Partial Summ. Judg. 23 [ECF 100]) (*quoting Feist Publ'ns, Inc. v. Rural Tel. Serv.*

*Co.*, 499 U.S. 340, 361 (1991)). EIG has not proven that it owns a valid copyright in its *Oil Daily* publications, and is not entitled to summary judgment on the issue.

On July 17, 2017, the Refinery filed a motion asking this Court to refer the question of whether EIG has valid copyright registrations to the Register of Copyrights based on the fact that EIG knowingly included inaccurate information in its copyright applications. (*See* the Refinery's Mot. Referral to Register of Copyrights [Dkt 98].) If the Refinery prevails on that motion, and the Register of Copyrights determines that it would have rejected EIG's copyright applications, EIG has no grounds to bring this copyright infringement claim. 17 U.S.C. § 411(a) (requiring valid registration as a prerequisite for filing a copyright infringement claim). More specifically, because EIG seeks statutory damages it must have an effective date of registration "not later than the earlier of 3 months after the first publication of the work or 1 month after the copyright owner has learned of the infringement . . . ." 17 U.S.C. § 412. Even if EIG amends its applications in some way that would grant it valid copyrights, it is too late for EIG to receive such remedies. There is a genuine issue of material fact as to whether EIG has valid copyright registration in its *Oil Daily* publications. As a result, EIG is not entitled to summary judgment.

## VI.    A Reasonable Jury Could Find That EIG's Claims for Statutory Damages Violates the Due Process Requirements of the 14th Amendment and/or 5th Amendments.

Like the Refinery's adequate remedy at law defense, the Refinery's defense that EIG's claim for a multi-million windfall violates due process is proper to assert in the pleadings and should not be dismissed on summary judgment. In this District, it is proper to assert anything that might possibly be considered an affirmative defense, even if it means pleading something that could have been set forth as a denial. *See FTC v. Affiliate Strategies, Inc.*, No. 9-4104-JAR, 2010 WL 11470103, at *7 (D. Kan. June 8, 2010). *See also Voltage Pictures, LLC v. O'Leary*, 2016 WL 2693610 (D. Or. June 21, 2016) (recommending that the district court deny plaintiff's

motion to strike affirmative defense that damages are unconstitutionally excessive); *Voltage Pictures, LLC v. Blake*, No. 3:14-cv-1875-AC, 2015 WL 92788, at *7 (D. Or. Dec. 17, 2015) (denying motion to strike affirmative defense of unconstitutionally excessive statutory damages, noting that the Due Process Clause applies to statutory damages that "are so severe and oppressive as to be wholly disproportionate to the offense and obviously unreasonable."); *Malibu Media, LLC v. Lee*, No. 12-3900, 2013 WL 2252650, at *1 (D. N.J. May 22, 2013) (denying motion to strike affirmative defense of excessive statutory damages, noting that other courts have permitted such defenses to stand, and finding that inclusion of such a defense was not sufficiently prejudicial to require dismissal); *UMG Recordings, Inc. v. Lindor*, 05-1095, 2006 WL 3335048, at *3 (E.D.N.Y. Nov. 9, 2006). This Court should not dismiss or strike affirmative defenses without a showing of prejudice. *Id.* EIG has not shown that this affirmative defense will cause it any prejudice, and EIG's motion for summary judgment on this issue should be denied.

Additionally, it is premature to dismiss this affirmative defense because the Refinery does not know exactly what EIG's request for damages is at this point since EIG has not disclosed it. But the Refinery reasonably believes that EIG's request will be excessive, as EIG has already requested damages far exceeding any actual damages that it might have incurred. For instance, the most the Refinery would have paid for its subscription to *Oil Daily* is $3,995 (EIG's Ex. A), and $4,195 for its subscription to *Petroleum Intelligence Weekly* (EIG's Ex. B). If the Refinery added five users at the same rate, it would have paid somewhere around $19,975 for the five subscriptions to *Oil Daily* and $20,975 for the five subscriptions to *Petroleum Intelligence Weekly*. Even if the relevant time period is ten years as EIG claims, the most the Refinery would have paid is $199,750 for *Oil Daily* and $209,750 for *Petroleum Intelligence Weekly*. The multi-

million dollar award that EIG seeks far exceeds $400,000 in actual damages. Such a damages award is likely unconstitutional.

But EIG contends that its request for excessive damages is constitutional because its "express purpose" is to punish and discourage infringement. This argument is not persuasive on both accounts. First, statutory damages in copyright law are not punitive. *See* Patry on Copyright § 22:151 ("Punitive damages are *never* available for copyright infringement brought under the 1976 Copyright Act."). Even if this Court were to find that statutory damages serve a punitive purpose, the damages still cannot violate due process. That is exactly the finding in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), the reasoning in which has been extended to apply in copyright infringement cases. *See In re Napster*, No. C MDL-00-1369 MHP, C 04-1671 MHP, 2005 WL 1287611, at *10 (N.D. Cal. June 1, 2005) ("[L]arge awards of statutory damages can raise due process concerns . . . Extending the reasoning of Gore and its progeny, a number of courts have recognized that an award of statutory damages may violate due process if the amount of the award is 'out of all reasonable proportion' to the actual harm caused by a defendant's conduct . . . [T]hese cases are doubtlessly correct to note that a punitive and grossly excessive statutory damages award violates the Due Process Clause.").

Second, it is unreasonable to expect that a multi-million dollar award will deter future infringement either by the Refinery or anyone else. EIG does not need to deter any future infringement by the Refinery because the Refinery has not subscribed to any EIG publication since May 2015, and EIG has not submitted any evidence that the Refinery has continued or will continue to infringe EIG's copyrights. EIG's point that its excessive claim for statutory damages will deter the Refinery is moot, or at least unsupported by factual evidence.

EIG also has not shown that an award of excessive statutory damages in <u>this</u> litigation will deter future alleged infringers. EIG has already filed at least 100 lawsuits against its subscribers, so the deterrent effect of this litigation (over the other 100 lawsuits) is non-existent. *See Stygian Songs v. Patton*, 1982 WL 1161, at *2 (D. Kan. Nov. 23, 1982) (holding that where there is little deterrent value, the Court will not permit an award for excessive statutory damages). Moreover, EIG has never published a settlement amount in any of those other lawsuits or taken a case to trial. EIG settled those cases in secret and has taken extensive measures to maintain their secrecy. But EIG cannot have it both ways. It cannot claim that an excessive statutory damages award in this case will act as a deterrent when EIG has had ample opportunity to deter future alleged infringers by publishing its settlement awards but has not done so. The argument that an excessive statutory damages award in this litigation is a deterrent, as opposed to all of other awards EIG could have published, is not persuasive. Accordingly, EIG's motion for summary judgment on this issue should be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, summary judgment should be denied.

Dated: August 7, 2017                    Respectfully submitted,


                                         **KLENDA AUSTERMAN LLC**

                                         By  /s/ Christopher A. McElgunn
                                                 Christopher A. McElgunn #13359
                                                 Michelle L. Brenwald #19287
                                                 1600 Epic Center
                                                 301 N. Main
                                                 Wichita, KS 67202-4816
                                                 Phone: 316-267-0331
                                                 Fax: 316-267-0333
                                                 cmcelgunn@klendalaw.com
                                                 mbrenwald@klendalaw.com

                                         and

                                         **GRAY, PLANT, MOOTY, MOOTY,
                                         BENNETT, P.A.**

                                                 Dean C. Eyler (#267491)
                                                 Loren L. Hansen (#387812)
                                                 Molly R. Littman (#398449)
                                                 500 IDS Center
                                                 80 South Eighth Street
                                                 Minneapolis, Minnesota 55402
                                                 Phone: (612) 632-3000
                                                 Fax: (612) 632-4444


                                         **ATTORNEYS FOR DEFENDANT CHS
                                         McPHERSON REFINERY, INC. (f/k/a
                                         NATIONAL COOPERATIVE
                                         REFINERY ASSOCIATION).**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 7th day of August, 2017, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

By  /s/ Christopher A. McElgunn____

Christopher A. McElgunn #13359