## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP, INC
and ENERGY INTELLIGENCE GROUP
(UK) LIMITED,

                Plaintiffs,

v.                               Case No.  6:16-CV-1015-EFM-GLR

CHS McPHERSON REFINERY, INC
(F/K/A NATIONAL COOPERATIVE
REFINERY ASSOCIATIONS),

                Defendant.

## PRETRIAL ORDER

A pretrial conference was conducted in this case on August 29, 2017, by U.S. Magistrate Judge Gerald L. Rushfelt.  Plaintiff appeared through counsel Kimberly D. Farha, Richard L. Honeyman, Keith E. Sharkin, and Stephen M. Ankrom. Defendant appeared through counsel Dean C. Eyler, Loren L. Hansen, Molly R. Littman, and Christopher A. McElgunn.

This pretrial order supersedes all pleadings and controls the subsequent course of this case.  It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice.  Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1

1.     **PRELIMINARY MATTERS.**

a.     **Subject-Matter Jurisdiction.**  Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1338(a).

**Defendant's statement:**   Pending the outcome of the Refinery's Motion for Referral to the Register of Copyrights and any subsequent decisions on the validity of EIG's copyright registrations, the Refinery may contest the court's subject matter jurisdiction over EIG's copyright infringement claim as it relates to *Oil Daily*.

**Plaintiffs' statement:** Even if the Refinery's Motion for Referral were successful, subject matter jurisdiction is still proper in this matter.  The Supreme Court has expressly held that the registration requirement of 17 U.S.C. § 411 does not implicate subject matter jurisdiction.  *Reed Elsevier, Inc. v. Muchnick,* 559 U.S. 154, 166 (2010).  Section 411 instead represents a claim-processing requirement. *Id.*  Furthermore, Defendant has infringed copyrighted works that are not subject to Defendant's Motion for Referral to the Register of Copyrights.

b.     **Personal Jurisdiction.**  The court's personal jurisdiction over the parties is not disputed.

c.     **Venue.**  Venue in this court is not disputed.

d.     **Governing Law.**  Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the Copyright Act, 17 U.S.C. §§ 101  *et seq*.

2.     **STIPULATIONS.**

**a.**      The following facts are stipulated:

1.      Plaintiff Energy Intelligence Group, Inc. ("EIG") is a Delaware corporation with a principal place of business located at 270 Madison Avenue, Suite 302, New York, New York 10016-2807.

2.      Plaintiff Energy Intelligence Group (UK) Limited ("EIG") is a United Kingdom limited company with a principal place of business at Interpark House, 7 Down Street, London, W1J 7AJ United Kingdom.

3.      Defendant CHS McPherson Refinery, Inc. (the "Refinery") is a cooperative organized and existing under the Kansas Cooperative Marketing Act, with its principal place of business at 2000 S. Main St., McPherson, KS 67460. The Refinery was known as the National Cooperative Refinery Association prior to September 1, 2015 when CHS purchased NCRA.

4.      EIG commenced this action on January 18, 2016, and filed an Amended Complaint on August 16, 2016, alleging that the Refinery willfully infringed the copyrights of both its *Oil Daily* and *Petroleum Intelligence Weekly* publications by regularly and systematically copying and forwarding the publications and the articles contained therein.

5.      The Refinery has denied infringement and denied EIG's ownership of valid copyrights.

6.      EIG originally sought all remedies available to it under the Copyright Act.

7.      EIG has elected to recover statutory damages under the Copyright Act.

8.      EIG sells subscriptions to a number of publications, two of which include *Oil Daily* and *Petroleum Intelligence Weekly*.

9.      Derrick Dent has been an account manager at EIG since at least 2009.

10.     EIG sells at least three types of subscriptions: (1) a single subscription; (2) multiple subscriptions; and (3) a Global Enterprise License.

11.     In addition to its subscriptions, EIG permits readers to purchase individual articles or issues on a pay-per-view basis.

12.     For *Oil Daily*, an individual article costs $9.00, while an individual issue costs $95.00.

13.     For *Petroleum Intelligence Weekly*, an individual article costs $24.00, while an individual issue costs $395.00

14.     Since 2006, Deborah Brown—account services manager at EIG—has filed EIG's copyright applications for both *Oil Daily* and *Petroleum Intelligence Weekly*.

15.     From 2004 to about 2016, *Oil Daily* was registered using Form G/DN.

16.     From 2004 to 2016, *Petroleum Intelligence Weekly* was registered as a collective work using Form SE/Group.

17.     From at least as early as 1992 through May 15, 2015, the Refinery maintained a subscription to *Oil Daily.*

18.     From at least as early as 1982 through June 13, 2016, the Refinery maintained a subscription to *Petroleum Intelligence Weekly*.

4

19.     The Refinery received *Petroleum Intelligence Weekly* by print delivery until approximately 2002 when EIG moved from print delivery to electronic delivery and the Refinery agreed to receive *Petroleum Intelligence Weekly* through web access.

20.     On September 25, 2007, Mr. Menard, the Refinery's Vice President of Supply and Trading, sent an email to Mr. Loving, the Refinery's President, which stated:

> The Oil Daily is produced by the same company as Energy [sic] Intelligence Weekly. Please note the copyright pronouncement below for the Energy Intelligence Group.
>
> We will need to discontinue the e-mailing of the Oil Daily until a decision is made as to our subscription and the cost of retaining service to the list that currently receives the publication.

21.     On February 26, 2008, LeAnn Flickinger, a Refinery employee, sent an email to eleven people on the *Oil Daily* distribution list, which included Menard and Loving, stating:

> I will no longer be forwarding the Energy [sic] Oil Daily report out every morning due to Energy Oil Daily's [sic] copyright policy.  Let me know if you have any questions.  Thanks.

22.     On February 27, 2008, Galen Menard emailed EIG customer service the following: "My subscription expires on May 19th. Would like to discuss the costs associated with adding additional subscriptions within our company. Possibly up to ten users. Thanks!"

23.     The next day, February 28, 2008, EIG sales director, Peter Buttrick, responded with the following email:

Thank you again for taking the time to speak with me earlier today. As we

discussed, the following prices are applicable for Oil Daily:

| Users | Annual Cost |
|-------|-------------|
| 1 | $1,910 |
| 5 | $7,863 |
| 10 | $14,708 |

Please feel free to contact me if you have any questions.

24.     Later on February 28, 2008, Menard sent an email to eleven other

employees of the Refinery, including Flickinger, stating:

> NCRA has historically subscribed to the Oil Daily as a single user. As it is
> time to renew I asked Energy Intelligence Group for a quote to expand the
> number of users at NCRA.

Menard then relayed the pricing options he received from EIG and stated:

> As you can see it feels like highway robbery to add additional subscribers. I
> will continue to negotiate with them for better rates but so far they don't
> seem to interested in lowering their prices.  Let me know if you believe the
> information in the Oil Daily is worth the additional cost.

25.     Menard followed up with Buttrick on April 2, 2008 and again on April 3,

2008 requesting pricing for adding two or three additional users.

26.     On April 17, 2008, the Refinery received renewal notice number four by

email from EIG for its subscription to *Oil Daily.* The Refinery's subscription to *Oil Daily*

was renewed on May 12, 2008.

27.     On March 27, 2012, LeAnn Flickinger, employee of the Refinery, had a

telephone conversation with Derrick Dent about the Refinery's subscription to *Oil Daily*.

6

28.     On March 27, 2012, Ms. Flickinger sent an email to Derrick Dent, an

account manager at EIG, stating:

> As per our phone conversation, the Energy [sic] Oil Daily is forwarded to
> Galen Menard by me and if he is out it is forwarded to one of the other
> executives. I get the e-mail since Galen is out of the office on occasions and
> then someone else in the Executive office can see the information.

29.     Pursuant to EIG policy, Dent reported this information to John Hitchcock.

30.     Two days later, on March 29, 2012, the subscription was renewed.

31.     On March 30, 2012, Dent sent the following email:

> Thank you for your recent renewal to Oil Daily. You are one of your valued
> subscribers and we appreciate your business. This is just a gentle reminder
> to inform you that our publications are licensed for use by named
> authorized user as provided in the license (subscription) agreement for their
> sole use and are priced accordingly. All single user subscriptions such as
> yours are intended solely for the designated named recipient and not
> anyone else or any entire organization or a group within it. A single user
> subscription cannot be shared by electronic means among multiple readers
> by forwarding or posting on an intranet, or by sharing of a log-in name and
> password. If access is required by others beyond the current subscription
> agreement, a multiple named user subscription could be purchased.

32.     On or about March 27, 2015, Dent and Menard had a telephone

conversation during which Menard informed EIG that *Oil Daily* was distributed to  a

group of the Refinery's executives.

33.     On March 27, 2015, Dent contacted Menard after the two had spoken on

the phone, stating

> I would like to make clear that the terms of our subscription agreement with
> NCRA for the Oil Daily publication do not permit the kind of usage you
> described during our phone call. Electronic forwarding of the publication

creates copies that violate the terms of the subscription agreement and our copyrights in the publication.

I would be happy to discuss a license that would be in keeping with the usage NCRA is making of Oil Daily.

34.     On March 31, 2015, Menard responded to Dent apologizing for the Refinery's "misunderstanding on [its] subscription," and requested a quote for additional users to determine how Defendant could renew the *Oil Daily* subscription going forward.

35.     In 2010, John Hitchcock joined EIG.

36.     On February 23, 2010, Hitchcock emailed a number of EIG employees a memorandum in which he identified "a ratcheting-up of [EIG's] efforts to thwart copyright abuse."

37.     In the memorandum, EIG called on "sales force and customer service representatives—to act as another line of defense in identifying incidents of unauthorized usage among its customers."

38.     Hitchcock also asked that "any credible, well-documented information regarding suspicious activity by a customer or, of course, direct evidence of authorized usage, be reported immediately to" him.

**b.**     The parties have stipulated to the admissibility of the following exhibits for purposes of trial:

| Bates Beg. | Bates End | Date | Description |
|---|---|---|---|
| | | | *Oil Daily* renewal notices and renewals of same |
| | | | *Petroleum Intelligence Weekly* renewal notices and renewal of same |

| Bates Beg. | Bates End | Date | Description |
|---|---|---|---|
| | | | All terms and conditions and copyright policies for *Oil Daily* and *Petroleum Intelligence Weekly* |
| | | | *Oil Daily* copyright registrations from June 2004 through June 2015 |
| | | | *Petroleum Intelligence Weekly* copyright registrations from May 2004 through April 2015 |
| | | | *Oil Daily* issues published between June 2004 and June 2015 |
| | | | *Petroleum Intelligence Weekly* issues published between June 2004 and June 2015 |
| N/A | N/A | June 9, 2017 | Chart of Defendant's sales and net income for fiscal years 2004 through 2016 (Beckman Dep. Ex. 161) |
| CHS038636 | CHS038638 | March 30, 2012 | Email from Derrick Dent to LeAnn Flickinger re NCRA – Oil Daily follow-up |
| CHS050071 | CHS050073 | April 3, 2008 | Email from Galen Menard to Peter Buttrick re: FW: Oil Daily follow up |
| CHS047419 | CHS047427 | September 25, 2007 | Email and attachment from Galen Menard to Jim Loving re: FW: The Oil Daily, September 25, 2007 (pdf) |
| CHS050054 | CHS050055 | February 26, 2008 | Email from Galen Menard to Jeff Sinnett re: Energy Oil Daily |
| CHS050056 | CHS050057 | February 28, 2008 | Email from Galen Menard to LeAnn Flickinger; Tom Hunter; Dana Kresky; Jeff Sinnett; Jim Loving; Jimmie Jones; John Buehrle; Ken Sims; Kent Stos; Mary Minor; and Rick Leicht re: Energy Oil Daily |
| EIG044471 | EIG044473 | March 30, 2012 | Email from Derrick Dent to LeAnn Flickinger re: NCRA – Oil Daily follow-up |
| EIG044502 | EIG044502 | February 28, 2008 | Email and attachment from Peter Buttrick to Deborah Brown re: RE: Related to My Subscription or Account: Subscription Renewal |
| EIG044512 | EIG044514 | March 31, 2015 | Email from Galen Menard to Derrick Dent re: RE: Energy Intelligence – Oil Daily |
| EIG044596 | EIG044598 | March 29, 2012 | Email and attachment from Derrick Dent to Gladys Infante re: Renewal 03-29-2012 Natl. Coop. Refinery Assoc. TOD |
| EIG045464 | EIG045464 | March 30, 2015 | Email from Derrick Dent to Galen Menard re: Energy Intelligence - Oil Daily |

| Bates Beg. | Bates End | Date | Description |
|---|---|---|---|
| EIG045520 | EIG045521 | June 22, 2012 | Email from Kathy Swanson to Gladys Infante re: Change email address - Related to My Subscription or Account |
| EIG045821 | EIG045821 | February 27, 2008 | Email from Galen Menard to customerservice@energyintel.com re: Related to My Subscription or Account Subscription Renewal |
| EIG045996 | EIG045996 | February 28, 2008 | Email from Peter Buttrick to 'gmenard@ncra.coop' re: Oil Daily follow up |

## 3.    FACTUAL CONTENTIONS.

### a.    Contentions of Plaintiff(s).

The relevant time period for Defendant's copyright infringement as alleged in the Amended Complaint is May 2004 through June 2015 ("Relevant Period"). From June 2004 through June 2015, EIG published nearly 2,800 issues of *Oil Daily*. From May 2004 through April 2016, EIG published over 600 issues of *Petroleum Intelligence Weekly*. EIG owns valid federal copyright registrations for all of the issues of *Oil Daily* and *Petroleum Intelligence Weekly* published during the Relevant Period. The Refinery maintained subscriptions to one copy of Plaintiffs' daily publication *Oil Daily* and one copy of Plaintiffs' weekly publication *Petroleum Intelligence Weekly* continuously throughout the Relevant Period. The terms and conditions of the subscriptions to *Oil Daily* and *Petroleum Intelligence Weekly* ("Terms and Conditions") were sent to the Refinery annually in renewal notices and/or invoices for the relevant subscriptions. Neither the Terms and Conditions nor any other document or communication from EIG

permitted copying of either publication. The Refinery's employees recklessly disregarded these terms. Additionally, each issue of *Oil Daily* and *Petroleum Intelligence Weekly* contained at least one copyright notice stating that making copies of the issue was not permitted. In addition to having been alerted from these copyright notices and warnings that copying was not permitted, internal communications show that Refinery employees knew that copying and distributing copies of issues of *Oil Daily* and/or *Petroleum Intelligence Weekly* were not permitted and that such copying and/or distribution constituted willful infringement of EIG's copyrights in and to their copyrighted works.

Issues of *Oil Daily* and *Petroleum Intelligence Weekly* published during the Relevant Period were delivered to the Refinery either by downloading from EIG's website or sent directly to the Refinery as attachments to emails from EIG (according to the subscription terms effective at the time). The Refinery created copies of each issue of *Oil Daily* and *Petroleum Intelligence Weekly* it received during the Relevant Period and distributed these copies in .pdf attachments, forwarded via email, to employees of the Refinery on a daily basis for *Oil Daily* and on a weekly basis for *Petroleum Intelligence Weekly*. Unlike the Refinery's previous practice of routing a single copy of EIG's publications to multiple employees in sequence, forwarding the publications by email unlawfully created multiple copies. Each issue of *Oil Daily* and *Petroleum Intelligence Weekly* alleged to be infringed in this litigation was: (1) received by and accessed by the Refinery under the terms of a subscription agreement with EIG and (2) copied in its

entirety by the Refinery, resulting in the creation of identical copies of each issue which the Refinery distributed to multiple employees.

Each instance of the Refinery's systematic infringement of EIG's copyrights in *Oil Daily* and *Petroleum Intelligence Weekly* during the Relevant Period was conducted on the Refinery's private, protected servers, which EIG could not access. The Refinery stated to EIG at various times throughout the Relevant Period that it only required a single copy of *Oil Daily* and *Petroleum Intelligence Weekly* and maintained subscriptions to one copy of both publications throughout the Relevant Period even though the Refinery was making copies of the publications and distributing these copies to other employees without EIG's permission or knowledge on a daily or weekly basis respectively throughout the Relevant Period.

EIG did not know or have reason to know of the Refinery's infringing activity until March 27, 2015 when Galen Menard indicated in a phone conversation with EIG's sales representative that the Refinery was making and distributing copies of *Oil Daily* via email on a daily basis. EIG learned the full extent of the Refinery's copyright infringement of *Oil Daily* and the existence of and extent of the Refinery's copyright infringement of *Petroleum Intelligence Weekly* through the course of discovery in this litigation.

The Refinery willfully infringed EIG's copyrights in at least 2,784 issues of *Oil Daily* and at least 620 issues of *Petroleum Intelligence Weekly*. Internal communications demonstrate that the Refinery knew it was not permitted to make copies of the

publications through the Terms and Conditions, the Copyright Notices and through direct communications with EIG**,** yet persisted in its systematic infringement of EIG's copyrights for over a decade.  The Refinery's infringing acts were kept secret from EIG and, on more than one occasion, the Refinery purposefully misled EIG by stating that it only had a need for a single copy to each publication when, in fact, both publications were systematically being copied and sent to multiple employees on a daily or weekly basis.  This conduct constitutes willful infringement of EIG's copyrights.

     **b.**    **Contentions of Defendants.**

The Refinery denies infringing EIG's alleged copyrights in any of the *Oil Daily* or *Petroleum Intelligence Weekly* publications identified in this lawsuit. Moreover, the Refinery contends that EIG does not have valid copyright registrations in its *Oil Daily* publications and that EIG's claim for statutory damages must be reduced to a three-year period under the statute of limitations.

Since 1982, the Refinery has subscribed to at least one EIG publication. It received these publications in print until the late 1990's when EIG moved from delivering its publications in print to delivering them electronically. When the Refinery received the publications in print, it routed them through the office for a handful of Refinery executives to read. Though EIG never explicitly told the Refinery that this type of sharing was permitted, EIG's internal policies allowed it, and EIG did not protest. When the Refinery began receiving EIG's publications electronically, it continued to route the publications to a limited group of executives. For example, though the Refinery

had been receiving *Oil Daily* long before Galen Menard became Vice President of Supply and Trading, once he assumed the role the *Oil Daily* publication was routed to him as well. Galen Menard became the name identified on the subscription agreements, in addition to NCRA (the Refinery) as a whole. Though, Galen Menard's assistant, LeAnn Flickinger, actually received the publication in her inbox. The reason was so that she could efficiently get the publication to the other Refinery executives. Similarly, Kathy Swanson and Debbie Ratzloff were named on the *Petroleum Intelligence Weekly* subscription, along with NCRA (the Refinery) as a whole.

In February 2008, Galen Menard reached out to EIG Account Manager, Peter Buttrick, to inquire about the cost of adding up to ten more subscribers. When the price for adding ten more subscribers was too high compared to the number of Refinery executives who wanted to read the publication, Menard asked Refinery executives to identify who truly wanted to read it. After that, Menard reached to Buttrick on April 2, 2008 inquiring about the cost of adding three more subscribers. Buttrick did not respond. Menard reached out again on April 3, 2008, changing his inquiry to just two more subscribers. Again, Buttrick did not respond. Nonetheless, EIG renewed the Refinery's same subscription in May 2008. The Refinery continued to forward *Oil Daily* and *Petroleum Intelligence Weekly* to a limited group of individuals that had received it historically.

In March 2012, veteran EIG Account Representative, Derrick Dent, reached out to LeAnn Flickinger. On these calls, Dent typically asked subscribers about their needs and

whether they could use additional subscriptions. After the call, Dent followed up with Flickinger asking her to explain how she used the *Oil Daily* subscription and the list of people that she forwarded it to. Flickinger responded that she would often forward the email to someone other than Menard. After receiving her email, Dent reached out to John Hitchcock,  EIG's managing director and vice president, and EIG's in-house counsel, as he was required to do when coming across activity deemed suspicious of copyright infringement. The next day, EIG renewed the Refinery's same subscription for the 2012 year. Meanwhile, Hitchcock and in-house counsel crafted an email for Dent to send to Flickinger, which he did on March 30, 2012. The email warned the Refinery that the use that Flickinger described was in violation of the Parties' subscription agreement, and constituted copyright infringement. The Refinery was put on a "litigation hold" list and from that point forward Dent and others at EIG were required to get permission from Hitchcock and counsel before renewing the Refinery's subscription.

In March 2015, Dent called Menard and Menard again disclosed to EIG that a handful of Refinery executives received *Oil Daily*. Like in 2012, Dent informed Hitchcock and in-house counsel who crafted another email for Dent to send to Menard. Dent told Menard that the use that Menard had described was in violation of the Parties' subscription agreement, and constituted copyright infringement. Menard asked Dent about adding more subscribers, but neither Dent nor anyone else at EIG responded. In November 2015, EIG executives flew to Chicago to meet Menard for settlement discussions, in which EIG told the Refinery it could either purchase a "Global Enterprise

License" for more than a million dollars or EIG would file suit. When the Refinery declined, EIG filed this lawsuit on January 18, 2016. EIG now seeks unspecified damages, which is believed to exceed several million dollars. EIG is aware of the actual harm caused by the Refinery's alleged infringements, but seeks statutory damages far exceeding that amount.

**4.    LEGAL CLAIMS AND DEFENSES.**

   **a.    Legal Claims of Plaintiff(s).**

   Copyright Infringement - Defendant infringed Plaintiffs' exclusive rights to copy and distribute issues of their copyrighted newsletter publications, *Oil Daily* and *Petroleum Intelligence Weekly,* under 17 U.S.C. § 106 by systematically copying and distributing at least 3,378 individual copyrighted issues of *Oil Daily* and *Petroleum Intelligence Weekly* without authorization during the time period May 2004 to June 2015. Defendant's acts of infringement were committed willfully or with reckless disregard entitling Plaintiffs to an increased award of statutory damages of $750 up to $150,000 per work infringed.

   **b.    Defenses of Defendant(s).**

   The Refinery asserts the following defenses:

1.  The Refinery did not infringe EIG's alleged copyrights in Petroleum Intelligence Weekly.

16

2. EIG's claims are barred, in part, because it does not have valid copyright registrations in Oil Daily as required by the Copyright Act.

3. EIG's claims are barred by the statute of limitations of 3 years, as provided by 17 U.S.C. § 507(b).

4. EIG's claims are barred, in whole or in part, by their failure to mitigate damages.

5. EIG's claims are barred, in whole or in part, by the doctrine of copyright misuse for EIG has asserted demands on their copyrights that illegally extend their monopoly beyond granted by the Copyright Office and therefore violate public policies underlying copyright laws.

6. EIG's claims are barred, in whole or in part, by the doctrine of implied license.

7. EIG's claims are barred, in part, because they have an adequate remedy at law, namely, monetary damages, and therefore EIG is not entitled to injunctive relief.

8. EIG's claims for damages, to the extent they assert that they are entitled to statutory damages, are barred inasmuch as such damages are wholly punitive in this instance and violate the due process requirements of the Fourteenth Amendment and/or Fifth Amendment of the Constitution of the United States of America.

## 5.   DAMAGES AND NON-MONETARY RELIEF REQUESTED.

Plaintiffs allege that Defendant's acts of copyright infringement were willful and Plaintiffs seek statutory damages under 17 U.S.C. § 504(c) in the range of $750 -

$150,000 per work infringed, as provided by the statute for willful copyright infringement.  Plaintiffs also seek an award of costs and attorney's fees under 17 U.S.C. § 505.

**6.  AMENDMENTS TO PLEADINGS.**

None

**7.  DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by June 15, 2017. Discovery is complete.

**8.  MOTIONS.**

**a.  Pending Motions.**

**Plaintiffs' Pending Motions:**

Plaintiffs' Cross Motion for Partial Summary Judgment—Filed April 21, 2017 (Dkt. 67);

Plaintiffs' Motion Challenging the Admissibility of Expert Report and Testimony of William R. Rosenblatt—Filed May 30, 2017 (Dkt. 86); and

Plaintiffs' Motion for Partial Summary Judgment to Dismiss Defendant's Affirmative Defenses Two Through Seven—Filed July 17, 2017 (Dkt. 100).

**Defendant's Pending Motions:**

Defendant's Motion for Partial Summary Judgment—Filed on March 17, 2017 (Dkt. 76); and

Defendant's Motion for Referral to the Register of Copyrights and for a Concurrent Stay—Filed July 17, 2017 (Dkt. 98).

**b.    Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

- Motions in *Limine*—Plaintiffs

- Motions In *Limine*—Defendant

The dispositive-motion deadline, as established in the scheduling order and any amendments, was **July 17, 2017.**

The parties should follow the summary-judgment guidelines available on the court's website:

http://www.ksd.uscourts.gov/summary-judgment/

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.    Motions Regarding Expert Testimony.**

All motions to exclude testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, were due on have been filed **on May 30, 2017.**  All such motions in this case have been filed.

19

9.   **TRIAL.**

The trial docket setting is **<u>March 27, 2018 at 9:00 a.m.,</u> in Wichita, Kansas.** This case will be tried by jury. Trial is expected to take approximately five to seven days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge will convene another pretrial conference to discuss, among other things, the setting of deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**IT IS SO ORDERED**.

Dated September 15, 2017 at Kansas City, Kansas.


<u>*S/ Gerald L. Rushfelt*</u>
Honorable Gerald L. Rushfelt
U. S. Magistrate Judge