## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ENERGY INTELLIGENCE GROUP, INC.
and ENERGY INTELLIGENCE GROUP
(UK) LIMITED,

      *Plaintiffs,*

  vs.

CHS McPHERSON REFINERY, INC.
(F/K/A A NATIONAL COOPERATIVE
REFINERY ASSOCIATION),

      *Defendant.*

Case No. 16-1015-EFM-GLR

## MEMORANDUM AND ORDER

Plaintiffs Energy Intelligence Group, Inc., and Energy Intelligence Group (UK) Limited (collectively "EIG") have sued CHS McPherson Refinery, Inc. ("the Refinery") for copyright infringement. There are four motions pending before the Court. The Refinery has moved for partial summary judgment (Doc. 52) seeking to limit EIG's claims based on the three-year statute of limitations and seeking to limit EIG's request for statutory damages. In response to this motion, EIG has filed a cross-motion for summary judgment (Doc. 67) regarding EIG's statutory damages request. In addition, EIG has moved for partial summary judgment (Doc. 100) seeking to dismiss the Refinery's affirmative defenses and has filed a Motion Challenging the Admissibility of Expert Report and Testimony of William Rosenblatt (Doc. 86). For the reasons stated below, the Court

denies the Refinery's motion for partial summary judgment, grants EIG's cross motion for summary judgment, grants in part and denies in part EIG's motion for partial summary judgment, and grants EIG's motion to exclude the expert testimony and report of Rosenblatt.

## I.     Factual and Procedural Background

### A.     EIG's Publications and Copyright Registrations

EIG sells subscriptions to many publications, two of which include *Oil Daily* and *Petroleum Intelligence Weekly*. EIG sells at least three types of subscriptions to its publications: (1) a single subscription; (2) multiple subscriptions; and (3) a Global Enterprise License, which includes up to 15 publications and six databases. In addition to its subscriptions, EIG allows readers to access individual articles or issues on a pay-per-view basis.

Within EIG, account managers are required to make periodic calls on their assigned accounts to, among other things, look for opportunities to increase the number of subscriptions an individual or company might hold. Account managers are assigned to both large and small accounts. One of EIG's account managers who specializes in small accounts is Derrick Dent. Dent managed the Refinery's account with EIG beginning in 2009.

Since 2006, Deborah Brown—an account services manager at EIG—has filed EIG's copyright applications with the U.S. Copyright Office. During that time, EIG registered *Oil Daily* using Form G/DN. From 2006 to 2008, Brown checked the "Compilation" box in the "Author's Contribution" section of Form G/DN, as well as the "text" and "editing" boxes in the group applications. In 2008, she stopped checking the "Compilation" box but continued checking the "text" and "editing" boxes. From 2004 to 2016, EIG registered *Petroleum Intelligence Weekly* as a collective work using Form SE/Group.

**B.**     **EIG's Copyright Enforcement**

EIG began enforcing its copyrights and pursuing potential copyright infringement litigation around 2005.  At that time, EIG's president, Tom Wallin, proposed copyright enforcement as a potential revenue stream, comprised of both legal settlement and improved subscription revenues due to better compliance by subscribers.  In 2007, EIG ramped up its copyright enforcement tactics by issuing copyright notices on its publications, implementing new procedures for monitoring and enforcing its copyrights, and running "password abuse" reports designed to "pick out users with the most suspicious behavior."  When EIG uncovered information indicating infringement by its large clients, EIG believed that it should pursue remedies for that infringement, including litigation.  This aggressive approach was supported by EIG's board of directors and ownership.

In 2010, EIG hired John Hitchcock as managing director.  On February 23, 2010, he emailed his team a memorandum "which represented[ed] a ratcheting-up of [EIG's] efforts to thwart copyright abuse."  In the memorandum, EIG rolled out its bonus plan, calling upon the "sales force and customer service representatives to act as another line of defense in identifying incidents of unauthorized use among [its] customers."  The plan required all documented information of suspicious activity or direct evidence of unauthorized usage to be reported immediately to Hitchcock.  Under these policies, if management determines that there are ambiguous circumstances as to whether unauthorized copying occurred, the account representative is instructed to contact the customer and ask them to confirm the scope of their usage of EIG's publications.

If an EIG salesperson reports suspicious behavior to management and EIG initiates a lawsuit based on such reporting, then EIG pays that salesperson $5,000.  If the lawsuit leads to a settlement or court-ordered award, EIG then pays the salesperson an additional $5,000.  Since

2005, EIG has vigilantly protected its copyrights and aggressively enforced them after discovering overt evidence of infringement.

**C.      The Refinery's Subscription to *Oil Daily* and *Petroleum Intelligence Weekly***

The Refinery purchased a subscription to *Oil Daily* beginning in 1992 and renewed it annually until it allowed the subscription to expire on or around May 15, 2015.  The Refinery received *Oil Daily* by print delivery until 1999 when it elected to receive it electronically.  EIG directed its subscription renewals to Galen Menard, who was the Refinery's Vice-President of Supply & Trading.  Refinery employee LeAnn Flickinger, who was Menard's assistant, received the publication through an email sent by EIG with the publication attached.  Flickinger forwarded the email with the attached publication to Menard and other Refinery employees daily.

The Refinery first subscribed to *Petroleum Intelligence Weekly* in 1982 and renewed it annually until it allowed the subscription to expire on or around June 13, 2016.  The Refinery received the publication by print delivery until approximately 2002 when EIG moved from print delivery to electronic delivery.  From 2005 to 2011, EIG directed its renewal subscriptions to Refinery employee Kathy Swanson.  Swanson served as an assistant to James Loving, who was the Refinery's president.  Swanson downloaded issues of *Petroleum Intelligence Weekly* and distributed it to multiple Refinery employees including Loving.  When Swanson retired in June 2012, her responsibilities regarding the publication were assumed by Deborah Ratzloff.

Both *Oil Daily* and *Petroleum Intelligence Weekly* contained copyright notices and warnings.  In addition, EIG included a copyright notice and warning on the weekly emails it sent notifying the Refinery that a new issue was available.

**D.      Communications between the Refinery and EIG**

On September 25, 2007, Menard sent an email to Loving, which stated:

> The Oil Daily is produced by the same company as Energy [sic] Intelligence Weekly.   Please note the copyright pronouncement below for the Energy Intelligence Group.
>
> We will need to discontinue the e-mailing of the Oil Daily until a decision is made as to our subscription and the cost of retaining service to the list that currently receives the publication.

Five months later, on February 26, 2008, Flickinger emailed 11 Refinery employees, including Menard and Loving, stating:  "I will no longer be forwarding the Energy Oil Daily report out every morning due to Energy Oil Daily's copyright policy."  That same day, in response to an inquiry from a Refinery employee about *Oil Daily*'s ongoing availability, Menard told the employee that he was going to attempt to negotiate with EIG regarding a group discount and that he would make sure copies were available until the situation was resolved.

The following day, on February 27, Menard emailed EIG Customer Service indicating that he would like to discuss the costs associated with adding up to 10 users within the Refinery for *Oil Daily*.  EIG responded with a pricing schedule that indicated that five users would cost $7,863.00 annually and that 10 users would cost $14,708 annually.  Menard then notified the Refinery employees of the quoted prices and stated that he was reluctant to increase the Refinery's subscription because the prices were "highway robbery."  Menard further stated that he would continue to negotiate with EIG for better rates but that EIG did not seem interested in lowering its prices.

Menard followed up with EIG on April 2, and again on April 3, requesting pricing for two or three additional users.  On April 17, the Refinery received a renewal notice from EIG for its subscription to *Oil Daily*.  The Refinery renewed that subscription on May 12.

Almost four years later, on the morning of March 27, 2012, Flickinger forwarded *Oil Daily* to Menard and three other Refinery employees.  Later that day, she spoke with EIG account

manager Derrick Dent about the Refinery's subscription to *Oil Daily*. After their conversation, she

sent Dent the following email:

> As per our phone conversation, the Energy [sic] Oil Daily is forwarded to Galen
> Menard by me and if he is out it is forwarded to one of the other executives.  I get
> the email since Galen is out of the office on occasions and then someone else in the
> Executive office can see the information.

Pursuant to EIG's copyright infringement policy, Dent reported this information to Hitchcock.

Two days later, on March 29, the Refinery renewed its *Oil Daily* subscription.  The next day, Dent

sent the following email:

> Thank you for your recent renewal to Oil Daily.  You are one of your [sic] valued
> subscribers and we appreciate your business.  This is just a gentle reminder to
> inform you that our publications are licensed for use by the named authorized user
> as provided in the license (subscription) agreement for their sole use and are priced
> accordingly.  All single user subscriptions such as yours are intended solely for the
> designated named recipient and not anyone else or any entire organization or group
> within it.  A single user subscription cannot be shared by electronic means among
> multiple readers by forwarding or posting on an intranet, or by sharing of a log-in
> name and password.  If access is required by other beyond the current subscription
> agreement, a multiple named user subscription could be purchased.

No further action was taken by Dent or EIG.  The Refinery did not stop forwarding *Oil Daily* or

*Petroleum Intelligence Weekly* after receiving this email until June 2015.

Three years later, on or about March 27, 2015, Dent contacted Menard for a routine sales

call.  During that call, Menard informed Dent that Flickinger distributed *Oil Daily* to himself and

Loving.  Dent contacted Menard after the two had spoken stating:

> I would like to make clear that the terms of our subscription agreement with [the
> Refinery] for the Oil Daily publication do not permit the kind of usage you
> described during our phone call.  Electronic forwarding of the publication creates
> copies that violate the terms of the subscription agreement and our copyrights in
> the publication.

Nonetheless, Dent offered to discuss a license that would "be in keeping with the usage [the

Refinery] is making of Oil Daily."

Menard responded on March 31, apologizing for the misunderstanding and requesting a quote for additional users. Dent did not respond to Menard's email. After conferring with counsel, EIG began to treat the Refinery's use of *Oil Daily* as a copyright infringement matter. On or about November 10, 2015, EIG pitched its "Global Enterprise License" to the Refinery.

**E.**     **EIG Files Suit against the Refinery**

EIG filed this lawsuit against the Refinery on January 18, 2016, and filed an Amended Complaint on August 16. EIG claims that the Refinery engaged in copyright infringement by allegedly copying *Oil Daily* and *Petroleum Intelligence Weekly* and distributing copies of these publications to multiple Refinery employees in violation of the subscription agreements. The Refinery disputes these allegations and contends that EIG's claims are limited or barred by the following affirmative defenses: (1) the three year statute of limitations set forth in 17 U.S.C. § 507(b); (2) EIG's failure to mitigate damages; (3) the doctrine of copyright misuse; (4) the doctrine of implied license; (5) EIG has an adequate remedy at law; (6) EIG's claims fail to state a claim upon which relief may be granted; and (7) EIG's claims for statutory damages violate the due process requirements of the Fourteenth Amendment and/or Fifth Amendment.

On July 17, 2017, the Refinery filed a motion for referral to the Register of Copyrights and a concurrent stay on the grounds that EIG knowingly included inaccurate information in its copyright applications for *Oil Daily* that, if known at the time of registration, would have caused the Register of Copyrights to refuse registration. The Court denied the Refinery's motion in a Memorandum and Order dated January 17, 2018. It concluded that the Refinery did not meet its burden to show that EIG included inaccurate information in its copyright applications or that even if EIG did include inaccurate information, it did not do so with knowledge that it was inaccurate.

-7-

The Refinery has now moved for partial summary judgment seeking to limit EIG's claim based on the statute of limitations and its statutory damages request based on the number of registrations obtained versus the number of publications the Refinery received. In response, EIG filed a cross motion for summary judgment on the statutory damages issue. In addition, EIG has filed a motion for partial summary judgment on the Refinery's affirmative defenses two through seven listed above and a motion challenging the admissibility of the report and testimony of Rosenblatt—the Refinery's designated expert. All of these motions are ripe for the Court's consideration.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[1] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[2] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[3] If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[4] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone

---

[1] Fed. R. Civ. P. 56(a).

[2] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[3] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[4] *Id.* (citing Fed. R. Civ. P. 56(e)).

cannot survive a motion for summary judgment.[5] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[6]

Though the parties in this case filed cross-motions for summary judgment, the legal standard remains the same.[7] Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[8] Each motion will be considered separately.[9] To the extent the cross-motions overlap, however, the court may address the legal arguments together.[10]

### III. Analysis

### A. The Refinery's Motion for Partial Summary Judgment (Doc. 52) and EIG's Cross Motion for Summary Judgment (Doc. 67)

The Refinery seeks partial summary judgment on two grounds. First, the Refinery seeks summary judgment on EIG's copyright infringement claims occurring before January 18, 2013, arguing that these claims are barred by the statute of limitations. Second, the Refinery seeks summary judgment on EIG's claim that if it is liable for copyright infringement it is entitled to statutory damages for each individual publication infringed from 2004 to 2016. EIG has filed a cross motion for summary judgment on the statutory damages issue.

---

[5] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[7] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008) (citation omitted).

[8] *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1382 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir. 1983)).

[9] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[10] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

### 1.    Statute of Limitations

A claim for copyright infringement must be brought "within three years after the claim accrued."[11]   The Tenth Circuit has long applied the discovery rule of accrual in the copyright context, meaning that the claim accrues when the copyright owner has "knowledge of a violation or is chargeable with such knowledge."[12]   The Supreme Court, however, recently discussed the limitations period in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, in an opinion holding that the equitable defense of laches does not apply to claims for copyright infringement brought within the statute of limitations.[13]   In discussing the applicable statute of limitations, the Supreme Court applied the incident of injury rule, meaning that the claim accrues when the infringement occurs.[14] The Supreme Court acknowledged that a majority of circuits use the discovery rule and noted that the Court has "not passed on the question," but proceeded to analyze the case under the incident of injury rule.[15]

Since *Petrella*, district courts have wrestled with its implication on the use of the discovery rule in copyright infringement cases.  Many of the district courts who have examined *Petrella* have concluded that the Supreme Court did not intend to abrogate the discovery rule in that case.[16]

---

[11] 17 U.S.C. § 507(b).

[12] *Diversey v. Schmidley*, 738 F.3d 1196, 1200 (10th Cir. 2013) (quoting *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994)).

[13] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1969 (2014).

[14] *Id.*

[15] *Id.* n.4.

[16] *See, e.g., Design Basics, LLC v. Windsor Homes, Inc.*, 2017 WL 1836893, at *2-3 (N.D. Ind. 2017); *Energy Intelligence Group, Inc. v. Scotia Capital (USA) Inc.*, 2017 WL 432805, at *1-2 (S.D.N.Y. 2017); *Cooley v. Penguin Grp. (USA), Inc.*, 31 F. Supp. 3d 599, 611 n.76 (S.D.N.Y. 2014).

Furthermore, in a subsequent case, *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*,[17] the Supreme Court made the following statement regarding *Petrella*:

> While some claims are subject to a discovery rule under which the limitations period begins when the plaintiff discovers or should have discovered the injury giving rise to the claim, that is not a universal feature of statutes of limitations. . . . And in *Petrella*, we specifically noted that we have not passed on the question whether the Copyright Act's statute of limitations is governed by such a rule.[18]

This statement appears to confirm that the Supreme Court has not determined whether the discovery rule or the incident of injury rule applies when calculating the statute of limitations in a copyright infringement case.  Neither party in this case has addressed *Petrella* or its applicability. Because this Court is bound to apply Tenth Circuit law, it will apply the discovery rule in this case.

A copyright infringement claim accrues when the copyright owner has actual knowledge or constructive knowledge of the infringement.[19]  It is easy to determine the limitations period when a copyright owner has actual knowledge.  Accrual begins with the acquisition of that knowledge and is determined based on the passage of time.[20]  But, in the absence of actual knowledge, the question becomes "when a reasonably prudent person in the plaintiff's shoes would have discovered (that is, would have acquired an awareness of) the putative infringement."[21]  The defendant bears the burden of proof in this "fact-intensive inquiry."[22]

---

[17] 137 S. Ct. 954 (2017). *SCA Hygiene* presented a similar question to *Petrella*—whether the equitable defense of laches brought within a statute of limitations period is valid, but in the context of the Patent Act.  *Id.* at 959.

[18] *Id.* (citations omitted).

[19] *See Diversey*, 738 F.3d at 1200 (stating that a claim accrues when the copyright owner has knowledge of a violation or is chargeable with such knowledge).

[20] *Warren Freedenfeld Assocs. v. McTigue*, 531 F.3d 38, 44 (1st Cir. 2008).

[21] *Beidleman v. Random House, Inc.*, 621 F. Supp. 2d 1130, 1134 (D. Colo. 2008) (quoting *Warren Freefield Assocs.*, 531 F.3d at 44).

[22] *Id.*

EIG filed its Complaint on January 18, 2016.  The Refinery argues that EIG cannot recover damages for any act of infringement three years before this date, *i.e.* January 18, 2013, because EIG knew or should have known of the Refinery's alleged infringement at least as early as 2008 and at the latest in 2012.  According to the Refinery, EIG had constructive knowledge that it was forwarding *Oil Daily* in 2008 and it had actual knowledge that it was forwarding the publication in 2012.  The Refinery also asserts that EIG had constructive notice that the Refinery was forwarding *Petroleum Intelligence Weekly* at least as early as 2012.

a. EIG's Knowledge of the Refinery's Use of *Oil Daily* in 2008

The Refinery argues that when EIG received an email from Menard in 2008 asking how much it would cost to increase his subscription by ten, EIG, acting as a reasonably diligent plaintiff under the circumstances, should have investigated the Refinery's use of *Oil Daily*.  The Refinery seeks to hold EIG to a higher standard of care than a reasonably prudent person.  The Refinery contends that EIG has specialized knowledge about what constitutes copyright infringement due to its enforcement efforts that it established in 2005 and that it must exercise "a quantum of care which is commensurate with the circumstances."  Thus, the Refinery argues that EIG, as a company with specialized knowledge of copyright infringement, failed to act reasonably and diligently when it did not investigate Menard's request to increase the Refinery's subscription. The Court disagrees.

First, the Court declines to impose a more stringent standard other than that of a reasonably prudent person.  The Refinery has cited no case law in the copyright context indicating that EIG should be held to have "special knowledge" about copyright infringement because of its enforcement policies.  The cases the Refinery relies on involve negligence during a skiing accident

and an illness contracted while manufacturing airplane instruments, not copyright infringement.[23] If the Court were to apply this standard it would contravene well-established law regarding the discovery rule.

With regard to EIG's knowledge in 2008, a reasonable fact-finder could conclude that Menard's email in 2008 was not sufficient to trigger a duty to investigate further. A customer's inquiry into increasing the number of subscriptions does not in and of itself provide a basis for constructive knowledge of infringement.[24] While Menard's request may have been motivated by his knowledge that the Refinery was forwarding *Oil Daily* beyond what was allowed in the subscription agreement, this knowledge is not imputed to EIG simply from an email exchange asking to increase subscriptions. Furthermore, even if Menard's email triggered an investigation by EIG, it is not likely that EIG would have discovered that the Refinery was forwarding *Oil Daily* to employees beyond Menard. EIG had no access to the Refinery's email system or computer network. The only way EIG could have learned of the infringement would be if the Refinery told it that it was copying and distributing *Oil Daily* to multiple employees. Thus, based on the evidence before the Court, a reasonable fact-finder could conclude that a reasonably prudent person in EIG's shoes would not have discovered the Refinery's infringement in 2008.

---

[23] *LaVine v. Clear Creek Skiing Corp.*, 557 F.2d 730, 734 (10th Cir. 1977); *Johnston v. United States*, 568 F. Supp. 351, 354 (D. Kan. 1983).

[24] *Cf. Energy Intelligence Grp., Inc. v. Jefferies, LLC*, 101 F. Supp. 3d 332, 342 (S.D.N.Y. 2015) (holding that allegations of a customer's comments regarding the company's need for additional subscriptions and the company's subsequent reduction of the number of licenses was not sufficient to sustain a claim for copyright infringement).

        b.       EIG's Knowledge of the Refinery's Use of *Oil Daily* in 2012

In the alternative, the Refinery contends that EIG had actual or at least constructive knowledge of the Refinery's alleged infringement in March 2012 when Flickinger emailed Dent telling him that she received *Oil Daily* through her email account, that she forwarded the publication to Menard daily, and on occasion, when Menard was gone, she forwarded it to another Refinery executive. The Refinery claims that there are several critical facts that weigh in favor of granting summary judgment, including (1) Dent's reporting of Flickinger's March 27, 2012, email to EIG's in-house counsel under EIG's copyright enforcement policy; (2) Dent's email to Flickinger reiterating the terms of the Refinery's subscription and warning her that electronic forwarding of the publication violates the subscription agreement; and (3) Dent's testimony that EIG was placed on a potential litigation hold list in 2012.

EIG argues in response that there is a genuine issue of material fact regarding whether it had actual or constructive knowledge in 2012. In response to Flickinger's email regarding her forwarding practices of *Oil Daily*, EIG offers evidence of its long-standing policy that access by assistants for the purpose of sending a publication to a supervisor is not an unauthorized use. EIG argues that practically speaking, it is not concerned with the number of readers of a single copy of a given subscription, but the number of copies made. It also cites its policy that a printed copy of a publication may be placed in a library and read by multiple individuals. Accordingly, EIG claims Flickinger's practice of forwarding *Oil Daily* to Menard did not violate the subscription agreements. EIG also claims that Flickinger's practice of forwarding *Oil Daily* to another executive when Menard is absent conforms with the Refinery's subscription because on those days, only one subscribed copy would have been used by the Refinery—the copy that went to Menard simply went to another executive.

EIG also offers the declaration of Thomas Wallin, EIG's Executive Vice President and Editor-In-Chief.  Wallin explained that under EIG's policy, customer service employees are instructed to report any suspicious circumstance regarding a customer's unauthorized use of a publication.  If the circumstances indicate unauthorized copying, the sales director will report them to senior management who will decide what steps to be taken.  If the circumstances are ambiguous, the account representative is required to contact the customer and ask them to confirm their scope of usage.  If the customer confirms that they are using EIG's publication in an authorized manner, and there is no further evidence, then EIG concludes its investigation.  Here, because Dent's inquiry to Flickinger showed nothing more than the fact that she normally emailed *Oil Daily* to Menard, this concluded EIG's investigation of the matter.

EIG also points out that although Dent testified that the Refinery was placed on a potential litigation list, Dent also testified that he was not aware whether the Refinery was placed on that list in 2012 or in 2015.  Furthermore, Hitchcock stated in his declaration that no Potential Litigation Hold Notice involving the Refinery existed before 2015.

Based on this evidence, the Court cannot conclude as a matter of law that EIG had actual or constructive notice of the Refinery's alleged infringement in 2012.  "Generally, the reasonableness of [the] plaintiffs' actions, including the reasonableness of inquiring or failing to inquire, is a fact question for the jury."[25]  Flickinger's email stated that she forwarded *Oil Daily* to Menard daily and when he was absent she forwarded it to another Refinery executive.  EIG claims that based on its policies this conduct was not infringing and thus it had no reason to know of the

---

[25] *Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, LP*, 2016 WL 1203763, at *7 (S.D. Tex. 2016) (quoting *Dodson v. Hillcrest Sec. Corp.*, 1996 WL 459770, *8 (5th Cir. 1996)).

Refinery's alleged infringement.  But, when Dent emailed Flickinger two days later, he informed her that the publication is only licensed for use by "the designated named recipient and not anyone else or any entire organization" and that the subscription could not be shared electronically by forwarding.  Thus, there is a genuine issue of material fact as to whether EIG knew or had reason to know that infringement was occurring in March 2012.  The Court denies summary judgment on this issue as to the Refinery's alleged infringement of *Oil Daily*.

        c.      EIG's Knowledge regarding the Refinery's Use of *Petroleum Intelligence Weekly*

Finally, the Refinery argues that EIG had constructive knowledge of the Refinery's alleged infringement of *Petroleum Intelligence Weekly* based on Flickinger's March 27, 2012, email to Dent.  But, Flickinger's email is silent regarding *Petroleum Intelligence Weekly*, and throughout its relationship with EIG, different Refinery employees accessed the publications.  Moreover, as discussed above, the Court could not conclude as a matter of law that EIG had actual or constructive knowledge of *Oil Daily* based on Flickinger's email, and thus this lack of evidence cannot be used to impute knowledge on EIG regarding *Petroleum Intelligence Weekly*.  Based on the summary judgment evidence, there is genuine issue of material fact as to whether EIG knew or had reason to know that the Refinery was infringing *Petroleum Intelligence Weekly* in 2012.

        *2.*     *Statutory Damages*

EIG seeks an award of statutory damages for the Refinery's alleged infringement of *Oil Daily* and *Petroleum Intelligence Weekly*.  EIG contends that each issue of *Oil Daily* and *Petroleum Intelligence Weekly* is eligible for its own statutory damages award, while the Refinery contends that EIG's statutory damages should be limited to the number of copyright registrations.  Both parties seek summary judgment on the issue.

Under the Copyright Act, a copyright owner may select statutory damages for "all infringements involved in the action, with respect to any *one work*."[26]  "All the parts of a compilation or derivative work constitute one work."[27]  The Copyright Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."[28]

The U.S. Courts of Appeals are split in determining what constitutes a "compilation" or "one work" for purposes of statutory damages.  The Second and Fourth Circuits follow a strict "registration determinative" test which more strictly follows the language of the statute.[29]  Under this test, only one statutory damages award is available per compilation.[30]  The First, Ninth, Eleventh, and D.C. Circuits employ a "separate economic value test," which allows a plaintiff to receive multiple statutory damages awards if part of the compilation copied "has an independent economic value and is, in itself, viable."[31]  The Tenth Circuit has not addressed this issue.

The Refinery contends that EIG's damages should be limited under either test.  Relying on the registration-determinative test, the Refinery argues that EIG's use of monthly group

---

[26] 17 U.S.C. § 504(c)(1) (emphasis added).

[27] *Id.*

[28] 17 U.S.C. § 101.

[29] *Bryant v. Media Right Prods., Inc.*, 603 F.3d 135, 142 (2nd Cir. 2010); *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 285 (4th Cir. 2003), abrogated on other grounds, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010).

[30] *Bryant*, 603 F.3d at 140; *Xoom*, 323 F.3d at 285 n.8.

[31] *Columbia Pictures Television v. Krypton Broad.*, 106 F.3d 284, 295 (9th Cir. 1997) *rev'd on other grounds*, *Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998)*; Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1117 (1st Cir. 1993); *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996); *Walt Disney Co. v. Powell*, 897 F.2d 565, 569 (D.C. Cir. 1990).

registration procedures established by the Copyright Office for *Oil Daily* and *Petroleum Intelligence Weekly* renders the collection of each month's issues of each publication a "compilation" that is only eligible for one statutory damages award. And relying on the independent economic value test, the Refinery contends that individual issues of *Oil Daily* and *Petroleum Intelligence Weekly* have no "independent economic value" apart from the subscriptions EIG sells for those publications. Neither test, however, supports the Refinery's argument in this case.

EIG registers its daily issues of *Oil Daily* and weekly issues of *Petroleum Intelligence Weekly* using the group registration procedures established by the Copyright Office. Group registration allows a copyright claimant to register multiple works, such as daily newspapers or weekly periodicals, using a single application and single filing fee. EIG's group registration of *Oil Daily* is pursuant to 37 C.F.R. § 202.3(b)(9), which requires, in part, that "[t]he works must be essentially all new collective works or all new issues that have not been published before" and that all of the issues "bear issue dates within a single calendar month under the same continuing title."[32] Since at least 2004, EIG has registered *Oil Daily* as "daily newsletters" by filing monthly applications using Form G/DN, each of which includes all issues of *Oil Daily* published during that month. Each issue of *Oil Daily* is a collective work[33] consisting of articles created,[34] selected,

---

[32] 37 C.F.R. § 202.3(b)(9)(i) and (v).

[33] A "collective work" is "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101.

[34] Based on the Courts' Memorandum and Order denying Motion Referral to the Register of Copyrights and Concurrent Stay (Doc. 116), the Court recognizes that Oil Daily also contains articles licenses from Reuters. This does not change Oil Daily's status as a collective work.

and arranged by EIG.  Until 2008, EIG marked the "compilation" box when asked to describe the author's contribution in the works covered by the application.

EIG's group registration of *Petroleum Intelligence Weekly* is pursuant to 37 C.F.R. § 202.3(b)(6), which allows for a single registration for a group of serials, a type of collective work, published at intervals of a week or longer.  Since at least 2004, EIG has registered *Petroleum Intelligence Weekly* by filing monthly applications using Form SE/Group, each of which includes all issues of *Petroleum Intelligence Weekly* published that month.  Each issue of *Petroleum Intelligence Weekly* is a collective work consisting of separate and independent articles created, selected, and arranged by EIG.

The Refinery's arguments fail because they confuse group registration with compilation formation.  Under the Refinery's theories, each collection of issues is a compilation simply because EIG placed them together for group registration.  But this is not the case. "Authorship of work involves creation, not mere accumulation."[35]  A compilation is the product of arranging pre-existing materials or data to create an original work.[36]  While each individual issue of *Oil Daily* or *Petroleum Intelligence Weekly* may be a compilation, EIG's group registrations are not.  EIG only bundled *Oil Daily* and *Petroleum Intelligence Weekly* into monthly collections for group registration purposes.  There is no evidence that EIG sold these monthly collections to customers as one work.  Furthermore, the U.S. Copyright Office has made clear that "[c]opyright owners who use a group registration option may be entitled to claim a separate award of statutory damages for each work—or each issue in the case of serials, newspapers, or newsletters—that is covered by the

---

[35] *Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, LP*, 2017 WL 363004, at *3 (S.D. Tex. 2017).

[36] *Id.*

registration, because group registration covers each work or each issue that is submitted for registration (rather than the group as a whole)."[37]   Accordingly, each issue of *Oil Daily* and *Petroleum Intelligence Weekly* is entitled to a separate statutory damages award if EIG prevails on its copyright infringement claim.  The Court denies the Refinery's motion for partial summary judgment on this issue and grants EIG's cross motion for partial summary judgment on this issue.

     *3.*     *Conclusion*

     The Court denies the Refinery's Motion for Partial Summary Judgment (Doc. 52).  There are genuine issues of material fact regarding EIG's knowledge of the Refinery's alleged infringement.  Therefore, the Court cannot conclude as a matter of law that EIG's damages must be limited to the three-year period before EIG filed its Complaint.  In addition, the Court denies the Refinery's request to limit EIG's statutory damages based on the number of registrations rather than the number of publications.  The group registration procedures utilized by EIG did not transform the monthly collections of *Oil Daily* and *Petroleum Intelligence Weekly* that EIG provided with its applications into compilations.  If the Refinery is liable for copyright infringement, EIG is entitled to a separate award for each individual issue of *Oil Daily* and *Petroleum Intelligence Weekly*.  Accordingly, the Court grants EIG's Cross Motion for Partial Summary Judgment (Doc. 67).

**B.**     **EIG's Motion for Partial Summary Judgment (Doc. 100).**

     The Refinery has asserted the following affirmative defenses: (1) failure to mitigate damages; (2) the doctrine of copyright misuse; (3) the doctrine of implied license; (4) EIG has an adequate remedy at law; (5) EIG's claims fail to state a claim upon which relief may be granted;

---

[37] U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices*, § 1104.5 (3d ed.  rev. 2017).

and (6) EIG's claims for statutory damages violate the due process requirements of the Fourteenth Amendment and/or Fifth Amendment.  EIG has moved for partial summary judgment on each of these defenses arguing that they are not supported by the factual record or that they fail as a matter of law.

### 1.    Failure to Mitigate Damages

The Refinery asserts the affirmative defense of failure to mitigate damages.  EIG contends that this affirmative defense must be dismissed as a matter of law because EIG has elected to pursue statutory damages.  The Court agrees.

Section 504(c) of the Copyright Act allows a copyright owner to elect an award of statutory damages in lieu of actual damages and profits.[38]  In the Tenth Circuit, a failure to mitigate defense does not apply to an award of statutory damages.[39]  Although neither the Tenth Circuit nor this District has applied this rule in the copyright context, the District of Colorado has concluded multiple times that the election of a statutory damages by a plaintiff in a copyright infringement suit invalidates the affirmative defense of failure to mitigate.[40]

The Refinery claims that mitigation of damages is an element that must be considered because it bears directly on the amount of statutory damages a jury might award within the statutory range.  According to the Refinery, one of the factors that the Court must look at when

---

[38] 17 U.S.C. § 504(c).

[39] *Moothart v. Bell*, 21 F.3d 1499, 1506-07 (10th Cir. 1994).

[40] *See, e.g., Purzel Video GmbH v. Smoak*, 11 F. Supp. 3d 1020, 1031 (D. Colo. 2014); ("Because Plaintiff has elected statutory damages in this case, Defendant Smoak's failure-to-mitigate defense should be stricken."); *Malibu Media, LLC, v. Ryder*, 2013 WL 4757266, at *3 (D. Colo. 2013); *Malibu Media, LLC v. Batz*, 2013 WL 2120412, at *3 (D. Colo. 2013).

determining the amount of statutory damages is the "conduct and attitude of the parties"[41] and thus, EIG's conduct and attitude toward the Refinery throughout the parties' relationship are relevant in determining a "just" statutory damages calculation.

The Refinery's argument is not persuasive.  The Refinery relies on an outdated, out-of-Circuit case to support its theory that the plaintiff's conduct is relevant in determining a statutory damages award.[42]  In this District, a plaintiff's actions have no effect on the determination of a statutory damage award.  When calculating statutory damages, the jury weighs (1) the expenses and profits the defendant gained by infringement; (2) the plaintiff's lost revenue; and (3) whether the infringement was willful.[43]  Thus, a plaintiff's failure to mitigate damages is not relevant to a statutory damages award calculation.  The Court grants EIG's motion for summary judgment on this affirmative defense.

### 2.    *Copyright Misuse*

---

[41] *Nat'l Football League v. PrimeTime 24 Joint Venture*, 131 F. Supp. 2d 458, 473-74 (S.D.N.Y. 2001) (citations omitted).

[42] The Refinery relies primarily on *National Football League* in arguing that a court must consider the conduct and attitude of both parties in calculating statutory damages.  In that case, the District Court for the Southern District of New York quoted the following passage from *Patry on Copyright*:

> In awarding statutory damages, the courts may consider, among other factors, the expenses saved and the profits earned by the defendant, the revenues lost by the plaintiff, the deterrent effect on the defendant and third parties, the defendant's cooperation in providing evidence concerning the value of the infringing material, and *the conduct and attitude of the parties*.

*Id*. at 473-74 (citation omitted) (emphasis added).  The current version of the treatise, however, has removed "the conduct and attitude of the parties" as one of the factors for a court to consider when determining the amount of a statutory damages award.  6 William F. Patry, *Patry on Copyright* § 22:174.  Instead it focuses on the defendant's conduct rather than the plaintiff's conduct.  *Id*.

[43] *Beginner Music v. Tallgrass Broad., LLC*, 2009 WL 2475186, at *3 (D. Kan. 2009); *Big Tree Enters., Ltd. v. Mabrey*, 1994 WL 191996, at *7 (D. Kan. 1994) (citing *Jasperilla Music Co., M.C.A., Inc. v. Wing's Lounge Ass'n*, 837 F. Supp. 159, 161 (S.D. W. Va. 1993)).

Copyright misuse forbids the use of a copyright "to secure an exclusive right or limited monopoly not granted by the copyright office and is contrary to public policy to grant."[44]  The defense is an absolute bar to a plaintiff's recovery.[45]  To prevail on this defense, the Refinery must prove either: (1) that EIG violated antitrust laws; or (2) that EIG illegally extended its monopoly beyond the scope of the copyright or violated the public policies underlying copyright laws.[46]  EIG contends that it is entitled to summary judgment because the Refinery has not met its burden of proof under either of these tests.

In response, the Refinery argues that EIG cannot prevail as a matter of law because a reasonable jury could find that EIG has used "its abusive litigation tactics to extend its monopoly to minimally-protected composite works beyond that granted by the Copyright Office."  According to the Refinery, courts have found copyright misuse in cases where a copyright owner uses an infringement suit to protect property not protected by copyright law in the hopes of forcing a settlement or achieving an outright victory.[47]  Courts have labeled this type of conduct an "abuse of process."[48]  The Refinery argues that EIG has engaged in abuse of process through its actions of filing multiple copyright infringement lawsuits against its clients, paying its employees bonuses for finding and reporting potential copyright infringement claims, engaging in efforts to "entrap"

---

[44] *Malibu Media, LLC v. Cuddy*, 2015 WL 1280783, at *8 (D. Colo. 2015) (citations omitted).

[45] *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 979 (4th Cir. 1990).

[46] *In re Indep. Serv. Orgs. Antitrust Litig.*, 85 F. Supp. 2d 1130, 1175-76 (D. Kan. 2000) (citations omitted).

[47] *See AF Holdings, LLC v. Olivas*, 2013 WL 4456643, at *3 (D. Conn. 2013) (quoting *Assessment of Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640, 647 (7th Cir. 2003)).

[48] *Id.*.

its largest clients into admitting that they are engaging in copyright infringement, and by pushing the Refinery into purchasing a costly Global Enterprise License to avoid this lawsuit.

The Court is not persuaded by the Refinery's arguments.  The cases the Refinery relies on are distinguishable from this case because the copyright owner in those cases attempted to assert rights beyond those granted in their copyright registration.[49]  For example, in *Design Basics, LLC v. Petros Homes, LLC*,[50] the district court denied summary judgment on the defendant's copyright misuse defense because the defendant alleged that the plaintiff's design plans contained many standard elements not protected by the plaintiff's copyrights and because of other evidence showing that the defendant engaged in a business "model" to incentivize employees to find alleged infringers, sue those infringers, and force settlements on those claims.[51]  Similarly, in *Home Design Services v. Park Square Enterprises, Inc.*,[52] the defendant claimed that the plaintiff's work was largely generic in nature and thus not protectable by copyright.[53]  In analyzing the copyright misuse defense, the district court stated that it would determine whether the plaintiff engaged in copyright misuse after it determined whether the plaintiff's works were generic.[54]

In this case, there is no evidence that *Oil Daily* or *Petroleum Intelligence Weekly* are not protected by valid copyright registrations.  Indeed, the Court foreclosed any argument to the

---

[49] *Compare AF Holdings, LLC v. Olivas*, 2014 WL 4782816, at *1 (D. Conn. 2014) (denying the defendant's counterclaim for copyright misuse because the plaintiff's ownership of the copyrighted works was in question).

[50] 240 F. Supp. 3d 712 (N.D. Ohio 2017).

[51] *Id*. at 720-21.

[52] 2005 WL 1027370 (M.D. Fla. 2005).

[53] Id. at *11-12.

[54] *See id*. ("In the event, [the plaintiff's works] are found to be largely generic in nature, *the only logical next step* would be to determine whether [the plaintiff] has used its limited rights to 'obtain property protection … that copyright law clearly does not confer.' ")

contrary when it denied the Refinery's motion for referral to the Register of Copyrights.  "[T]he predicate for a misuse defense is an attempt to use the copyright monopoly to control something the monopoly does not protect."[55]  Because EIG is not asserting rights beyond those granted in its copyright registrations, the Refinery's copyright misuse defense fails as a matter of law.

Furthermore, the evidence that the Refinery relies on does not necessarily show that EIG engaged in abusive litigation tactics.  The parties dispute the number of copyright infringement suits EIG has filed against its subscribers.  Regardless, the fact that EIG has filed multiple suits does not mean that it engaged in an abuse of process.  Similar facts were alleged in *Malibu Media v. Doe*, when the defendant offered the existence of multiple similar copyright infringement lawsuits in support of a copyright misuse defense.[56]  The court did not find such evidence persuasive, noting "[i]t is certainly true that [the plaintiff] has filed a very large number of infringement suits in this district and in others.  But that is what the holders of intellectual property rights do when they are faced with mass infringement."[57]  In addition, courts have concluded that attempts to negotiate a settlement before filing a copyright infringement lawsuit are not evidence of abuse of process.[58]

Overall, the Court finds that the Refinery has failed to come forward with any evidence that EIG misused its copyrights by attempting to extend its copyright monopoly to rights its registrations do not protect.  The cases the Refinery relies on in support of this defense all contain

---

[55] *Malibu Media, LLC v. Doe*, 2014 WL 2581168, at *2 (N.D. Ill. 2014).

[56] *Id.*

[57] *Id.*

[58] *Purzel Video*, 11 F. Supp. 3d at 1027; *Malibu Media, LLC v. Doe 1*, 2013 WL 5603275, at *3 (D. Md. 2013); *Malibu Media, LLC v. Lee*, 2013 WL 2252650, at *5-6 (D.N.J. 2013).

evidence that the plaintiff was attempting to exert rights in works that were not protected by copyright or owned by that plaintiff.  Here, the court has foreclosed any argument the Refinery may have regarding the validity of EIG's copyrights.  Therefore, the Court grants summary judgment for EIG on the Refinery's copyright misuse defense.

### 3.    Implied License

EIG next seeks summary judgment on the Refinery's affirmative defense that EIG's claims are barred, in whole or in part, by the doctrine of implied license.  The Tenth Circuit has not yet addressed implied licenses in the context of copyright infringement.  However, several Circuit Courts of Appeal have done so.  These courts have held that for a party to establish an implied license, a party must show that "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute [the] work."[59]  Clearly, these factors are not satisfied in this case because the undisputed facts show that EIG did not create *Oil Daily* or *Petroleum Intelligence Weekly* at the Refinery's request.  Nonetheless, the courts do not strictly require that all three factors be present for an implied license to exist.[60]  A license may be implied from the conduct of the parties.[61]

According to EIG, the undisputed facts demonstrate that it did not grant the Refinery an implied license to copy and forward the publications.  EIG claims the following facts support its

---

[59] *Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*, 223 F. Supp. 3d 1168, 1181 (D. Kan. 2016) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)).

[60] *Id*. at 1182 n.8 (stating that the absence of one of the three factors does not preclude the finding of an implied license).

[61] *See id*. at 1181-82 (holding that there was an implied license allowing the defendant to use copyrighted characters); *see also Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 752 (11th Cir. 1997) (finding implied license where copyright owner allowed the defendant to repeatedly play song despite no explicit agreement).

argument: (1) the express terms of the subscription agreements between EIG and the Refinery prohibited copying and distributing EIG's publication; (2) EIG's publications and emails delivering these publications contain express copyright warnings and notices; (3) there is no evidence of any communications between the Refinery and EIG allowing the Refinery to copy the publications; (4) the Refinery's own internal communications show that the Refinery knew that EIG did not permit copying and distributing its copyrighted publications; and (5) EIG employees directly informed the Refinery that copying and distributing the publications via email forwarding was not permitted.

The Refinery argues in response that there is a genuine issue of material fact as to whether EIG granted the Refinery an implied license. The Refinery cites another case from this District, *Kid Stuff Marketing, Inc. v. Creative Consumer Concepts, Inc.*, in which Judge Lungstrum relied on three factors to determine whether a licensor intended to grant an implied license.[62] These factors are:

> (1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts … providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.[63]

The Refinery asserts that the Court cannot grant summary judgment on its affirmative defense based on these three factors.

Turning to the first factor—the nature of the parties' relationship—the Court concludes that this factor favors the Refinery. The parties were engaged in a long-term relationship,

---

[62] 223 F. Supp. 3d at 1182.

[63] *Id*. at 1182 (quoting *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008)).

beginning in 1982.  When the Refinery received *Oil Daily* and *Petroleum Intelligence Weekly* in print form, it would routinely route the publications to other executives at the Refinery to read. When these publications became available electronically, the Refinery continued to do the same by distributing them through email.

The second factor—whether the licensor utilized written contracts containing copyright limitations—is more complicated.  According to the Refinery, the subscription agreements neither stated the type of subscription the Refinery held nor prevented the Refinery from forwarding the publications to other employees.  The invoices EIG sent to renew the subscriptions from 2005 to 2007 only contained a general copyright notice stating that EIG's written consent was necessary to use the publication in any way.  After 2007, the subscription invoices explicitly stated that "[t]he subscription(s) for the publication(s) identified on the front of this Invoice is for the sole use and/or access by the individual(s) or the employee(s) of the entity identified under the "Shipped to" notation on front of this Invoice only ("Authorized User(s)") and may not be shared electronically or by any means now known throughout the universe or hereafter devised."  For *Oil Daily*, the Refinery listed Galen Menard and NCRA[64] in the "Shipped to" notation.  For *Petroleum Intelligence Weekly*, the Refinery listed either Kathy Swanson or Debbie Ratzloff and NCRA in the "Shipped to" notation.  It was not until 2013, that the invoice to renew the *Oil Daily* subscription defined the term "Authorized User" as "the individual(s) expressly named on this invoice under the "Shipped to" notation," and stated that an "Authorized User can only be a living individual and never a company, organization or any other entity."  The first *Petroleum Intelligence Weekly* invoice containing this language was sent to the Refinery in 2015.

---

[64] The Refinery was formerly known as National Cooperative Refinery Association or "NCRA."

Viewed in the light most favorable to the Refinery, the subscription agreements are not clear regarding what type of subscription the Refinery held and who had the right to access the publications. Because the invoices seemingly allowed multiple employees under the entity listed in the "Shipped to" notation to access the publication, a reasonable jury could find that the Refinery believed that employees other than Menard could access the publications—especially considering the past practice of routing the printed publications from executive to executive.  However, the contractual language in the 2013 *Oil Daily* invoice and 2015 *Petroleum Intelligence Weekly* invoice clearly indicates that the Refinery had a single subscriber license and that the named individual on the invoice was the only Refinery employee who could access the publication.  Thus, the Refinery could not have an implied license once the subscription provided for in these licenses became effective.

The third factor—whether the licensor's conduct indicated that the use was permissible— does not favor finding an implied license.  The Refinery claims that EIG's policies of allowing an assistant to access and forward the publication to a supervisor and allowing a printed copy of the publication to be placed in a library for anyone to read support this factor.  But, the Refinery acknowledges that neither of these facts were communicated to the Refinery before litigation. "There must be some conduct or expression from which a license could be implied."[65]  Because the Refinery was not aware of these facts, a license can not be implied from them.

Overall, the Court concludes that there is a genuine issue of material fact regarding whether the Refinery had an implied license to forward the publications to a group of Refinery executives. The Court recognizes that the three factors discussed above do not consider the Refinery's internal

---

[65] *Kayne Anderson Capital Advisors*, 2017 WL 363004, at *7.

communications, which EIG asserts are conclusive evidence that the Refinery did not have an implied license. But, these communications only relate to *Oil Daily* and not *Petroleum Intelligence Weekly*. Furthermore, these communications do not support dismissal of this affirmative defense for the entire period of the alleged infringement as a matter of law.

The Court does, however, limit the Refinery's use of this affirmative defense based on the March 29, 2012, email Dent sent to Flickinger. In that email, Dent told her that the Refinery only had a single user subscription for *Oil Daily* and that such subscription is "intended solely for the designated named recipient and not anyone else or any entire organization or a group within it." He further stated that "[a] single user subscription cannot be shared by electronic means among multiple readers by forwarding or posting on an intranet." This language clearly explains to the Refinery what type of subscription it had and that *Oil Daily* could not be forwarded to multiple Refinery executives. Therefore, the Court concludes that the Refinery cannot claim that it had an implied license after this date.

The Court grants in part and denies in part EIG's motion for summary judgment on the Refinery's implied license affirmative defense. The Refinery is only allowed to assert this defense for the alleged infringement of *Oil Daily* prior to March 29, 2012. It cannot assert this defense for any alleged infringing activity occurring after this date. The Refinery may also only assert this defense for the alleged infringement of *Petroleum Intelligence Weekly* before June 15, 2015—the date the 2015 invoice took effect.

### 4. *Adequate Remedy at Law*

EIG seeks summary judgment on the Refinery's affirmative defense that EIG has an adequate remedy at law. In response, the Refinery argues that it plead this defense to avoid waiving it because EIG seeks an injunction as well as damages.

In this District, an adequate remedy at law defense is not an affirmative defense.[66]  But, a court will not necessarily strike it just because it has been mislabeled.[67]  Because an affirmative defense might be deemed waived if not timely plead, "the cautious pleader is fully justified in setting up as affirmative defenses anything that might possibly fall into that category, even though that approach may lead to pleading matters as affirmative defenses that could have been set forth in simple denials."[68]  A court in this District will not strike this type of defense unless the moving party has shown that it is prejudiced by the defendant's assertion of it.[69]  Other courts have ruled similarly.[70]

Here, EIG has not demonstrated any prejudice.  At most it has shown that the Court's failure to grant summary judgment on this issue will result in additional briefing by the parties prior to trial.  Therefore, the Court does not find it necessary to grant summary judgment solely because EIG plead this denial as an affirmative defense.

EIG also argues that the adequate remedy at law defense fails as a matter of law because it is not a legal requirement that is applicable in a copyright infringement action.  Section 502 of the

---

[66] *FTC v. Affiliate Strategies, Inc.*, 2010 WL 11470103, at *7 (D. Kan. 2010).  EIG argues that this case is inapposite because it involves alleged violations of the FTC Act and not the Copyright Act.  Yet, the case EIG repeatedly cites, *Household Financial Servs., Inc. v. Northeastern Mortg. Inv. Corp.*, is from the Northern District of Illinois and involves a contractual dispute.  2000 WL 816795, at *1 (N.D. Ill. 2000).

[67] *Affiliate Strategies*, 2010 WL 11470103, at *7.

[68] *Id*. (quoting *Bobbitt v. Victorian House, Inc*., 532 F. Supp. 734, 736 (N.D. Ill. 1982)).

[69] *Id*. (citing *Wilhelm v. TLC Lawn Care, Inc*., 2008 WL 474265, at *2 (D. Kan. 2008) ("Without a showing of prejudice, the Court gives leeway to defendant in affirmatively pleading theories which do not actually constitute affirmative defenses.")).

[70] *See Home Design Servs., Inc., v. Schroeder Const*., 2012 WL 527202, at *2 (D. Colo. 2012) ("While the court agrees that a number of Defendants' 'affirmative defenses' are more accurately characterized as denials, the Court does not find it necessary to grant summary judgment on this basis."); *Home Design Servs., Inc. v. Trumble*, 2011 WL 843900, at *3 (D. Colo. 2011) (denying summary judgment when denials were mislabeled as affirmative defenses).

Copyright Act states that a court may "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."[71]  The Tenth Circuit has held that a copyright owner is entitled to a permanent injunction under this statute when the owner "establishes past infringement and a substantial likelihood of infringement in the future."[72]  EIG interprets this holding to mean that these are the only elements a plaintiff is required to show to obtain an injunction.  The Court, however, is not persuaded that this is the case.  Nothing in *Harolds Stores* explicitly eliminates the requirement that the plaintiff show there is no adequate remedy at law to obtain an injunction.  Accordingly, the Court declines to grant summary judgment on this defense.[73]

*5.      Failure to State a Claim*

EIG asserts that it has sufficiently plead the requirements for copyright infringement, and therefore the Refinery's affirmative defense of failure to state a claim for which relief may be granted must be dismissed.  To establish copyright infringement, a plaintiff must prove:  "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[74]  EIG has satisfied both of these elements.

EIG has shown that it owns federal copyright registrations for the *Oil Daily* and *Petroleum Intelligence Weekly* publications at issue in this case.  The Refinery asserts that there is a genuine

---

[71] 17 U.S.C. § 502(a).

[72] *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1555 (10th Cir. 1996).

[73] *Harolds Stores* is ambiguous regarding whether a copyright owner is required to show that it does not have an adequate remedy at law to obtain an injunction.  The Court need not decide this issue now, however, because there appear to be issues of fact surrounding the other elements EIG must prove to obtain an injunction, *i.e.*, whether there is a substantial likelihood of future infringement.

[74] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

issue of fact regarding this issue because it claims that these registrations are not valid and it has filed a motion to refer that issue to the Register of Copyrights. The Court, however, recently denied that motion, concluding that the Refinery did not satisfy its burden to show that EIG knowingly included inaccurate information on its copyright applications. Therefore, the Refinery's argument with respect to this element fails.

EIG has also sufficiently plead the second element of infringement—copying of constituent elements of the work that are original. EIG has asserted that the Refinery purchased subscriptions to *Oil Daily* and *Petroleum Intelligence Weekly* and that the Refinery copied and distributed these publications in violation of the subscription agreements. Therefore, the Court grants EIG summary judgment on the Refinery's affirmative defense of failure to state a claim upon which relief may be granted.

### 6.    *Alleged Violation of Due Process*

The Refinery asserts that "Plaintiff's [sic] claims for statutory damages are barred inasmuch as such damages are wholly punitive in this instance and violate the due process requirements of the Fourteenth Amendment and/or Fifth Amendment of the Constitution of the United States of America." EIG contends that it is entitled to summary judgment on this affirmative defense because it is not a true "affirmative defense" and because the punitive nature of a statutory damages award under the Copyright Act does not implicate the Due Process Clause.

The Court agrees with EIG that the Refinery's defense regarding statutory damages is not a proper affirmative defense. Proof of statutory damages is not an element of a copyright

infringement claim.[75]  Thus, this defense cannot defeat any portion of EIG's direct infringement claim and is simply a denial of EIG's rights to damages.  This District, however, does not strike a denial that is improperly plead as an affirmative defense unless the defendant can show prejudice.[76]  Here, EIG has not demonstrated that it is prejudiced by the Refinery's assertion of this defense.  Therefore, the Court will not grant summary judgment on this basis.

EIG also argues that the Court should grant summary judgment because the Refinery's defense, as written, is based on the incorrect premise that the punitive nature of a statutory damages award implicates the Due Process Clause.  According to EIG, a statutory damages award may be "wholly punitive" in nature and the imposition of such award is a proper application of the Copyright Act.  The Court agrees.

The U.S. Supreme Court addressed the purpose of statutory damages awards under the Copyright Act in *F.W. Woolworth Co. v. Contemporary Arts, Inc.*[77] when it stated:

> The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct.  The discretion of the court is wide enough to permit a resort to statutory damages for such purposes.  Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.[78]

This case has subsequently been applied by the Supreme Court and various Circuit Courts of Appeals to recognize that statutory damages include a punitive element.[79]  Thus, the fact that EIG

---

[75] *See id.* (stating that for a plaintiff to prove copyright infringement, the plaintiff must show "(1) ownership of a valid copyright, and (2) copying of the constituent elements of the work that are original").

[76] *Affiliate Strategies*, 2010 WL 11470103, at *7.

[77] 344 U.S. 228 (1952).

[78] *Id.* at 233.

[79] *See, e.g., Feltner*, 523 U.S. at 353 ("[A]n award of statutory damages [under § 504(c)] may serve purposes traditionally associated with legal relief, such as compensation and punishment."); *Sony BMG Music Entm't v.*

seeks statutory damages and that those damages include a punitive element does not automatically implicate the Due Process Clause.

The Refinery asserts that a statutory damages award in this case would be "wholly punitive."  But this still does not implicate the due process requirements of the Fourteenth and Fifth Amendments.  According to the Supreme Court, a statutory damages award is proper "[e]ven for uninjurious and unprofitable invasions of copyright."[80]  And Circuit Courts have determined that a statutory damages award is appropriate even when the copyright owner cannot show evidence of actual damages or lost profits.[81]  For example, the Ninth Circuit stated that "[a] plaintiff may recover statutory damages 'whether or not there is adequate evidence of the actual damages suffered by plaintiff or of the profits reaped by defendant.' "[82]  Thus, a statutory damages award may properly be "wholly punitive" in nature.

The Refinery contends that dismissal of this affirmative defense is premature because EIG has not stated the amount of statutory damages it intends to seek and that excessive damage awards, even those that are punitive in nature, may still violate due process.  But, as EIG asserts, the Refinery's affirmative defense does not address an excessive statutory damages award.  It only claims a due process violation based on the punitive nature of a statutory damages award.  Because

---

*Tenenbaum*, 660 F.3d 487, 514 (1st Cir. 2011) (stating that statutory damages under the Copyright Act "have both a compensatory and punitive element."); *Fitzgerald Publ'g Co., Inc. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986) ("Awards of statutory damages serve two purposes—compensatory and punitive.").

[80] *F.W. Woolworth*, 344 U.S. at 233.

[81] *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 302 F. Supp. 2d 455, 459 (D. Md. 2004) ("[b]ecause statutory damages are an alternative to actual damages, there has never been a requirement that statutory damages must be strictly related to actual injury."); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998); *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 496-97 (4th Cir. 1996) (upholding a statutory damages award despite the plaintiff's inability to show actual damages or lost profits).

[82] *L.A. News Serv.*, 149 F.3d at 996 (quoting *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1335 (9th Cir. 1984)).

this Court concludes that the punitive nature of a statutory damages award is a proper application of the Copyright Act, the Refinery's defense fails as a matter of law.  The Court grants summary judgment for EIG on this issue.

       *7.*    *Conclusion*

      The Court grants in part and denies in part EIG's Motion for Partial Summary Judgment (Doc. 100).  The Court grants EIG's motion with respect to the Refinery's affirmative defenses of mitigation of damages, copyright misuse, failure to state a claim upon which relief may be granted, and the violation of the Due Process Clauses of the Fifth and Fourteenth Amendments.  The Court denies EIG's motion regarding the Refinery's adequate remedy at law defense.  And finally, it grants in part and denies in part the Refinery's implied license affirmative defense.  The Refinery may assert the affirmative defense of implied license for all allegedly infringing conduct for *Oil Daily* before March 29, 2012.  The Refinery may assert the affirmative defense of implied license for all allegedly infringing conduct for *Petroleum Intelligence Weekly* before June 15, 2015.

**C.**    **Motion to Exclude Expert Testimony of Rosenblatt (Doc. 86)**

      EIG moves to exclude the testimony of the Refinery's expert, William Rosenblatt.  The Refinery produced the Expert Report of William Rosenblatt on January 23, 2017 ("Rosenblatt Report").  The Rosenblatt Report contains three sections of analysis.  In the first section, titled "Summary of Opinions," Rosenblatt opines that EIG did not take "substantive measures to mitigate infringement of its copyrights."  In the second section, titled "EIG Has Chosen to Publish Content in Ways Especially Amenable to Unauthorized Copying," Rosenblatt summarizes EIG's publishing practices, including how it makes its publications available to subscribers.  And in the third section, titled "EIG Has Not Adopted Specific Measures to Mitigate Unauthorized Copying," Rosenblatt discusses available technology EIG could have implemented to prevent copyright

infringement and opines that EIG "invested only minimal money and resources into tools and techniques for mitigating copyright infringement." EIG contends that neither Rosenblatt's Report nor Rosenblatt's testimony should be permitted at trial.

1.    *Legal Standard*

Rule 702 of the Federal Rules of Evidence governs the admissibility of opinions based on scientific, technical, or specialized knowledge. Rule 702 provides that a witness who is qualified by knowledge, skill, experience, training, or education (called an "expert witness") may testify in the form of opinion or otherwise as to scientific, technical, or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or to determine a fact issue, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." A district court has broad discretion in deciding whether to admit expert testimony.

The proponent of expert testimony must show " 'a grounding in the methods and procedures of science' which must be based on actual knowledge and not 'subjective belief or unaccepted speculation.' "[83] To determine whether an expert opinion is admissible, the Court performs a two-step analysis. First, the Court must determine "if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.' "[84] The Court must then inquire into whether the proposed testimony is sufficiently "relevant to the task at

---

[83] *Mitchell v. Gencorp Inc*., 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[84] *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1232-33 (10th Cir. 2005) (quoting *Daubert*, 509 U.S. at 592); *see also Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 883-84 (10th Cir. 2005).

hand."[85] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required."[86]

Daubert sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[87] These factors may or may not be pertinent, depending on the nature of a particular issue, the expert's particular expertise, and the subject of the expert's testimony.[88]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under Daubert.[89] The most common method for fulfilling this function is a Daubert hearing, although such a process is not specifically mandated.[90] Here, neither party has indicated that such a hearing is necessary, and after carefully reviewing the motion and exhibits, the Court believes a hearing is not required in this case to render a decision.

### 2.   Analysis

EIG challenges the Rosenblatt Report and Rosenblatt's testimony on multiple grounds. It argues that (1) the Report and testimony are not relevant because EIG was not required to mitigate

---

[85] Norris, 397 F.3d at 884.

[86] Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir. 2003) (quotation omitted).

[87] Daubert, 509 U.S. at 593-94.

[88] Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.s. 137, 153 (1999).

[89] Goebel v. Denver & Rio Grande W. R.R. Co., 215 F.3d 1083, 1087 (10th Cir. 2000).

[90] See United States v. Charley, 189 F.3d 1251, 1266 (10th Cir. 1999) (district court granted great latitude in deciding whether to hold formal hearing), cert. denied, 528 U.S. 1098 (2000).

its damages; (2) the Report and testimony are not based on reliable principles and standards; (3) the Report and testimony consist of conclusory opinions; and (4) the Report and testimony will not assist the trier of fact.  The Court will only address EIG's first argument, as it is dispositive of the admissibility of the Rosenblatt Report and testimony.

EIG argues that the Rosenblatt Report is based on the faulty hypothesis that the issue of mitigation of copyright infringement is relevant to the Court's determination of damages in this case.  EIG claims that its election of statutory damages invalidates the Refinery's affirmative defense that EIG failed to mitigate its damages.  Thus, EIG argues that because the Rosenblatt Report discusses EIG's efforts to mitigate copyright infringement, the Report is not relevant to this case.

The Refinery argues in response that the Rosenblatt Report is relevant because the Refinery's failure to mitigate damages is one factor to consider in calculating a statutory damages award.  The Refinery's argument is almost identical to the one it presented in response to EIG's motion for summary judgment on the Refinery's failure to mitigate affirmative defense. Citing a 2001 case from the Southern District of New York, *National Football League v. PrimeTime 24 Joint Venture*,[91] the Refinery asserts that when determining statutory damages, a jury may look at a variety of factors, including the conduct and attitude of the parties.  According to the Refinery, several points in the Rosenblatt Report relate to EIG's conduct and attitude, such as the value that EIG places on its copyrights, EIG's failure to mitigate damages, and EIG's overall conduct and attitude toward copyright protection.

---

[91] 131 F. Supp. 2d 458.

As discussed above, EIG's election to pursue statutory damages invalidates the Refinery's failure to mitigate damages affirmative defense, and a plaintiff's conduct is not relevant to calculating statutory damages.  In this District, the relevant considerations for calculating statutory damages are (1) the expenses saved and profits gained by the defendant from the infringement; (2) the plaintiff's lost revenues because of the infringement; and (3) the defendant's state of mind.[92] The Refinery continually refers to the "conduct and attitude of the parties" as a factor to be considered, but as discussed above, the single case it relies on setting forth this factor is not binding on this Court and is outdated.

The Rosenblatt Report focuses exclusively on EIG's efforts to mitigate copyright infringement, whether that be through its discussion of EIG's publishing practices, the technology available for publishers to prevent copyright infringement, or EIG's investment in the available technology.  EIG's efforts to mitigate such infringement, however, are not relevant to the calculation of statutory damages.  Therefore, the Rosenblatt Report has no relevance to this case. The Court grants EIG's motion to exclude Rosenblatt's Report and testimony at trial.

**IT IS THEREFORE ORDERED** that the Refinery's Motion for Partial Summary Judgment (Doc. 52) is **DENIED**.

**IT IS FURTHER ORDERED** that EIG's Cross Motion for Partial Summary Judgment (Doc. 67) is **GRANTED**.

---

[92] *Beginner Music*, 2009 WL 2475186, at *3; *Walden Music, Inc. v. C.H.W., Inc.*, 1996 WL 254654, at *5 (D. Kan. 1996).

**IT IS FURTHER ORDERED** that EIG's Motion for Partial Summary Judgment to Dismiss Defendant's Affirmative Defenses (Doc. 100) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that EIG's Motion Challenging the Admissibility of Expert Report and Testimony of William R. Rosenblatt (Doc. 86) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 14th day of March, 2018.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE